**FILED**

NOV 13 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Michael Smith
1225 Skyline Dr Apt 105
Orrville, Ohio 44667

          **Plaintiff ,**

   **v.**

         **Defendant.**
**FLOCK SAFETY**
**1170 HOWELL MILL RD. NW SUITE**
**210 ATLANTA , GA 30318**

Case No:

**5:23 CV 02198**

**COMPLAINT FOR INJUNCTIVE**
**RELIEF AND JURY DEMAND**

Judge:

**JUDGE PEARSON**

**MAG JUDGE KNAPP**

 

**COMPLAINT FOR  PERMANENT INJUNCTIVE RELIEF  AND RECOVER**
**DAMAGES FOR PRODUCT LIABILITY/ DEFAMATION/ LIBEL AND DAMAGES**
**FOR DEPRIVATION OF CIVIL RIGHTS**

**I.**    **NATURE OF THE CASE**

1.    The Plaintiff, pro se,  brings this, pursuant to 42 U.S.C. § 1983, complaint to recover

damages and permanently enjoin the Defendant from distributing any more unverified

Proprietary/licensed Information in their alerts to law enforcement. Following a comprehensive

months-long investigation  Plaintiff has determined by the evidence collected  that the Defendant

designed a product that a lack of proper data input validation for the accuracy of information

added to their Proprietary/licensed Information subjecting innocent citizens to being potentially

defamed by Flock Safety, then Flock Safety calling the police on the subject under the color of

the law to then be pulled over based on unverified and slanderous information provided by Flock

safety, the Defendants deprived the Plaintiff 's of his civil rights under the Fourth Amendment

and also for violation of the Plaintiff's right to due process under the Fifth and Fourteenth

Amendments to the U.S. Constitution

## II. PARTIES

Plaintiff Michael Smith ("MICHAEL") is and was a resident of the State of Ohio, lived in

Orrville, County of Wayne, during the relevant period in this action.

Defendant FLOCK SAFETY ("FLOCK") is a Delaware corporation who is a non publisher

or broadcaster, and maintains its principal place of business at 1170 Howell Mill Rd NW, Ste.

210 Atlanta, GEORGIA UNITED STATES 30318 acting under the color of the law during all

relevant periods in this action.

## III.    Jurisdiction and Venue

This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1)

because the amount in controversy exceeds $75,000, exclusive of interests and costs,

and FLOCK SAFETY are citizens of different states.

Jurisdiction is also founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because it is

brought to obtain compensatory and punitive damages for the deprivation, under color of state

law, of the right under the Fourth Amendment, pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff

brings this pursuant to the Fourth/Fifth and Fourteenth Amendment to the United States

Constitution.

Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

**Intradistrict Assignment:** A substantial part of the acts and/or omissions in this Complaint occurred in the County of Stark County Ohio. Pursuant to CivR.3(C) this case is properly assigned to the Akron or Cleveland Division of the Court.

Venue is proper in this judicial district under 28 U.S.C. §1391 (b)(2) because FLOCK acting under the color of the law throughout this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. At all pertinent times, FLOCK was also and is in the business of marketing, advertising, distributing, and selling products, including the ALPR Machines, throughout Ohio and this judicial district, and nationwide.

## IV. FACTUAL ALLEGATIONS

### A. **FLOCK Definitions**

4.      The one word that will be discussed many times is "Hotlist." here is the undisputed FLOCK definition of Hot List, which is on the FLOCK Website [1]

"1.11 "Hotlist(s)" means a digital file containing alphanumeric license plate-related information pertaining to vehicles of interest, which may include stolen vehicles, stolen vehicle license plates, vehicles owned or associated with the wanted or missing person(s), vehicles suspected of being involved with criminal or terrorist activities, and other legitimate law enforcement purposes. Hotlist also includes, but is not limited to, national data (i.e., NCIC) for similar categories,

---

[1] "Terms and Conditions." Flock Safety, www.flocksafety.com/terms-and-conditions. Accessed November 6, 2023.

3

license plates associated with AMBER Alerts or Missing Persons/Vulnerable Adult Alerts, and includes manually entered license plate information associated with crimes that have occurred in any local jurisdiction."

B.     **FLOCK System and how it is relevant to this case**

5.     Flock describes the Falcon camera, the camera used in this incident, as "An indispensable tool for modern law enforcement, this state-of-the-art license plate recognition (LPR) camera does not just capture license plates – it is redefining the entire landscape of public safety." [2] (exhibit 1) (figure 1)



(figure 1)

---

[2] "FalconTM." Flock Safety, www.flocksafety.com/devices/falcon. Accessed November 6, 2023.

**C.      Contractual Obligations and Information Dissemination by FLOCK Safety:**

6.      Within the contractual agreements established by FLOCK Safety with the state, it is explicitly states under "4.1 CONFIDENTIALITY" that "Flock's use of the Proprietary Information may include processing the Proprietary Information to send Agency alerts, such as when a car exits Agency 's neighborhood, or to analyze the data collected to identify motion or other events.." (figure 2)(exhibit 2) confirming that FLOCK is the party that sends the alerts and are responsible for what information the alerts disseminates

### 4. CONFIDENTIALITY; AGENCY DATA

4.1 Confidentiality. This provision is subject to any obligations under FOIA and state-specific Public Records Acts. Each Party (the "***Receiving Party***") understands that the other Party (the "***Disclosing Party***") has disclosed or may disclose business, technical or financial information relating to the Disclosing Party's business (hereinafter referred to as "***Proprietary Information***" of the Disclosing Party).  Proprietary Information of Flock includes non-public information regarding features, functionality and performance of the Services.  Proprietary Information of Agency includes non-public data provided by Agency to Flock or collected by Flock via the Unit, including the Footage, to enable the provision of the Services, which includes but is not limited to geolocation information and environmental data collected by sensors built into the Units ("***Agency Data***").  The Receiving Party agrees: (i) to take the same security precautions to protect against disclosure or unauthorized use of such Proprietary Information that the party takes with its own proprietary information, but in no event will a party apply less than reasonable precautions to protect such Proprietary Information, and (ii) not to use (except in performance of the Services or as otherwise permitted herein) or divulge to any third person any such Proprietary Information.  Flock's use of the Proprietary Information may include processing the Proprietary Information to send Agency alerts, such as when a car exits Agency 's neighborhood, or to analyze the data collected to identify motion or other events.  The Disclosing Party agrees that the foregoing shall not apply with respect to any information that the Receiving Party can document (a) is or becomes generally available to the public, or (b) was in its possession or known by it prior to receipt from the Disclosing Party, or (c) was rightfully disclosed to it without restriction by a third party, or (d) was independently

(figure 2)

**D.      Potential for Misuse and False Information:**

7.      It is a conceivable , that FLOCK going ahead and parsing **all** information from their customer without verifying its authenticity before using it in **their own** Proprietary/licensed

Information, that any bad actor can then manipulate FLOCK's Proprietary/licensed Information to trigger a high-priority response from law enforcement by falsely attributing serious crimes, such as human trafficking, to certain license plates.

8.      FLOCK Safety, per their own contract is the one notifying police. FLOCK clearly didn't design their product, hot list, against reasonably foreseeable hazards (invalid data).

E. **Legal Duties and Responsibilities of FLOCK Safety:**

9.      In light of the prevailing circumstances, it is incontrovertible that FLOCK Safety, through its contracts with police departments, unmistakably operates under the color of the law. This status inherently imposes upon FLOCK Safety a legal duty to exercise utmost caution in the dissemination of information garnered through their services. This duty extends to a meticulous scrutiny of their product design to ensure it does not inadvertently facilitate negligence. Moreover, the contractual relationship between FLOCK Safety and law enforcement agencies underscores the imperative to prevent any potential defamation of individuals to third parties. This legal duty is inherent in their roll in assisting law enforcement and is crucial to maintaining the integrity of the legal system and safeguarding the rights of individuals affected by their operations.

F.      **Access to FLOCK Safety's Services:**

10.      Entities ranging from individuals with a financial capacity of $2500, to businesses, homeowners associations (H.O.A.), municipalities, and law enforcement agencies can purchase a camera from FLOCK Safety.

G.      **Implications of unverified FLOCK's own Proprietary/licensed information:**

11.      The crux of the issue lies in the fact that FLOCK Safety, having influence with their contractual agreements with the police agencies, has been disseminating unverified Proprietary/licensed information, leading to the arrest or detention of individuals such as the Plaintiff. Figure 3 and Figure 4, as presented evidence, vividly illustrates the broad reach of clientel that FLOCK has.

In light of these circumstances, FLOCK Safety failed to implement industry standard data and input verification processes. Such standards are not only pivotal for upholding the integrity of their services but are also essential to fulfill their ethical and legal obligations. FLOCK Safety , for their clear failures, disseminated unverified Proprietary/licensed information  and have yet to take immediate steps to rectify this lapse in how their data is validated. The argument stands solidified on the grounds that the broad access to FLOCK Safety's services  as evidenced in Figure 3 and Figure 4, necessitates proper data and input verification, especially given the Proprietary/licensed/licensed nature of the information involved. The absence of stringent validation procedures has led to the dissemination of unverified Proprietary/licensed information under the color of the law by FLOCK and unlawful detention of the Plaintiff.



FAQ

# 💲 Price and Payment

**Price & Payment**

Why pay an annual fee? ▾

What are my payment options? ▾

What happens after my subscription ends? ▾

Why can't I buy Flock Safety cameras? ▾

How much does a Flock Safety camera cost? ▴

As part of our subscription model, Flock Safety cameras for neighborhoods start at $2,500 per camera per year, with a one-time installation fee of $150-$650 per camera. This price includes everything – installation, maintenance, footage hosting, cellular service, and software updates.

For more information on solutions and pricing for businesses or law enforcement, please contact:

· Businesses: commercial@flocksafety.com
· Law enforcement: support@flocksafety.com

(figure 3)

# Who we serve

**Neighborhoods**     Law Enforcement     Business     Residential     Improvement Districts



Helping keep your sub-divisions, HOAs, and neighborhoods safe from crime with 24/7 protection.

Learn More

(figure 4)

13.     The guide manual that was provided to police also makes clear, even though their

contract states clearly, but reminds the agency again that Flock will also use privately owned

cameras to send Agency alerts, (Exhibit 3 page 7)(figure 5)

SOFTWARE USER INTERFACE

Included at no additional cost with unlimited user licenses. Receive alerts to help detect crime and search
footage to access evidence — with any internet-connected device (based on user credentials that are easily
managed/approved by admin).



Detect Crime

- Connected to the NCIC Hot List & CJIS compliant
- State detection to ensure quality alerts
- Hotlist alerts (includes privately owned cameras in your jurisdiction)
- Create custom alerts for tags under investigation with your organization
- Filter notifications by reason codes (exclude sex offenders, include stolen plates, etc.)
- Email and SMS alerts to users
- Audible and visual alerts

(figure 5)

H. **Deficient product**

14.     This case is to hold FLOCK Safety ("FLOCK") accountable for the defects inherent in

their product, which notably falls short of industry standards concerning data and input

validation. Central to this issue is FLOCK's provision of a feature that empowers customers to

create a custom 'hot list.' Once created, the information within this hot list is now

Proprietary/licensed information, belonging or licensed to FLOCK, and is subsequently

disseminated at the discretion of the company. A critical design flaw, however, looms over this

process: the absence of a mechanism to verify the authenticity of the information inputted into

9

the custom hot list before its conversion into Proprietary/licensed information. This

dissemination, conducted under the color of the law through notifications, either via text or email,

whenever a license plate from the custom list is detected, has inflicted harm upon the Plaintiff.

**I. Validity of Information and Defamation:**

15. The Proprietary/licensed information contained in the specific FLOCK alert under scrutiny is

not only false but also unprivileged. Furthermore, it does not constitute a matter of public

concern or opinion; it is inherently defamatory, both through interpretation or innuendo and on

its face. Importantly, the Defendant, acting under the color of state law, furnished their own false

and defamatory Proprietary/licensed information to the police, directly precipitating an unlawful

traffic stop for the Plaintiff (see Exhibit 4 and Figure 6). Consequently, the Plaintiff was deprived

of his liberty without any opportunity to challenge the accuracy of the information provided by

the Defendant before the traffic stop occurred. The lack of a robust data validation mechanism in

FLOCK's product is directly implicated in the harm suffered by the Plaintiff. This critical

deficiency allowed false and defamatory information to be disseminated, triggering a cascade of

events leading to the Plaintiff's unlawful detention. FLOCK's failure to implement industry-

standard data and input validation protocols not only contravenes best practices but also resulted

in a tangible violation of the Plaintiff's rights. The tangible impact on the Plaintiff serves as a

stark reminder of the real-world consequences stemming from the deficiencies in FLOCK's

product. This case, therefore,is to hold FLOCK accountable for the harm inflicted upon the

Plaintiff due to the absence of proper data and input validation in their product design

**J. Explicit Acknowledgement by FLOCK:**

16.     FLOCK explicitly acknowledges on their website that their devices are designed to notify

law enforcement agencies (Figure 7)(Exhibit 5). This acknowledgement further implicates

FLOCK in the dissemination of false and unverified information. Nobody else is notifying police,

its FLOCK

## OH - JVM1640

Event Time: 4:33:15 02/25/2023

Source: CLEVELAND PD / FBI HUMAN TRAFFICKING MISSING JUVENILE VICTIM

Case Number: CLEVELAND PD / FBI CASE

Reason: CLEVELAND PD / FBI HUMAN TRAFFICKING VICTIM - ████████████ / SUSPECT: MICHAEL T. SMITH (DOB: 03/11/95) - IF SUBJECTS LOCATED CONTACT CLEVELAND PD, FBI, AND STARK COUNTY CDS (HAVE CUSTODY OR MISSING JUVENILE)

(figure 6) (exhibit 4)



COMMUNITY SAFETY

# How to be Proactive Against Crime

November 17, 2022 • 1 mins

Not all security cameras are created equal. Although many people believe that security cameras are made to solve crimes when they happen, Flock Safety cameras take a proactive approach and work to *prevent* crimes before they occur.

The difference lies in Flock Safety's **Hot List** alerts, which notify law enforcement when a known suspect's vehicle is in the area. These real-time notifications work by connecting Flock cameras with data from the National Crime Information Center and local law enforcement agencies.

When a vehicle with a warrant or a stolen vehicle passes a camera, officers receive a notification enabling them to respond accordingly, and prevent the suspect from committing any further crimes.

To see these how the Hot List can deter crime in your community, **schedule a free demo** today.

(figure 7)(exhibit 5)

K.      **Absence of Any Prior Investigation:**

17.      At no point was the Plaintiff subjected to any investigation related to human trafficking

by the Federal Bureau of Investigation ("FBI"), Cleveland Police Department ("CPD"), or Stark County Children Services. Legally, the gravity of an investigation of such a serious nature, particularly one that would necessitate collaboration with child protective services, renders it impossible for such proceedings to be conducted without the knowledge of the Plaintiff (See Ohio Revised Code [O.R.C.] 2151.421 G(1), 42 U.S. Code § 5106a (b)(2)(B)(xviii)). The alleged investigation, purportedly conducted in secrecy, is rendered fictitious by legal standards, as the Plaintiff, by law, must be promptly notified of any investigation involving Children Services. The legal mandates, specifically outlined in O.R.C. 2151.421 G(1) and 42 U.S. Code § 5106a (b)(2)(B)(xviii), unequivocally dictate that the Plaintiff must be informed of any investigation by Children Services involving matters of such gravity as human trafficking. This statutory requirement ensures transparency and safeguards the rights of individuals implicated in any investigation. Crucially, the call log from Stark County, presented as Exhibit 6, serves as irrefutable evidence of the absence of any such investigation. This tangible record contradicts the alleged investigation alert and substantiates the Plaintiff's claim that the reported inquiry into human trafficking is a fabrication. The absence of any corresponding entries in the call log underscores the spurious nature of the purported investigation. The Plaintiff, in accordance with state and federal laws, has the unequivocal right to be notified of any investigation involving Children Services, especially in cases of such gravity as human trafficking. The lack of evidence further solidifies the argument that the alleged investigation is nothing more than a fictitious claim by FLOCK. This absence of supporting documentation not only discredits the purported inquiry but also calls into question why FLOCK allowed such defamatory information to be disseminated in the first place.

**L. Defamation and Misappropriation by FLOCK:**

18.     The Defendant, FLOCK, perpetrated defamation against the Plaintiff by failing to verify the information contained within their own false/ defamatory Proprietary/licensed information prior to its distribution under the color of the law. This unverified and slanderous information was disseminated under the color of the law without any supporting evidence to third parties. The Defendant misappropriated under the color of the law, the Plaintiff's personal details, including name, birthdate, and license plate number, for their own advantage, leading to the unlawful detainment of the Plaintiff

**M. Reckless Disregard and Offensive Association:**

19.     The association of the Plaintiff with human trafficking is deemed highly offensive to any reasonable person. FLOCK is accused of acting with reckless disregard for the truth under the color of the law. As per Section 4.2 of their contracts, FLOCK acknowledges their license to use potentially defamatory and false information, thereby publicizing matters concerning the Plaintiff.

(see exhibit 2)

> *4.2 Agency Data.. ... Agency hereby grants to Flock a limited, non-exclusive, royalty-free, worldwide license to use the Agency Data and perform all acts with respect to the Agency Data as may be necessary for Flock to provide the Flock Services to Agency, including without limitation the Support Services set forth in Section 2.9 above, and a non-exclusive, perpetual, irrevocable, worldwide, royalty-free, fully paid license to use, reproduce,*

*modify and distribute the Agency Data as a part of the Aggregated Data (as defined in Section 4.4 below).As between Agency and Non-Agency End Users that have prescribed access of Footage to Agency, each of Agency and Non-Agency End Users will share all right, title and interest in the Non-Agency End User Data..."*

N.     **Negligence by FLOCK:**

20.     It is evident that FLOCK Safety  under the color of the law made false and defamatory statements about the Plaintiff, which were unprivileged and published to a third party. FLOCK demonstrated negligence, at the very least, in the publication of these statements. The statements were actionable irrespective of special harm, or there was special harm caused by the publication, as per Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc. 81 Ohio App.3d 591, 601 (1992).

O. **Common Law and Defamation:**

21.     In Ohio, the Supreme Court case Am. Chem. Soc. v. Leadscope, Inc. held that 'a statement, in whatever form, that tends to injure a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business, is defamatory.' (Am. Chem. Soc. v. Leadscope, Inc., 13. Ohio St.3d 366, 2012-Ohio-4193).  Because private individuals characteristically have less effective opportunities for rebuttal than do public officials and public figures, they are more vulnerable to injury from defamation. Because they have not voluntarily exposed themselves to increased risk of injury from defamatory falsehoods, they are also more deserving of recovery. The state interest in compensating *324 injury to the reputation of private individuals is therefore greater than for public officials and public figures. Pp. 3008—3010. Gertz v. Robert Welch, Inc., 418 U.S. 323, 323–24, 94 S. Ct. 2997, 2999, 41 L. Ed. 2d 789 (1974)

14

**P. Facts support a Defective Product Design:**

22.      The alert issued by FLOCK Safety raises immediate concerns about FLOCK's data validation of their own Proprietary/licensed information, as there has never been a "case number" in any court system with the words "CLEVELAND PD/ FBI CASE". FLOCK Safety should not have permitted the entry of invalid data without verification through NCIC and/or law enforcement databases. Interestingly, FLOCK already has an implementation for such verification, as it alerts police officers if a license plate is associated with a missing person or warrant, as seen in the pamphlets provided to every FLOCK Falcon customer (Figure 8)(see Exhibit 3). This shows an intentional design decision to implement a non-verified custom hot list which then becomes FLOCK's own Proprietary/licensed information as they use it for alerts per their contract, as FLOCK could have easily chosen to only stick with information only from trusted law enforcement databases such as NCIC(figure 8)(exhibit 3),but to stand out to their competitor's by posting about such hot list in articles.[3] they choose not to have custom hot lists verified through NCIC(figure 9)(exhibit 7)(where an article posted on December 20, 2022 directly mentions the easy sharability of hotlists),(figure 10)(exhibit 8) [4] (where an article posted by FLOCK Safety on December 20th 2022 openly talks about the hotlist essentially short circuiting the NCIC system with a step by step guide and bragging that multiple jurisdictions have access

---

[3] "Best Practices for RTCCs for Sharing Internal Intelligence." Flock Safety, https://www.flocksafety.com/ALERTs/lpr-camera-rtcc-internal-intelligence-sharing. Accessed November 8th, 2023.

[4] "Flock Safety + NRTCCA: How LPR Cameras Can Improve Deconfliction" Flock Safety, https://www.flocksafety.com/ALERTs/lpr-camera-deconfliction. Accessed November 8th, 2023.

1    to the internal FLOCK hot list, which can be hundreds of police departments/communities

2    having access to this erroneous information)



**SOFTWARE USER INTERFACE**

Included at no additional cost with unlimited user licenses. Receive alerts to help detect crime and search footage to access evidence — with any internet-connected device (based on user credentials that are easily managed/approved by admin).

**Detect Crime**

- Connected to the NCIC Hot List & CJIS compliant
- State detection to ensure quality alerts
- Hotlist alerts (includes privately owned cameras in your jurisdiction)
- Create custom alerts for tags under investigation with your organization
- Filter notifications by reason codes (exclude sex offenders, include stolen plates, etc.)
- Email and SMS alerts to users
- Audible and visual alerts

(figure 8)

**Share Hot List Additions by Updating Reports and Sending Emails**

A **hot list** is a list of leads in which local law enforcement is especially interested. There is more than one kind of hot list, but common types include lists of known, wanted suspects and lists of stolen vehicles.

(figure 9)

16

(figure 10)

## Q. Legal Duty/ Design Defect/Nonconformance with Representation

23.    FLOCK had a duty to design their software, such as their hot list against reasonably

foreseeable hazards, they clearly didn't here. FLOCK Safety even uses custom hot lists as a

talking point in case studies on FLOCK's own site as recently as October 2023 [5](figure

11)(exhibit 9),  FLOCK refers to their FLOCK Safety as "Flock Safety is a public safety

operating system" FLOCK seemingly acknowledges a unique duty of care distinct from other

Automated License Plate Recognition (ALPR) camera companies. Given FLOCK's deliberate

---

[5] "West Cancer Center Reduces Parking Lot Crime by 100% With Flock Safety Falcon® LPR Cameras
." Flock Safety, https://www.flocksafety.com/resources/west-cancer-center-reduces-parking-lot-crime-with-flock-safety-cameras. Accessed November 8th, 2023.

engagement with law enforcement through integration with the National Crime Information Center (NCIC) and the Federal Bureau of Investigation (FBI),

24.     FLOCK bears a legal obligation under the color of the law to ensure the veracity of the Proprietary/licensed data prior to its dissemination to third parties. In contravention of this duty, FLOCK chose to incorporate a 'custom hot list' that then automatically becomes FLOCK's own Proprietary/licensed information to disseminate to a wide array of law enforcement agencies and private businesses without verification. Each of these entities possesses the ability to their own custom hot list but without verification, should never becomes FLOCKs Proprietary/licensed information to disseminate without verifying , leading to unjustified enforcement actions against the individual identified by the alert, even if the information is incorrect. In short, FLOCK, has a license to distribute this potentially damaging information, which has not undergone any form of validation.

25.     The unique nature of the custom hot list, with its capacity to be included automatically in FLOCK's Proprietary/licensed information to disseminate, amplifies FLOCK's breach of its duty of care. FLOCK's actions are considered the proximate cause of the injury, given that FLOCK knowingly disseminated false and defamatory information to third parties such as police under the color of the law. FLOCK failed to incorporate sufficient safeguards within its software to prevent the licensing and subsequent distribution of inaccurate data to its customers. The conspicuous lack of data validation mechanisms within FLOCK's software highlights the breach of duty owed to the Plaintiff, ensuring that FLOCK does not disseminate information that is categorically false and defamatory.

26.     Again, FLOCK refers to their FLOCK Safety as "Flock Safety is a public safety operating system" (figure 12) (exhibit 7 page 8) thus has a duty to use reasonable care in

18

product in light of those claims. The negligent actions are evident in its failure to implement even basic input validation for one of its primary features. As a consequence of this breach of duty, the Plaintiff has suffered non-economic damages, emotional distress, and damage to their reputation.

## RESULTS: Parking Lot Crime Is Reduced by 100% After Flock Deployment

Prior to the installation of Flock Safety's Falcon® LPR cameras, West Cancer Center encountered attempted crimes almost every other week. Since deploying the LPR perimeter, the facility has experienced a 100% reduction in property crime – with no attempted car thefts or break-ins reported in their parking lot.

### Increasing Staff Safety: Using LPR Cameras to Create a Secure Environment

The introduction of LPR cameras had an additional positive impact on staff safety. When an employee shared concerns about a domestic violence situation, the administration gave them the option to place the vehicle on a Flock custom Hot List so that security could be alerted and take appropriate action if the person's vehicle entered West Cancer Center's parking lot. Upon learning about this capability, the employee noted they appreciated the proactive efforts from the administration to keep them safe. This added layer of security ensures the safety of employees in the event that a threatening vehicle arrives on the premises.

(figure 11)(exhibit 9)

19

*Flock Safety is a public safety operating system that helps communities and law enforcement in 2000+ cities work together to eliminate crime, protect privacy, and mitigate bias. We build devices that capture objective evidence and use machine learning to create and deliver unbiased investigative leads to law enforcement. Our proprietary devices and cloud-based software reduce crime by +70%. Flock Safety serves 2000 cities in 42+ states and is helping solve hundreds of crimes every day.*

(figure 12)(exhibit 7 page 8)

R.    **How the data was invalid**

27.    It is well known that Case numbers traditionally lack linguistic structure, typically comprising alphanumeric sequences devoid of sentence-like formations. These combinations of numbers and letters can be inputted into a  court clerk's website or by a law enforcement agency. Given FLOCK's integration with the National Crime Information Center (NCIC) and other law enforcement databases, FLOCK demonstrates clear familiarity with the characteristic features of a legitimate case number. Flock Safety, possessing knowledge or reasonably expected to possess knowledge commensurate with the prevailing standard of care within its professional capacity, should have discerned the falsity of the statements contained in the alert and what a proper case number looks like.

28.    Applicable to both manufacturing and design defects, this standard now states that a product may be proven to be in a defective condition if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Leichtamer v. American Motors Corp. (1981), 67 Ohio St.2d 456, 21 O.O. 3d 285, 424 N.E.2d 568, paragraph two of the syllabus; Knitz v. Minster Machine Co. (1982), 69 Ohio St.2d 460, 23 O.O. 3d 403, 432 N.E.2d 814, syllabus; Cremeans v. International Harvester Co. (1983), 6 Ohio St.3d 232, 6 OBR 302, 452 N.E.2d 1281, syllabus. This standard "* * * recognizes the legitimacy of one of the fundamental values in the law of torts: `the protection of the

individuality of persons, by according formal respect for their fairly developed expectations of product safety * * *.' [Citation omitted.]" Leichtamer, supra, at 467, 21 O.O. 3d at 292, 424 N.E.2d at 577

29.    This design decision for input data validation runs contrary to "**de facto** "industry standards/ specifications, formula, or performance which FLOCK states on their website. (figure 13)(exhibit 10), the evidence shows.



(figure 13)(exhibit 10)

30.    The same "**de facto standard**" OWASP [6] cheat sheets that FLOCK site speaks about, mentions input validation as

*Goals of Input Validation*

*Input validation is performed to ensure only properly formed data is entering the workflow in an information system, preventing malformed data from persisting in the database and triggering*

[6] "Input Validation Cheat Sheet
." OWASP® Foundation,
https://cheatsheetseries.owasp.org/cheatsheets/Input_Validation_Cheat_Sheet.html Accessed November 9, 2023.

21

*malfunction of various downstream components. Input validation should happen as early as possible in the data flow, preferably as soon as the data is received from the external party.*

*Data from all potentially untrusted sources should be subject to input validation, including not only Internet-facing web clients but also backend feeds over extranets, from suppliers, partners, vendors or regulators, each of which may be compromised on their own and start sending malformed data.*

31.     FLOCK's public assertions of adhering to best practices starkly contrast with its lack of input validation for a significant feature such as the custom hot lists and therefore becoming Proprietary/licensed information of FLOCK's to disseminate by license which resulted in the plaintiffs detainment. This discrepancy constitutes negligence, particularly given that FLOCK had the capability to implement such input validation without compromising the product's utility."availability of a technically feasible alternative," namely, a metal inlet ring. See Aldridge, 2006-Ohio-4964 at ¶ 50, 2006 WL 2716696 (recognizing that to defeat summary judgment on a defective design claim, plaintiff must present evidence of a "technically feasible alternative design").Ace Am. Ins. Co. v. Gerling & Assocs., Inc., 630 F. Supp. 3d 919, 929 (S.D. Ohio 2022)

32. FLOCK's software falls short of industry standards, such as those set by the Open Worldwide Application Security Project (OWASP) and the Security Cheat Sheet Series projects, particularly in relation to input/data validation. This defect existed when the product left the manufacturer's control and the defect currently affects FLOCK Software to this day. Anyone can still add unverified data which FLOCK has a license to distribute.

33. In the context of design defects, the 'product' refers to the FLOCK software, and the 'defect'

pertains to the design flaw that causes the software to function in an unintended and harmful

manner. In this case, the defect is the complete absence of input validation for information

entered into a custom hot list, which is designed to target specific license plates and then that

data becomes FLOCK's Proprietary/licensed information to  potentially result in the detainment

of motorists by law enforcement. The product is deemed defective if it poses greater danger than

an ordinary consumer would anticipate when used in an intended or reasonably foreseeable

manner [Ohio Rev. Code Ann. §    2307.71 et seq.]. The lack of validation for any information

entered can lead to unpredictable interactions with law enforcement, as FLOCK does not verify

the information prior to disclosing it to the police. Any FLOCK customer can add a license plate

and associate it with a serious crime, such as mass murder, and FLOCK Safety will then have a

license to disseminate this new unverified Proprietary/licensed information to law enforcement

and/or third parties. A practical and technically feasible alternative design that would have

prevented harm to the Plaintiff, without diminishing the product's usefulness to businesses or law

enforcement, is the simple implementation of proper input data validation. The Plaintiff was

never at fault at any point in time. This design defect directly resulted in the injury to the

Plaintiff.

34. In summary, the product was more dangerous than an ordinary consumer would anticipate,

and FLOCK failed to design their product, the hot list, to guard against reasonably foreseeable

hazards (invalid data in their own Proprietary/licensed data). The software defect in FLOCK

Safety's ALPR camera, which allows anyone to add false information, meets this standard,

especially for a company that is partnered with NCIC. It is evident that the product deviated from

its intended design during production, as it is clear that custom hot lists and their own

Proprietary/licensed data were not designed to be populated with unsubstantiated information.

23

However, due to the lack of safeguards, this has occurred, and FLOCK then has the audacity to alert the police using this erroneous, unverified Proprietary/licensed data under the color of the law. It is not the agency or non-agency distributing this erroneous information; it is FLOCK that alerts the police under the color of the law with the erroneous Proprietary/licensed information via their own one-way number/email and/or app. Therefore, they are responsible for the content of the Proprietary/licensed data as they have a license for it, and FLOCK disseminates it of their own volition to any FLOCK customer, without any external pressure. Evidence of unsafe, unexpected product performance is sufficient to infer the existence of a product defect under the Ohio Product Liabilities Act's consumer-expectation standard.   Tompkin v. Philip Morris USA, Inc. (C.A.6 (Ohio), 03-30-2004) 362 F.3d 882.

35.      The defendant publicly represented that the product was of a certain quality and would perform in a certain way. (figure 13)(exhibit 11) (figure 14)(exhibit 12)

24

With Flock Safety, the answers are straightforward and have been consistent since our founding in 2017.

· We collect the objective evidence police need to solve crime, which includes license plates and vehicle information. We do not utilize facial recognition technology, mitigating any implicit or explicit bias in the Flock Safety operating system.
· The data is fully owned by our customers. Only authorized users can access the system and every search requires a search reason, which is collected in a publicly available audit. No unauthorized users, including Flock Safety employees, have access to the footage. We never share or sell the data, and all the data is encrypted using AES-256 encryption with a secure cloud server.
· By default, all data is automatically deleted every 30 days on a rolling basis. Meaning, if you want to find footage from 31 days ago, you can't because it's been permanently deleted. The only exception to our data retention policy is if a democratically elected governing body or official has clearly defined a license plate reader data retention policy or law and made it publicly available. We always comply with local laws and regulations.

(figure 13)(exhibit 11)

How does Flock Safety protect citizen privacy?

Flock Safety has strict measures in place to protect resident privacy.

Flock Safety believes that we can successfully reduce crime while protecting and preserving privacy. Here are a few of the ways we have ethically-engineered our suite of products to ensure privacy protection:

· We store all data for only 30 days (or in adherence with local laws). Customers own all of their data — Flock will never share or sell data with third parties. The customer is the only one to determine who has access to the footage.

(figure 14)(exhibit 12)

36.     This representation was false, as the product did not conform to the represented quality or performance standards. Because behind the scenes within the contracts it makes the agency sign, it states(exhibit 2)

*" 4.4 Aggregated Data. ...Agency hereby grants Flock a nonexclusive, worldwide, perpetual, royalty-free right and license (during and after the Service Term hereof) to ..... (ii) disclose the Agency Data (both inclusive of any Footage) to enable law enforcement monitoring against law enforcement hotlists as well as provide Footage search access to law enforcement for investigative purposes only. No rights or licenses are granted except as expressly set forth herein. "*

37.    It is indisputable that the Plaintiff relied on the Defendant's public representations when deciding to utilize their product. As the Plaintiff consciously drove past a FLOCK camera, FLOCK captured an image of the Plaintiff's vehicle under the color of the law, thereby indicating the Plaintiff's knowing use of FLOCK's product feature. The Plaintiff could have chosen an alternate route, but instead opted to have their vehicle photographed by FLOCK's camera without charge. As a result of the product's deviation from its public representation, the Plaintiff has suffered damages, including both economic and non-economic harm.

## S.    Failure to Warn the Public

38.    FLOCK Safety, as the manufacturer, was cognizant of the fact that FLOCK Proprietary/licensed data is inaccurate and may result in ones detainment. Consequently, FLOCK Safety had a duty to provide a comprehensive warning outlining the inherent risks or hazards faced by each motorist in the vicinity of a FLOCK Camera, including the potential for being surrounded by multiple police officers without cause. Such a warning, necessitated by FLOCK Safety's knowledge that enforcement actions typically follow receipt of their own alerts which FLOCK sent under the terms of their government contract, is crucial given law enforcement's reliance on information provided by FLOCK Safety. To establish a claim for failure to warn or

warn adequately, it must be proven that the manufacturer knew, or should have known, in the

exercise of ordinary care, of the risk or hazard about which it failed to warn Crislip v. TCH

Liquidating Co., 52 Ohio St. 3d 251, 257, 556 N.E.2d 1177, 1182 (1990).

39.     FLOCK Safety bears a clear obligation to forewarn users of its product regarding the

inherent risk of detainment associated with the company's lack of adequate safeguards for

verifying Proprietary/licensed information disseminated to law enforcement and other third

parties. This critical oversight renders the product unsafe, as FLOCK neglects to disclose the

latent danger of false Proprietary/licensed information leading to a motorist's unwarranted

detention.

40.     FLOCK Safety's failure to affix an adequate warning on each camera represents a

fundamental breach of its duty to users, specifically the Plaintiff in this case. The absence of

explicit alerts, cautioning users about the potential risks linked to FLOCK's ability to disseminate

inaccurate Proprietary/licensed information, is not only a violation of the duty of care but also a

failure to meet industry standards.

41.     This breach of duty is further aggravated by FLOCK Safety's awareness of the inherent

defectiveness of its product, capable of generating defamatory information. The company,

cognizant of this potential harm, failed to implement necessary precautions or issue cautionary

notifications for motorists passing by the cameras. In essence, FLOCK Safety knew or should

have known about the defect and yet failed to take reasonable steps to warn users or correct the

issue.

42.     The duty to warn users about potential risks associated with a product is a well-

established legal principle, especially when the product in question has the capacity to impact

individuals' rights and liberties. FLOCK Safety's omission to provide explicit warnings on their

27

cameras, coupled with their knowledge of the defectiveness of the product, underscores a blatant disregard for the duty owed to users.

43. FLOCK Safety's awareness of the potential risks, coupled with their failure to incorporate adequate warnings or corrective measures, constitutes a breach of duty. The omission to caution users about the potential harm arising from inaccurate Proprietary/licensed information dissemination not only renders the product unsafe but also reflects a lack of due diligence on the part of FLOCK Safety. This failure to warn users, especially in the context of the known risks associated with their product, forms a solid foundation for holding FLOCK accountable for the Plaintiff's harm.

T. **How the incident unfolded/ severe emotional distress**

44. At approximately 04:33 AM on February 25th, 2023, a FLOCK camera positioned on South Blvd N.W in Canton, Ohio (see Figure 15), surveilled and documented the license plate JVM1640. The accompanying image illustrates the camera's specific location. Subsequently, FLOCK Safety, acting under the authority of the law, promptly notified the local law enforcement. However, in the course of reporting, FLOCK Safety disseminated misleading and damaging Proprietary/licensed information, which included details pertaining to the Plaintiff's private life and the aforementioned license plate, to the dispatch. This action not only constituted an infringement upon the Plaintiff's due process rights but also transpired without affording the Plaintiff an opportunity to contest the accuracy of the disseminated information prior to the ensuing deprivation.

45.      Illustrated below, no warnings are visible anywhere warning of any detainment. Private

life matters such as the Plaintiff's full name, D.O.B and linking the Plaintiff name and likeness to

imaginary but non charged investigations, none of the imaginary investigations, even if were true

were ever anyones concern other than the Plaintiff and should never have been shared with

anybody until the Plaintiff  was charged and it was in NCIC.



(figure 15)

It is indisputable, as per the records of Stark County, that the Plaintiff was never identified as a

person of interest or a potential suspect in any active investigation, and his record was clear of

any warrants or violations in both LEADS and NCIC. The Plaintiff was unlawfully detained as a

direct result of FLOCK Safety's negligent and unlawful alert to the police, which was based on

false information. FLOCK Safety's reckless decision to disseminate their own false and

defamatory Proprietary/licensed information about the Plaintiff, associating him with non-

existent crimes, constitutes a liability for the distress caused by their reckless conduct. FLOCK's actions goes beyond mere negligence or error. It is an act that exceeds the bounds of decency in a civilized society, particularly given the serious consequences for the plaintiff, who was surrounded by police officers and detained without consent or lawful privilege. The Plaintiff was neither issued a ticket nor given a warning on that occasion. FLOCK Safety's overall business of attempting of stopping crime by its ALPR Devices, its responsibilities and duties to the public, and the potential harm that could result from their false alerts, FLOCK still decided to disseminate their own false information to the police and failed their duty they owed to the Plaintiff.

46.     The Ohio Supreme Court has held that 'the seizure contemplated in a malicious-prosecution action is not limited to physical detention but includes any interference with the plaintiff's liberty or property rights.'(Trussell v. Gen. Motors Corp., 53 Ohio St. 3d 142 - Ohio: Supreme Court 1990)

47.     It is beyond dispute that the Defendant either intended their conduct to cause severe emotional distress, or acted with recklessness when it was likely that emotional distress would result from their failure to verify the information before disclosing it to the police. Restatement (Second) of Torts § 652E (1977) ][Restatement (Second) of Torts § 652B (1977) ][Restatement (Second) of Torts § 35 (1965) ] (One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.') (Yeager v. Local Union 20, 6 Ohio St.    3. 369, 1983-Ohio-35).

48.     It's beyond dispute the conduct by FLOCK was profound: "The key to liability [...] is whether the defendant's conduct in the instant matter rises to a level of outrageousness necessary

30

to permit recovery." [7]. Furthermore, to make out a prima facie case of IIED, the Plaintiff must allege emotional distress that is both "severe and debilitating." [8]

45.　　It is beyond dispute that an unwarranted detention can precipitate emotional distress for the unjustly detained individual. This distress may manifest as fear, anxiety, frustration, and feelings of helplessness, and may be accompanied by a genuine risk of physical danger, particularly if the individual, as in this case, is unaware of the reasons for their detention. The fear associated with the traffic stop can escalate to excessive levels due to the negligent actions of FLOCK.

46.　　The Defendant either intended to cause emotional distress or knew, or should have known, that their actions would result in severe emotional distress to the Plaintiff. Hayward, 759 F.3d 601, 619 (6th Cir. 2014). While the initial traffic stop in itself does not rise to the level of "atrocious" and "utterly intolerable," Ritter v. Bd. of Educ. of Arcadia Loc. Sch., 535 F. Supp. 3d 690, 696 (N.D. Ohio 2021), what does meet this standard is FLOCK's dissemination of false and defamatory information about the Plaintiff to third parties, resulting in his detention.

47. When FLOCK alerts, under the color of the law, the police using their own Proprietary/licensed information, leading to the Plaintiff's detention, it inflicts chaos in the Plaintiff's mind, causing confusion about the unfolding events and triggering a range of emotions throughout the protracted, antagonizing traffic stop. The Defendant intended to cause emotional injury at that point. The unlawful seizure resulting from FLOCK's dissemination of false information was the cause of the emotional distress.

48. A claim for Negligent Infliction of Emotional Distress (NIED) is also applicable to this case, as the Plaintiff was placed in fear of physical harm by being unjustly surrounded by armed

---

[7] Baab v. A.M.R. Servs. Corp., 811 F. Supp. 1246, 1269 (ND Ohio 1993)
[8] Paugh v. Hanks, 6 Ohio St. 3d 72 (1983).

officers without cause due to FLOCK's actions. As the traffic stop was unnecessarily prolonged, a genuine fear of harm was instilled in the Plaintiff. There was a real risk that any movement deemed "suspicious" could have resulted in physical harm to the Plaintiff, such as being forcibly removed from the vehicle due to the false alert. This high-intensity situation, with multiple units surrounding the area for no valid reason, created a scenario "where the Plaintiff was placed in fear of physical consequences to his or her person." Heiner v. Moretuzzo, 73 Ohio St. 3d 80, 86 (1995). "A plaintiff may only bring a claim for negligent infliction of emotional distress where "the plaintiff is cognizant of real physical danger to himself or another." King v. Bogner, 88 Ohio App.3d 564, 569, 624 N.E.2d 364 (Ohio Ct.App.1993) Doe v. SexSearch.com, 502 F. Supp. 2d 719, 730 (N.D. Ohio 2007), aff'd, 551 F.3d 412 (6th Cir. 2008).

49.     FLOCK's conduct is repugnant to fundamental notions of human dignity. It is beyond dispute that the aforementioned terrifying and traumatizing actions by FLOCK threatened the Plaintiff's physical safety. FLOCK chose to alert the police with knowingly erroneous information, and for this, they are liable.

V.     **FLOCK also Liable under 42 U.S.C. § 1983/ relationship with the police**

50.     FLOCK Safety's status as a 'state actor' is irrefutably established through its contractual relationship with the State, as evident in exhibit 2. The contractual link between FLOCK Safety and the State serves as a decisive factor in establishing the company's actions as being conducted under the color of state law, transforming them into a 'state actor.' This legal status is further underscored by the integration of FLOCK Safety's, with the dispatch software, text messaging, and app notifications used by law enforcement.

51.     The integration of FLOCK Safety's operations with police systems, as illustrated by their collaboration with the National Crime Information Center (NCIC) and law enforcement dispatch

32

software, substantiates their role as a 'state actor.' The systematic reporting of false and defamatory information to the police, resulting in unlawful traffic stops, constitutes a clear violation of individuals' constitutional or federal rights. Such actions impinge upon fundamental rights, including the right to due process and the right against unreasonable searches and seizures

52.     Importantly, there is no discernible point in time during these incidents where FLOCK Safety operated as a private entity distinct from its role as a contracted state actor. FLOCK's integration with law enforcement operations, particularly through the NCIC and dispatch software, entwines its business activities with police functions. The data (figure 16) reflecting a 184.962% increase in 'high priority' traffic stops with dispositions of 'Completed' (used typically for stops with no warning or tickets) since FLOCK's installation in April 2021 underscores the correlation between FLOCK's alerts and police actions. This statistical surge, particularly evident in January 2023, suggests a concerning pattern where FLOCK's tips result in traffic stops without any subsequent warnings or tickets.

53.     It is evident that FLOCK Safety, through its contractual relationships with the police and operational integration with law enforcement systems, consistently acts under the color of the law. This is not a sporadic or isolated occurrence, but rather a systemic engagement entwined with police operations. FLOCK's actions, facilitated by its contract with the police and collaboration with NCIC and law enforcement dispatch, dispel any notion of the company functioning solely as a private entity. Instead, FLOCK Safety operates as a 'state actor,' significantly impacting citizens' rights and liberties, making the company accountable for the constitutional violations arising from its actions by its flawed products.



(figure 16)

54.     Because of the defendant reprehensible behavior on February 25th 2023, FLOCK
Defamed and had the police seize a private citizen without wrongdoing searched
through every nook and cranny of his life to find something on him for over 40 minutes
even though he was clear, warrants a punitive damages of $4,000,000 to FLOCK to
send a clear message that this behavior will not be tolerated in our society.


55.     It's beyond dispute the conduct by FLOCK Safety was profound: "The key to liability [...]
is whether the defendant's conduct in the instant matter rises to a level of outrageousness

34

necessary to permit recovery." [9]. Furthermore, to make out a prima facie case of IIED, the Plaintiff must allege emotional distress that is both "severe and debilitating." [10]

56.     The Defendant intended to cause emotional distress or knew or should have known that actions taken would result in severe emotional distress to the Plaintiff ." Hayward, 759 F.3d 601, 619 (6th Cir. 2014).

55.     In essence, Flock Safety's software product stands defective, a consequence of its glaring deficiency in proper input validation and data validation—standards that FLOCK openly acknowledges on its website. The departure from industry standards is stark, revealing a deviation from the intended design during production. Notably, custom hot lists were never intended to have unsubstantiated information, yet due to the lack of safeguards, that is precisely what occurred. Compounding this defect is FLOCK Safety's role as a 'state actor,' acting under the color of the law. In an egregious display of negligence, the company leveraged the Plaintiff's likeness, name, and birthdate to disseminate defamatory information to third parties, including local law enforcement. This irresponsible action directly resulted in the Plaintiff's unlawful detention—a consequence of FLOCK's actions operating under the color of the law, distributing unfounded, and defamatory information. The unlawful notification to the police, facilitated by FLOCK, caused severe emotional distress to the Plaintiff. Such distress, arising from FLOCK's negligent actions, warrants due compensation under the law. FLOCK, as a purveyor of public safety technology, owes a duty to the public—a duty further emphasized by its integration with the National Crime Information Center (NCIC). It is imperative for FLOCK to ensure the accuracy of information reported to law enforcement, mirroring the standards expected of any

---

[9] Baab v. A.M.R. Servs. Corp., 811 F. Supp. 1246, 1269 (ND Ohio 1993)
[10] Paugh v. Hanks, 6 Ohio St. 3d 72 (1983).

35

citizen reporting a crime to 911. FLOCK's failure to meet this standard constitutes pure negligence. With the implementation of NCIC, FLOCK has a heightened responsibility to guarantee the accuracy of information provided to law enforcement. This duty is underscored by the fact that any other citizen would be held to similar standards when reporting a crime to 911. FLOCK, however, neglected this responsibility, resulting in the distribution of false and defamatory information. This is not just a failure in product design; it is an act of negligence that FLOCK is answerable for. Had the software been designed with proper input and data validation—industry standards that FLOCK is well aware of—the distribution of false and defamatory information leading to the Plaintiff's unlawful detention would have been averted. In stark contrast, ALPR Software with proper input/data validation, devoid of glaring defects like the FLOCK software, would not have facilitated the dissemination of inaccurate information, sparing individuals from such harm. In conclusion, FLOCK Safety's negligence in providing a defective product, coupled with its actions under the color of the law, directly led to the Plaintiff's unlawful detention and consequent emotional distress. FLOCK is accountable for these harms, as it failed in its duty to the public, overlooked industry standards, and operated without proper safeguards. The technology exists to ensure data accuracy, and FLOCK's disregard for this imperative has resulted in tangible harm to individuals.

**V.      CAUSES OF ACTION**

**COUNT I**

**NEGLIGENCE**

56.      Plaintiff incorporates by reference paragraph 1-55 of this Complaint as if fully set forth herein.

57.      Defendant had a duty to individuals, including Plaintiff, to use reasonable care in designing, manufacturing, marketing, labeling, packaging and selling the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS

58.      Defendant were negligent in failing to use reasonable care in designing, manufacturing, marketing, labeling, packaging, and selling the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS

59.      As a direct and proximate result of Defendant negligence, Plaintiff was caused and/or in the future will be caused to suffer  severe emotional distress, financial or economic loss, including, but not limited to,  lost income,reputational  and other damages.

**COUNT II**

**STRICT LIABILITY – DESIGN DEFECT (ORC §2307.75, et seq.)**

60.      Plaintiff incorporates by reference paragraphs 1-59 of this Complaint as if fully set forth herein.

37

61. The FLOCK SOFTWARE/ FLOCK ALPR CAMERAS product implanted in the Plaintiff was not reasonably safe for its intended use and was defective as a matter of law with respect to its design.

62. As a direct and proximate result of the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to, lost income,reputational and other damages.

63. Defendant are strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

64. Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including costs and and all such other relief as the Court may deem proper.

**COUNT III**

**STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT (ORC §2307.74, et seq.)**

65. Plaintiff incorporate by reference paragraphs 1- 64 of this Complaint as if fully set forth herein.

66. The FLOCK SOFTWARE/ FLOCK ALPR CAMERAS product used by the Plaintiff was not reasonably safe for its intended use and was defective as a matter of law with respect to its manufacture.

38

67. As a direct and proximate result of the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to, lost income,reputational and other damages.

68. Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including and all such other relief as the Court may deem proper.

## COUNT IV

### STRICT LIABILITY – FAILURE TO WARN (ORC §2307.76, et seq.)

69. Plaintiff incorporates by reference paragraphs 1- 68 of this Complaint as if fully set forth herein.

70. The FLOCK SOFTWARE/ FLOCK ALPR CAMERAS product was not reasonably safe for its intended use and was defective as a matter of law due to its lack of appropriate necessary warnings.

71. As a direct and proximate result of the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to, lost income,reputational and other damages.

72. Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including and all such other relief as the Court may deem proper.

## COUNT V

**Strict Product Liability: Defect Due to Nonconformance with**

**Representation (ORC §2307.77, et seq.)**

73. Plaintiff incorporates by reference paragraph 1- 72 of this Complaint as if fully set forth herein.

74. Defendant expected and intended the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS product to reach users such as Plaintiff in the condition in which the product was sold.

75. Defendant represented to Plaintiff that the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS was safe and reasonably and justifiably relied upon Defendant representations that the product was safe for use reading license plates and the data outputted was not defamatory/ slanderous and would conform to Defendant representations regarding the character and quality of the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS for use.

76. As a direct and proximate result of Plaintiff's Defendant's representations about the FLOCK SOFTWARE/ FLOCK ALPR CAMERAS, Plaintiff suffered injuries and damages as summarized herein.

77. WHEREFORE, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including costs , and all such other relief as the Court may deem proper.

**COUNT VI**

**LIBEL PER SE**

78.      PLAINTIFF incorporates by reference and realleges Paragraph 1 through 77, as if set forth in full herein.

79.      Defendant have defamed MICHAEL by publishing the ALERT and the false and

40

misleading statements about MICHAEL contained therein, including the statements alleged in Paragraphs 16 – 22. These statements about MICHAEL are false, misleading, and libelous, both explicitly and by implication.

80.     Defendant published the statements with knowledge of their falsity or reckless disregard of their falsity. Among other things, Defendant obtaining a license and publishing fabrication of a non existent crime regarding MICHAEL demonstrates their knowledge that these statements were untrue. In addition, these statements were published with the intent of harming MICHAEL reputation and career, and thus published with malice, both in law and in fact.

81.     Defendant statements constitute libel per se, for which MICHAEL is entitled to recover presumed damages for injury. Defendant statements also constitute libel per quod. As a result of all of these false statements, MICHAEL has suffered, and will continue to suffer, injury in fact, including loss of good will and injury to his reputation.

82.     The publication of the ALERT damaged MICHAEL's reputation, will continue to harm his reputation, and will continue to impact MICHAEL's appeal as an UBER/ gig work driver.

83.     Finally, as described above, FLOCK's unfounded statements and fabricated allegations demonstrate that Defendant acted deliberately, purposefully, and without regard for the truth. Defendant acted with malice and the intent to harm MICHAEL's reputation and with knowledge that their accusations were false. Moreover,  Defendant disregard for publication of false statement and/or reckless disregard for the truth renders punitive damages appropriate in this action.

**COUNT VII**

41

**FALSE LIGHT INVASION OF PRIVACY**

84.     MICHAEL incorporates by reference and realleges Paragraph 1 through 83, as if set forth in full herein.

85.     Defendant intended to and did publish the ALERT regarding MICHAEL that included non existent crimes MICHAEL was wanted for

86.     MICHAEL, like any reasonable person, was highly offended by being labeled a suspect in any human trafficking investigation. Any association with and/or attribution of responsibility of any human trafficking of a child is deeply offensive to any reasonable person.

87.     Defendant conducted no independent investigation as to the truth of the assertion that MICHAEL was a suspect of any human trafficking investigation

88.     Defendant knowledge of the falsity of their statements is highlighted by the fact that Defendant never had safeguards to verify such information. Defendant included in the ALERT both fake and real information by MICHAEL to convince third parties that the false information attributed to MICHAEL were real.

89.     Defendant acted without regard to the false light in which the ALERT would place MICHAEL. Defendant also acted without regard to the likelihood such false statements would lead to unlawful detainment to MICHAEL.

**COUNT IX.**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

90.     MICHAEL incorporates by reference and realleges Paragraph 1 through 89, as if set forth in full herein.

91.     Defendant intended to cause MICHAEL severe and serious emotional distress

42

through, among other things, their publication of false statements of fact and their efforts to elicit unlawful detainment against MICHAEL.

92.     Alternatively, Defendant knew or should have known that their actions would result in MICHAEL's severe and serious emotional distress by, among other things, impacting his reputation amongst his audience and potential employers and eliciting detainment against MICHAEL in response to their false and defamatory statements.

93.     Defendant conduct, including the publication of false statements and the fabrication of made up crimes that purport to show MICHAEL as a human trafficker MICHAEL, is extreme and outrageous, and is beyond all possible bounds of decency. Such conduct is so atrocious that it is utterly intolerable in a civilized society.

94.     Defendant conduct is the proximate cause of MICHAEL's emotional distress. MICHAEL did not suffer from emotional distress before learning of Defendant false and defamatory statements

95.     No reasonable person could be expected to endure the distress that MICHAEL has suffered since learning of Defendant false statements about him and the resulting detainment.

## Count X.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

96.     MICHAEL incorporates by reference and realleges Paragraph 1 through 95, as if set forth in full herein.

97.     Defendant negligently caused MICHAEL severe emotional distress by

publishing false statements of fact regarding MICHAEL's purported involvement in human trafficking. Defendant knew or should have known such false statements would cause severe emotional distress to MICHAEL.

98.    Defendant knew or should have known that the ALERT's false statements would result in detainment against MICHAEL.

99.    Defendant false statements of fact regarding MICHAEL resulted in an unlawful detainment

100.    Defendant conduct is the proximate cause of MICHAEL's severe emotional distress. MICHAEL did not suffer from emotional distress before learning of Defendant false and defamatory statements.

## COUNT XI

## COMMON-LAW MISAPPROPRIATION OF

## MICHAEL'S NAME AND LIKENESS

101.    MICHAEL incorporates by reference and realleges Paragraph 1 through 100, as if set forth in full herein.

102.    Defendant have misappropriated MICHAEL's name and likeness in the ALERT for commercial and non-commercial purposes.

103.    Defendant have misappropriated MICHAEL's name in the ALERT, thereby associating MICHAEL with the false statements of fact contained in the ALERT.

104.    Defendant have misappropriated numerous photos reflecting MICHAEL's

likeness in the ALERT, thereby associating MICHAEL with the false statements of fact

contained in the ALERT.

105. MICHAEL did not consent to Defendant use of his name or likeness.

106. Defendant used MICHAEL's name and likeness in connection with a product.

## COUNT XII

### Defamation Per Se

107. MICHAEL incorporates by reference and realleges Paragraph 1 through 100, as if

set forth in full herein.

108. Defendant FLOCK knew the above-reference statement was false or acted with reckless

indifference to the truth when it published the statement.

109. The defamatory statements of Defendant ~~Bidon~~ Frock and chargeable to the remaining

defendant

constitutes defamation per se because it accused the Plaintiff of conduct incompatible with

the Plaintiff's business, trade, position, or office.

110. As a result of the defamatory statements, the Plaintiff has suffered damages within the

jurisdictional limits of the Court.

## COUNT XIII

### Defamation Per Quod

111. The allegations in Paragraph one through Paragraph 110 are realleged and

incorporated herein.

112. The defamatory statement of Defendant FLOCK constitutes defamation per quod based

on extrinsic facts proving the existence of actual/special damages to the Plaintiff's reputation and

business.

45

# COUNT XIV

## 42 U.S.C. § 1983 – Unconstitutional and Unreasonable seizure in violation of the Fourth Amendment (As to defendant FLOCK SAFETY )

113.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

42 U.S.C. § 1983 provides that:

114.    Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

115.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

116.    In view of all the circumstances surrounding the foregoing incident on February 25th 2023, a reasonable person would have believed Michael Smith was not free to leave from his encounter with law enforcement after FLOCK reported false information to the police under their contract.

117.    Defendant FLOCK , deprived MICHAEL of clearly established rights secured to him under the United States Constitution— specifically the Fourth Amendment rights to be free from unreasonable search and seizures against one's person by working alongside the state and reporting false information which resulted in Michael's detainment

46

118.    Defendant FLOCK  failed to take any action to prevent harm to MICHAEL's rights which resulted in a constitutionally-actionable injury. Defendant FLOCK are liable for such constitutionally-actionable injuries.

119.    FLOCK had a reasonable opportunity to alert the police of the erroneous information in order to prevent or mitigate injury to MICHAEL, they chose not to.

120.    Any reasonable private company  would have known that the reporting false information to the police ,which they have a contract will result in the motorists detainment.

121.    Defendant' conduct also resulted in psychological injury to MICHAEL. Since his seizure, MICHAEL has experienced emotional and psychological injuries, including mental anguish, anxiety, emotional distress, loss of enjoyment of life, and other non-pecuniary losses. Due to these injuries from the seizure, MICHAEL still suffers of heighten anxiety.

122.    MICHAEL is further entitled to costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

123.    In depriving MICHAEL of his rights under the United States Constitution, Defendant FLOCK  acted under color of  the law which can be established by their contract with the state.

124.    This deprivation under color of law is actionable and may be redressed by 42 U.S.C. § 1983.

125.    The Defendant  accused Plaintiff of heinous criminal activity knowing those accusations to be without probable cause, and they made statements to police officers with the intent of exerting influence to institute and continue the investigatory proceedings.

126.    Statements of the Defendant regarding Plaintiff's alleged culpability were made with knowledge that said statements were false . In so doing, the

47

Defendant reported false allegations to get the Plaintiff stopped.

127.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others and the truth.

128.  Due to the injuries suffered by MICHAEL, he is entitled to compensatory, economic,non economic and consequential damages,  in amounts to be determined at trial against each Defendant. As a further result of Defendant' unlawful conduct, MICHAEL is entitled to recover punitive damages against the individual defendant.

**COUNT XV**

**42 U.S.C. § 1983 –Fifth and Fourteenth Amendments(As to defendant FLOCK SAFETY )**

129.     Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

42 U.S.C. § 1983 provides that:

130.     Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

131.     The Defendant's actions violated the Plaintiff's right to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution. The Defendant, acting under color of state law, deprived the Plaintiff of his liberty based on false information, without a fair process to challenge the accuracy of that information before the deprivation occurred [Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)].

**VI. Prayer for Relief**

MICHAEL demand that judgment be entered in his favor on all counts and pray the court to award the following relief:

a. Declare that defendant' acts, omissions, and conduct constitute violations of the Fourth Amendment/ Fifth and Fourthteenth to the United States Constitution, as well as of 42 U.S.C. § 1983.

b. A Preliminary and Permanently injunction from FLOCK allowing any police agencies using any cameras that allow FLOCK Custom hot list alerts preventing any further violations of citizens constitutional rights.

c. An award of actual and/or compensatory damages, including but not limited to damages for mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that MICHAEL has suffered and is reasonably certain to suffer; against the defendant to to be exactly determined at trial but no less than $20,000,000 that will fully and fairly compensate MICHAEL to make him whole.

d. An award of  punitive damages and exemplary damages  no less than $4,000,000 dollars in total this will serve to adequately punish and deter the acts and omission alleged in this complaint. Such acts that were clearly intentional, malicious, egregious, callous and a reckless disregard of MICHAEL's constitutional rights.

e. Punitive damages are recoverable in sec. 1983 suit where defendant conduct is motivated by an evil motive or intent, or where it involves reckless or callous indifference to MICHAEL's

federally protected rights." Smith v. Wade, 461 U.S. 30, 50 −51(1983); Clark v. Taylor, 710 F.2d 4, 14(1st Cir. 1983)

f.   Presumed Damages against the Defendant of no less than $4,000,000 dollars

g.  Nominal damages against the Defendant of no less than $4,000,000 dollars

h.  An award of costs and court costs of this action pursuant to 42 U.S.C. § 1988 allowed under FRCP 54(d)(1)

i.  Award pre- and post-judgment interest at the highest lawful rate;

j.  All such other relief to which MICHAEL is entitled and/or this Court deems equitable.

**JURY DEMAND**

Plaintiff requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated this November 13, 2023

Respectfully submitted

Pro Se

Michael Smith

1225 Skyline Dr Apt 105

Orrville Ohio 44667