**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FILED

DEC 14 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

**Michael Smith**
**1225 Skyline Dr Apt 105**
**Orrville, Ohio 44667**

Case No.: 5:23 - CV 02198

         **Plaintiff ,**
    **v.**

**FIRST AMENDED COMPLAINT**
**FOR INJUNCTIVE RELIEF AND**
**JURY DEMAND**

         **Defendant.**
**FLOCK SAFETY**
**1170 HOWELL MILL RD. NW SUITE**
**210 ATLANTA , GA 30318**

Judge:  Pearson

-

**FIRST AMENDED COMPLAINT FOR  PERMANENT INJUNCTIVE RELIEF  AND**
**RECOVER DAMAGES FOR PRODUCT LIABILITY/ DEFAMATION/ LIBEL AND**
**DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS**

I.     **NATURE OF THE CASE**

1.     The Plaintiff, proceeding pro se, initiates this action under 42 U.S.C. § 1983, seeking

redress for alleged violations of constitutional rights. Plaintiff seeks damages and a permanent

injunction to prevent Defendant, FLOCK Safety, from utilizing Plaintiff's personal information

within its Application Programming Interface (API) any longer and reimbursement for lost

profits over the last 8 months for using his data without permission in its API.

2.     The Plaintiff was involved regarding Flock's defective equipment by sending a false and

defamatory alert by associating it with a non-existent criminal investigation and also included the

numbers on his license plate; this information was disseminated to the police under the color of

the law, and the negligence by FLOCK was a proximate cause of damages to the Plaintiff.

FLOCK was a willful participant in joint action' with the State or its agents. FLOCK has

1

significant influence over state actions by the police and its policies.  Flock knowingly provided unverified information that led to the violation of Smith's rights. The case of Greenman v. Yuba Power Products, Inc, 59 Cal.2d 57 (1963) established the doctrine of strict liability in tort, which holds manufacturers liable for defective products even if they exercised all possible care in the preparation and sale of the product.

3.      Plaintiff alleges that FLOCK Safety's product, which was designed and manufactured by Defendant, contains inherent design and manufacturing defects. According to the Plaintiff, these defects were present when the product left FLOCK Safety's control. The Plaintiff further alleges that the camera lacks sufficient data validation measures before disseminating information, potentially leading to the release of false and defamatory information. No point during this complaint is this about who entered the wrong information. However, instead its  why a multi-billion dollar valued company like FLOCK decided it was ok to distribute it without verifying through any NCIC database, if the Plaintiff could find out accurate information through law enforcement, the Defendant could so as well, they had the ability especially more so with their system implementation with NCIC/Missing Children/Amber alert, in short, we have the technology to check if data has a proper syntax (how the data is formatted). The buck stops with FLOCK SAFETY and is liable.

4.      The Plaintiff contends that the product lacks visible warnings to the public and its users, including the Plaintiff, about the potential dissemination of false information that could lead to unwarranted detainment by law enforcement. The Plaintiff argues this is made possible due to FLOCK Safety's close relationship with the State of Ohio and its alleged misuse of law enforcement resources. Plaintiff further alleges that Defendant's product allows customers with API access to view personal information, such as license plate numbers and names, without

2

adequate warnings of telling users such as Plaintiff that their data is available for anyone who pays for access.FLOCK Safety did not remain reasonably current with scientific knowledge, development, research, and discoveries concerning the camera.

5.      The Plaintiff alleges that the Defendant's actions, due to its close relationship with the State of Ohio, constitute state action under color of law, thereby violating the Plaintiff's Fourth Amendment rights. Furthermore, the Plaintiff alleges violations of due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. See Monell v. Department of Social Services, 436 U.S. 658 (1978) (establishing the standard for state action under color of law).

6.      Finally, Plaintiff alleges that Defendant publicly represented its product as privacy-driven and bias-free while simultaneously acting as a data broker by selling access to its API, which allows anyone to view license plate data from Plaintiff's car. Plaintiff contends that Defendant allows unrestricted access to the vast amount of data collected by its cameras, thereby misrepresenting its product's nature and use of collected data.

## II. PARTIES

Plaintiff Michael Smith ("MICHAEL") is and was a resident of the State of Ohio, lived in Orrville, County of Wayne, and was a user of the FLOCK product during the relevant period in this action.

Defendant  FLOCK SAFETY ("FLOCK") is a Delaware corporation who is a non publisher or broadcaster , and maintains its principal place of business at 1170 Howell Mill Rd NW, Ste. 210 ATLANTA, GEORGIA UNITED STATES 30318 acting under the color of the law during all relevant periods in this action.

3

III.     **Jurisdiction and Venue**

This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1)

because the amount in controversy exceeds $75,000, exclusive of interests and costs,

and FLOCK SAFETY are citizens of different states.

Jurisdiction is also founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because it is

brought to obtain compensatory and punitive damages for the deprivation, under color of state

law, of the right under the Fourth Amendment, pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiff

brings this pursuant to the Fourth/Fifth and Fourteenth Amendment to the United States

Constitution.

Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

**Intradistrict Assignment:** A substantial part of the acts and/or omissions in this Complaint

occurred in the County of Stark County Ohio. Pursuant to CivR.3(C) this case is properly

assigned to the Akron or Cleveland Division of the Court.

Venue is proper in this judicial district under 28 U.S.C. §1391 (b)(2) because

FLOCK acting under the color of the law throughout this district and a substantial part of the

events or omissions giving rise to Plaintiffs' claims occurred in this district. At all pertinent times,

FLOCK was also and is in the business of marketing, advertising, distributing, and selling

products, including the ALPR Machines, throughout Ohio and this judicial district, and

nationwide.

4

1

2  **IV. FACTUAL ALLEGATIONS**

3

4  **A. FLOCK Definitions**

5

6  7.      Four words that will be discussed  is "AdvancedSearch" "FlockCustomer" "API'  and

7  "Hotlist." here is the

8  undisputed FLOCK definition of AdvancedSearch, FlockCustomer, API and Hot List, which is

9  on the FLOCK Website [1]

10
   8.      ""AdvancedSearch" is a query based function of Flock's API which enables users to
11
   search and categorize data in a multitude of ways including, but not limited to, any combination
12
   of date, time, geolocation,camera name, and vehicle attributes."
13

14

15  9.      "API" means Flock's application programming interface and any programming interface
16
   and any accompanying or related documentation, source code, SDKs, executable applications
17
   and other materials made available by Flock, including, without limitation, Hotlists,
18
19  AdvanceSearch, and any copies and derivative works thereof.

20  10.     "FlockCustomer" means a customer of Flock Services which has signed Flock's terms
21
   and conditions and is currently requesting integration with this API.
22

23  11.     "Hotlist(s)" means a digital file containing alphanumeric license plate related information
24
   pertaining to vehicles of interest, which may include stolen vehicles, stolen vehicle license plates,
25
   vehicles owned or associated with wanted or missing person(s), vehicles suspected of being
26

27  [1] "API Terms and Conditions." Flock Safety, https://www.flocksafety.com/api-terms-

28  service. Accessed December 6, 2023.

5

involved with criminal or terrorist activities, and other legitimate law enforcement purposes. Hotlist also includes, but is not limited to, national data (i.e.,NCIC) for similar categories, license plates associated with AMBER Alerts or Missing Persons/Vulnerable Adult Alerts, and includes manually entered license plate information associated with crimes that have occurred in any local jurisdiction."

FLOCK has sold access to the Plaintiff's personal information without permission.

**B.    FLOCK System that is the center of this incident on February 25th 2023.**

12.    The defective FLOCK Camera  that falsely alerted Law enforcement was stationed on Everhard @ Fulton in Canton Ohio, pictured below.( figure 1)



(figure 1)

6

(figure 1)

13.     This defective camera was a Flock Falcon, a camera that was designed and developed by

FLOCK. FLOCK has released many marketing materials regarding this device to law

enforcement departments, such as technical specifications (figure 2)(exhibit A). This is how

FLOCK states the technical capabilities of the FLOCK Falcon camera to the public and users

like the Plaintiff.



**Camera Specifications**

Design
Dimensions: 8.75" x 3"
Weight: 3 lbs
IP65 Waterproof

Power
14Ah Battery
30W Solar Panel (14" x 21")
AC Power (5 ft. range)

Data
16GB local storage, ~2 weeks

Motion
Passive Infrared Motion Detection

Connectivity
Embedded Cellular LTE Connection
Cellular service provider depends on area

Production
Designed & manufactured in the U.S.

Night Vision
850nm Custom IR Array

**Camera Performance**

Motion
NCIC and Custom Alert Notifications
Average of 10-15 seconds
Includes time, location, plate, and vehicle image
Includes state specific alerts based on image

Power Source
100-240 VAC +1 amp
60 W Solar
11-14 Volt

Processing Power
1.4GHz
64-bit quad-core CPU

(figure 2)

14.     Under CAMERA PERFORMANCE, it states " NCIC AND CUSTOM ALERT

NOTIFICATIONS.....INCLUDES STATE SPECIFIC ALERTS BASED ON IMAGE"

15.     The camera sends these alerts, as it even mentions the capabilities in the technical

specifications provided by FLOCK, the Defendants in this case.

16.     These proprietary cameras run Android apps and are considered "IoT"(Internet of Things)

devices, and even the job description for an Android engineer for FLOCK verifies this. (figure 3)

**Android Software Engineers**



Flock Safety
Atlanta, GA

Apply on Chegg Internships

Full-time 🎓 No degree mentioned

Job highlights
Identified by Google from the original job post

Qualifications
- Strong Java, C/C++ skills
- Ability to learn Kotlin
- Experience working with various layers of AOSP, including apps, framework, HAL, kernel, and bootloader

Responsibilities
- As part of this team, you will be responsible for writing and maintaining code for our devices deployed in the real world
- Your work will enable the seamless capture, processing, and uploading of data without the need for constant human interaction

(figure 3)

17.     These cameras have a processor, and a operating system built on Android OS; even looking at the camera itself, this court can see the following (figure 4) and the motherboard (figure 5)



(figure 4)

8



(figure 5)

18.     The last picture is of the FLOCK's motherboard, Lantronix Open-Q™ 624A System-on-Module. The camera is a mini computer. FLOCK has even done case studies with Qualcomm Technologies and Lantronix to tout the capabilities of the FLOCK Camera (figure 6)(exhibit B)(figure 7)(exhibit C)



Flock Safety recognized the need for an affordable, effective ALPR system capable of giving the public the evidence they need to solve crime without compromising the privacy of citizens.

management support for remote software updates. Without having to worry about this foundation, Flock Safety was able to start innovating on their solution extremely quickly.

The affordability of Flock Safety ALPR system primarily comes from its lack of infrastructure. Thanks to its efficient smartphone hardware and modern software solutions, it is powered entirely by solar and battery with a discrete design intended for neighborhoods. It can be installed in under thirty minutes in any area with solar and cellular coverage and receive software updates over the air to further reduce maintenance costs. This flexibility makes it a viable option for communities that cannot afford existing solutions.



Despite its affordable cost, Flock Safety's camera system is extremely powerful from a processing perspective. A single camera can capture 15,000 vehicles per day and send real-time alerts to law enforcement when it spots a license plate on the FBI's NCIC list of stolen vehicles. Using passive infrared motion detection, it can read the license plates of vehicles traveling at a speed of up to 75 MPH and up to 75 feet away from the camera during the day or night. The images it captures are analyzed with a proprietary machine learning algorithm using Vehicle Fingerprint™ technology to extract relevant data such as the license plate number and state of issue, the vehicle's make/type/color, and even additional objects caught in the image. The customer can search their database of footage using these details—even a partial license plate number—to filter through the images for easier identification.



(figure 6)

19.    "A single camera can capture 15,000 vehicles per day and send real-time alerts to law enforcement...." the use of the conjecture " and" is critical here. The Camera sends alerts with information attached to it. (see figure 2 as well under PERFORMANCE).

10

**Challenges included creating an ALPR solution with the following features:**

o Affordable, infrastructure-less design with wireless cameras
o Ability to integrate cellular data into cloud connectivity
o Secure website accessible only by authorized users
o Built-in privacy to protect neighbors' identities
o Power management for ultra-long battery life





**Lantronix's custom modules provide a great platform for fast-tracking product development of high-performance embedded devices.**

– Matt Feury, Founder & CTO, Flock Safety

**Solution: Lantronix Open-Q 624A SOM and Development Kit**

Utilizing Lantronix's Open-Q 624A SOM, its Development Kit and a custom carrier board designed by Lantronix's engineers, the Flock Safety team was able to quickly and cost-effectively build a purpose-built core platform for its safety system.

**Features include:**

• Wireless camera technology
• Secure access by authorized users
• Remote device management, including software updates
• Low-power requirement for long-lasting battery
• Assurance of privacy for neighbors
• FCC/IC pre-certified Wi-Fi/BT module

**Results: Flock Safety Cameras Fight Crime With Technology**

Utilizing Lantronix's Open-Q 624A SOM and engineering expertise, the Flock Safety design team created its breakthrough ALPR solution that combines powerful processing with security. Each camera can capture 15,000 vehicles per day and send real-time alerts to law enforcement with information including the license plate number, state, color of the car and if it is on the FBI's NCIC list of stolen vehicles.

Flock Safety's camera systems are currently being used in more than 700 cities across 38 states to help solve crimes. Law enforcement agencies have reported reductions in crime as high as 60 percent or more.

**Benefits include:**

• Quickly build a market-ready prototype
• Provide an affordable solution that helps contain development costs
• Get to production and market faster
• Deliver a powerful yet affordable safety device

**Please Visit:** https://www.flocksafety.com/product/product-overview

**Lantronix Open-Q 624A SOM Development Kit**

Lantronix's Open-Q 624A Development Kit is a cost-effective, feature-rich, exposed-board platform running the Android OS. It is ideal for evaluation of the Open-Q 624A SOM as well as jumpstarting development of AI-enabled home hub products requiring tasks such as video conferencing, remote video monitoring, movie and video streaming.

Applications

• Audio/video home hubs
• Smart home control center
• Video conferencing products
• Streaming video/audio devices
• Smart connected cameras

**About Lantronix**

Lantronix is a global provider of Software as a Service (SaaS), engineering services and hardware for Edge Computing, the Internet of Things (IoT) and Remote Environment Management (REM). Lantronix enables its customers to provide reliable and secure solutions while accelerating time to market.



(800) 422-7055 • sales@lantronix.com
lantronix.com

(figure 7)

20.    The "objective details" about the Plaintiff that the FLOCK camera provided to the police were false and defamatory, which resulted in his detainment all because the FLOCK camera/ lacked any proper data validation before the FLOCK camera "delivered" these "investigative leads" to the police. The camera/ system transmitted false, defamatory information to the police. (figure 8)

11

## Senior Software Engineer, Detectives & Dispatch

at Flock Safety (View all jobs)

Remote, US

### Who is Flock?

Flock Safety provides the first public safety operating system that empowers private communities and law enforcement to work together to eliminate crime. We are committed to protecting human privacy and mitigating bias in policing with the development of best-in-class technology rooted in ethical design, which unites civilians and public servants in pursuit of a safer, more equitable society.

Our Safety-as-a-Service approach includes affordable devices powered by LTE and solar that can be installed anywhere. Our technology detects and captures objective details, decodes evidence in real-time and delivers investigative leads into the hands of those who matter.

(figure 8)

21.     FLOCK SAFETY in marketing materials and other public representations, state to customers and users like the Plaintiff that "Flock Safety technology is purpose-built to remove human bias from crime-fighting. Our cameras and Vehicle Fingerprint TM technology are engineered to capture vehicle characteristics and license plates, which we cross-check against state and federal records to ensure data accuracy and minimize errors." FLOCK pulls from NCIC 4 times a day, there is the ability within NCIC to check for " A "Temporary Felony Want", which *"may be entered when a law enforcement agency has need to take prompt action to establish a "want" entry for the apprehension of a person who has committed or the officer has reasonable grounds to believe has committed, a felony and who may seek refuge by fleeing across jurisdictional boundaries and circumstances preclude the immediate procurement of a felony warrant. A "Temporary Felony Want" shall be specifically identified as such and subject to verification and support by a proper warrant within 48 hours following the entry of a temporary want. The agency originating the "Temporary Felony Want" shall be responsible for subsequent verification or re-entry of a permanent want."*

12

1    22.    It's beyond dispute that the following defamatory statements made by FLOCK below

2   were not checked by state and federal records before being disseminated by FLOCK, nor did the

3   Plaintiff have any Temporary Want in NCIC. Even if the alert came from a hot list, there is the

4   technical ability through NCIC to make sure if that person has a temporary want, FLOCK choose

5   not to utilize readily available data for any "hot list" alert, for which they are liable for having a

6   product, the camera, disseminate false information not verified through NCIC when the ability

7   exists(figure 9)

8

13

**SOURCES OF DATA:** Data contained in NCIC is provided by the FBI, federal, state, local and foreign criminal justice agencies, and authorized courts.

The most recent iteration of NCIC became operational on July 11, 1999 at the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia. A recent hardware upgrade to the NCIC system is responsible for this significant improvement in performance.

**Categories of individuals covered by the system:**

```
A. Wanted Persons: 1. Individuals for whom Federal warrants are
outstanding.
2. Individuals who have committed or have been identified with an
offense which is classified as a felony or serious misdemeanor under
the existing penal statutes of the jurisdiction originating the entry
and for whom a felony or misdemeanor warrant has been issued with
respect to the offense which was the basis of the entry. Probation and
parole violators meeting the foregoing criteria.
3. A "Temporary Felony Want" may be entered when a law enforcement
agency has need to take prompt action to establish a "want" entry
for the apprehension of a person who has committed or the officer has
reasonable grounds to believe has committed, a felony and who may seek
refuge by fleeing across jurisdictional boundaries and circumstances
preclude the immediate procurement of a felony warrant. A "Temporary
Felony Want" shall be specifically identified as such and subject to
verification and support by a proper warrant within 48 hours following
the entry of a temporary want. The agency originating the "Temporary
Felony Want" shall be responsible for subsequent verification or re-
entry of a permanent want.
4. Juveniles who have been adjudicated delinquent and who have escaped
or absconded from custody, even though no arrest warrants were issued.
Juveniles who have been charged with the commission of a delinquent
act that would be a crime if committed by an adult, and who have fled
from the state where the act was committed.
5. Individuals who have committed or have been identified with an
offense committed in a foreign country, which would be a felony if
committed in the United States, and for whom a warrant of arrest is
outstanding and for which act an extradition treaty exists between the
United States and that country.
6. Individuals who have committed or have been identified with an
offense committed in Canada and for whom a Canada-Wide Warrant has
been issued which meets the requirements of the Canada-U.S.
Extradition Treaty, 18 U.S.C. 3184.
B. Individuals who have been charged with serious and/or significant
offenses:
1. Individuals who have been fingerprinted and whose criminal history
record information has been obtained.
2. Violent Felons: Persons with three or more convictions for a
violent felony or serious drug offense as defined by 18 U.S.C.
Sec. 924(e).
C. Missing Persons: 1. A person of any age who is missing and who is
under proven physical/mental disability or is senile, thereby
subjecting that person or others to personal and immediate danger.
2. A person of any age who is missing under circumstances indicating
that the disappearance was not voluntary.
3. A person of any age who is missing under circumstances indicating
that that person's physical safety may be in danger.
4. A person of any age who is missing after a catastrophe.
5. A person who is missing and declared unemancipated as defined by
the laws of the person's state of residence and does not meet any of
the entry criteria set forth in 1-4 above.
D. Individuals designated by the U.S. Secret Service as posing a
potential danger to the President and/or other authorized protectees.
E. Members of Violent Criminal Gangs: Individuals about whom
investigation has developed sufficient information to establish
membership in a particular violent criminal gang by either:
1. Self admission at the time of arrest or incarceration, or
2. Any two of the following criteria:
a. Identified as a gang member by a reliable informant;
b. Identified as a gang member by an informant whose information has
been corroborated;
c. Frequents a gang's area, associates with known members, and/or
affects gang dress, tattoos, or hand signals;
d. Has been arrested multiple times with known gang members for
offenses consistent with gang activity; or
e. Self admission (other than at the time of arrest or incarceration).
F. Members of Terrorist Organizations: Individuals about whom
investigations has developed sufficient information to establish
membership in a particular terrorist organization using the same
criteria listed above in paragraph E, items 1 and 2 a-e, as they apply
to members of terrorist organizations rather than members of violent
criminal gangs.
G. Unidentified Persons: 1. Any unidentified deceased person. 2. Any
person who is living and unable to ascertain the person's identity
(e.g., infant, amnesia victim). 3. Any unidentified catastrophe
```

(exhibit D)(figure 9)

23.      Articles posted on FLOCK site also bring the point home to this court **that the camera**

sent the alert with the defamatory information. (figure 10)(exhibit e)

14

(figure 10)

## C.     The Defamatory Alert

24.     The alert/ or information disseminated by a FLOCK camera was through their email account and mobile phone number/app, and their camera in particular is integral to State functions, and FLOCK was actively in 'joint action' with the state. (figure 11)(exhibit f)

25.     The Plaintiff has repeatedly used and was a user of the FLOCK cameras throughout Ohio and Jackson township without issue, but on February 25th, 2023, the camera malfunctioned and disseminated false and defamatory information about the Plaintiff without cause; he was never on any hot list from Cleveland nor the FBI, the only two sources listed on the alert as possible

15

1  departments who could have put the Plaintiff on any potential hot list if it existed. The Plaintiff

2  drove by Jackson Township cameras multiple times before February 25th 2023 without issue, the

3  camera simply malfunctioned.

4
5  26.    This product, in this case, the FLOCK ALPR on South BLVD , was the source of a

6  defamatory 'statement.

7  From: Flock Hotlist Alerts <hotlist@flocksafety.com>
   Date: February 25, 2023 at 04:33:35 EST
8  To: "McDannold, D" <mcdannold@jtpd.com>
   Subject: HOTLIST ALERT: OH - JVM1640 #09 - South Blvd @ Fulton - SB
9

10
11 # OH - JVM1640

12 Event Time: 4:33:15 02/25/2023

13 Source: CLEVELAND PD / FBI HUMAN TRAFFICKING MISSING JUVENILE VICTIM

   Case Number: CLEVELAND PD / FBI CASE
14
   Reason: CLEVELAND PD / FBI HUMAN TRAFFICKING VICTIM -
15 / SUSPECT: MICHAEL T. SMITH (DOB: 03/11/95) - IF SUBJECTS LOCATED CONTACT CLEVELAND
   PD, FBI, AND STARK COUNTY CPS (HAVE CUSTODY OF MISSING JUVENILE)

16 Camera: #09 - South Blvd @ Fulton - SB

17 Network: Jackson Township OH PD

18

19 (figure 11)(exhibit f)

20
21 27.    It is a fundamental principle of law that FLOCK, as an entity, bears the responsibility for

22 the information it disseminates via its email system to law enforcement agencies and has only to

23 disseminate information that isn't defamatory. This aligns with the general legal standards

24 applicable to all businesses and individuals. The fact that FLOCK operates under a contract with

25 the government does not exempt it from this responsibility. Rather, it could be argued that this

26
27 contractual and inappropriate relationship with the State imposes a higher duty of care on

28 FLOCK, as established in the case of Jeffers v. Olexo (1989), 43 Ohio St.3d 140, 142, 539

16

614. "To maintain a negligence action, the plaintiff must show the existence of a duty, a breach of that duty, and that the breach of that duty proximately caused the plaintiff's injury. "

28.      FLOCK has sold access to Plaintiff's PI (personal information) through its API. While the images taken by the camera may be deleted after 30 days, the data entered into FLOCK is not. This is documentation of the FLOCK API from Axon using the AdvancedSearch query function of the FLOCK SAFETY API.



3. Scroll to the ALPR section and select **Allowed** or **Prohibited** as needed.

- **Read/hit record search** – Lets a user search and view any agency ALPR records.
- **Hotlist management** – Lets a user search, modify, and create agency hotlists.
- **ALPR system administration**– Lets a user modify agency-level ALPR settings such as record retention and alert categories.

(figure 12)(exhibit g)

28. Furthermore, there is no legal precedent in Ohio or in the 6th Circuit that absolves a company, such as FLOCK, from liability if it disseminates defamatory information via email even though it authorizes it. See Am. Chem. Soc. v. Leadscope, Inc., 133 Ohio St.3d 366, 2012-Ohio-4193. ("¶ 2. In determining whether a statement is defamatory as a matter of law, a court must review the totality of the circumstances and read the statement in the context of the entire publication to determine whether a reasonable reader would interpret it as defamatory. A client is vicariously liable for its attorney's defamatory statements only if the client authorized or ratified the statements.")

29. Even a sliver of verification of the alert information by FLOCK before disseminating it to anyone would have stopped the alert from being distributed as it was false at one level or another.

D. **How it was Defamatory.**

30. There was never an investigation into the Plaintiff for human trafficking; the Plaintiff was clear is NCIC.

31. Defendant's failure to exercise reasonable or ordinary care by not retracting the defamatory statements by FLOCK before the police arrived so Plaintiff wouldn't get detained, the actions of Flock, in conjunction with state action, directly led to the violation of Plaintiff's constitutional rights.

32. The false info disseminated by FLOCK constitutes a statement that caused severe harm to the Plaintiff's reputation.

33. The only "sources" listed on the alert were Cleveland PD and the FBI, but those agencies knew nothing about this alert, nor did those agencies input the alert. Only FLOCK Safety knows who put the alert in. Nowhere on the alert does it state who put the alert in, but FLOCK disseminated it; this case is not about who put the alert in but rather why FLOCK disseminated a false and defamatory alert with the Personal identifying information of the Plaintiff without permission.

34. The case number listed on the alert is not valid and implies to any outside reader that there is an active case against the Plaintiff, which is false and defamatory by the Defendant.

E. **Relationship Between FLOCK Safety and the State of Ohio**

35.      It is established that FLOCK Safety maintains a significant high-level relationship with the State of Ohio. This relationship persists even without physical camera equipment, as FLOCK permits Ohio state agencies to access its proprietary camera, software, and data repositories for free through a memorandum of understandings. FLOCK Safety also goes above and beyond its

18

ALPR contract with the State through its "Sales Force Account Engagement" by persuading these newly partnered police agencies to host "community safety events" aimed exclusively at HOA and exclusively for HOA and private communities.(figure 13)(exhibit H)

An early use case for Account Engagement? Event marketing. Here's an example:

- Flock Safety is partnering with the Atlanta Police Department to put on a community safety event.
- Flock Safety uses Account Engagement to run automated campaigns that invite prospects to the event. Thanks to the seamless sales and marketing alignment that Account Engagement enables, the Flock Safety team can not only easily drive

registrations, but also create a full journey for those prospects from pre- to post-event, driving more deals.
- Sales reps can see which leads attended the event.
- When one of those leads attends the event, and shows interest in Flock Safety's offerings, the sales team can easily see that activity within Salesforce. They can then reach out to the lead, using an email template that the marketing created ahead of time.
- With Account Engagement and Sales Cloud on the same platform, sales and marketing both get a full, 360-degree view of the customer, to inform future product evaluations.

(figure 13)

36.     Numerous high-ranking law enforcement and non-law enforcement agencies within the State of Ohio currently hold agreements with FLOCK. These include, but are not limited to, the Ohio Attorney General's Office, Ohio Bureau of Criminal Investigation, Ohio Bureau of Motor Vehicles (Ohio DPS), Ohio Bureau of Workers' Compensation (LE), Ohio Department of Public Safety, Ohio Drug TF (HIDTA / Moreland Hills OH PD), Ohio State Highway Patrol, and Cuyahoga Emergency Communications Systems OH (CECOMS).

37.     Some of those agencies, Ohio Attorney General or Department of  Public Safety, have no FLOCK cameras, but what these agencies does have, is provide grants to Flock Safety through

the cities and schools ran by the Government, even FLOCK asks for Law enforcement help for their projects.  (figure 14)(exhibit i) (figure 15)(exhibit j)(figure 16)(exhibit k)

From: Myron Maret myron.maret@flocksafety.com,

Date: June 20, 2023 at 15:25:29

Cc:

Subject: **Flock Safety I Success Storyboard**

Good Afternoon,

Hope all is well with you. I am currently assisting with a project to create success storyboards from agencies that used ARPA funds for Flock.

To assist the State in realizing the investigative successes from this funding, we are putting together storyboards of the most impactful cases made by your agency to send to Director Wilson and Asst. Director Huey at the Department of Public Safety. See the attached sample from Westlake PD.

I would be happy to create the storyboard for your agency - can you send me descriptions of your 4-5 success stories that you feel demonstrate the value of this program? (redacted photos would also help paint the picture of how the technology is used!)

Thank you for your assistance!

Myron Maret
**Senior Customer Success Manager**


404-631-6599    flocksafety.com



--

(figure 14)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Licking Heights Schools add license plate readers to their campuses**

by Jeremiah Wilcox | Thu, November 16th 2023, 5:34 PM EST



*Licking Heights School District is one of the fastest-growing districts here in Ohio. With the growth throughout their community, they're adding more ways to keep students safe. They've installed license plate readers across the district, called flock cameras. (WSYX)*




COLUMBUS, Ohio (WSYX) — Licking Heights School District is one of the fastest-growing districts here in Ohio. With the growth throughout their community, they're adding more ways to keep students safe.

They've installed license plate readers across the district, called flock cameras.

> It made me realize that is a tool that would be incredibly valuable to us to be able to track so many things," said Superintendent of Licking Heights Dr. Kevin Miller.

The district received a $30,000 Ohio School Safety grant to install 11 cameras across all campuses. The reader only focuses on license plates.

(figure 15)

21

## Prosecutor's Office Secures Grant for Crime Prevention Programming

*August 23, 2023* by Shylin Costello



ZANESVILLE, OH – In the latest effort to combat violent crime in Zanesville, the Muskingum County Prosecutor's Office teamed up with the Zanesville Police Department to secure grants for $350,000 to purchase and install crime prevention programming technology.

The new crime fighting technology is called a Flock Camera. It has the ability to pinpoint the location of gunfire and then sends the information to the police, allowing officers to greater respond to shots fired incidents. In conjunction with the gunshot detection technology, are ALPR's. These devices acquire vehicle information after vehicles pass in the device's line of site. The data can be held for 30 days and can only be accessed by law enforcement.

"If there's a gunshot, that information is recorded by the sensors, and it's immediately sent to law enforcement allowing them to dispatch immediately. What it also does is gives them a location where the gunshot was, and then what they can do is use the license plate readers that are in that area, to be able to locate suspected vehicles." Muskingum County Prosecutor, Ron Welch said.

(figure 16)

The State of Ohio provides significant funding to FLOCK by grants, and also at the same time, without cost, FLOCK provides Ohio State and its Attorney general access to its systems even without being a customer, giving these non-customers the ability to add people to a hotlist and have access to the thousands of FLOCK cameras nationwide through their TALON network. (figure 17)(exhibit l)(exhibit m)(exhibit n)(figure 18)(figure 19)

the Flock Service; (v) remove, obscure, or alter any notice of any intellectual property or
proprietary right appearing on or contained within any of the Flock Service; or (vi) assign,
sublicense, sell, resell, lease, rent or otherwise transfer or convey, or pledge as security or
otherwise encumber, Agency's rights under Sections 2. Agency may only access Recordings
and Flock Service to perform the Purpose, as described in Section 1. Agency shall not use the
Flock Service in any manner not permitted by appropriate governing Federal and State
regulations or laws; Agency represents and warrants that, in receiving access to Flock Services,
such video and supplemental data shall be used solely for purposes authorized by law and
described in this MOU.

4. **Ownership.** As between the Parties, subject to the rights granted in this MOU, Flock and its
licensors retain all right, title and interest in and to the Flock Service, and its components and
any Recordings or data provided by Flock through the Flock Service, and Agency
acknowledges that it neither owns nor acquires any additional rights in and to the foregoing not
expressly granted by this MOU.  Agency further acknowledges that Flock retains the right to use
the foregoing for any purpose in Flock's sole discretion.  There are no implied rights.

5. **Warranty.** Flock and its licensors make no express or implied warranty as to the conditions of
the Recordings, or fitness for a particular research, data, investigative purpose or resulting
actions or omissions resulting from videos and supplemental data obtained by Agency through
the use of Flock Services.

6. **Financial Implications to Agency.** No financial commitment by Agency is required to
access the Flock Services or Recordings.

7. **Term; Termination.**

A. **Term.**  This MOU will commence once executed by both parties and shall continue for a
period of Five (5) years.

(figure 17)(exhibit l)

ATLANTA, GA, Aug. 19, 2020 (GLOBE NEWSWIRE) -- Flock
Safety, a crime-solving company that provides the most
advanced and affordable security for neighborhoods, small
businesses, and law enforcement, today launched TALON, the
industry's first ethically-designed local and national network of
automatic license plate readers (ALPRs). TALON allows law
enforcement to opt-in to sharing their Flock Safety ALPRs with
other law enforcement agencies in their state or agencies in
over 700 cities nationwide, providing near real-time
information sharing across jurisdictions. TALON is available at
zero additional cost to Flock Safety customers.

**Share**

f

X

in

TALON is a critical new network of ALPRs for law enforcement
because over 80% of property crime goes unsolved, and
suspects don't often stay in just one jurisdiction. Near real-
time information sharing can save agencies time and money,
while clearing more cases.

"TALON works on an interconnected system," said Pell City
Police Chief Paul Irwin, "allowing us to view footage from other
jurisdictions. That's a huge advantage."

(figure 18)(exhibit m)

Shared Footage Search Network for Law
Enforcement
A new way to solve cross-jurisdiction crimes

- New privacy setting (National + State search)
- 1B + monthly reads
- Attached to "Lookup" experience

(figure 19)(exhibit n)

38.    These agreements also underscore the close relationship between FLOCK and the State, implicating the state action doctrine. FLOCK holds over 300 contracts with law enforcement and non-law enforcement government entities within Ohio. FLOCK also has agreements with State universities, such as Denison University Campus OH PD.

39.    Approximately 30 of these contracts are with Sheriff's offices, while the remainder are with various other law enforcement agencies within the State. Some of these agencies, such as the Barberton and OH PD, do not possess physical camera equipment but retain the ability to add a custom hot list, akin to a FLOCK camera owner. (figure 19a)

From: **Rick Lombardo** rick.lombardo@flocksafety.com,

Date: July 7, 2021 at 10:42:36

Cc:

Subject: **Re: Flock Safety**

Hi Chief Kinney,

I wanted to pass along a story that Action19 news ran a few days ago on some of the work we are doing out in Mentor.

https://www.cleveland19.com/2021/07/02/camera-system-tied-criminal-database-helps-mentor-police-fight-crime/

As stated in my previous emails I would love the opportunity to stop in and just present the technology to you.  Worst case scenario I can get your department free access to hundreds of cameras in the Cleveland area.

Thanks,

Rick Lombardo

(figure 19a)

40.     This extensive contractual relationship also brings FLOCK's actions within the ambit of

state action, as per the Supreme Court's decision in Brentwood Academy v. Tennessee

Secondary School Athletic Association, 531 U.S. 288 (2001).

41.     Forty other ALPR camera competitors, such as Verkada, cant match the volume of Ohio

law enforcement/non-law enforcement government contracts held by FLOCK, nor do those

companies inappropriately have high-level relationships with state officials. This is mainly due

to FLOCK's unique technical capability to share its system with hundreds of other Ohio agencies,

regardless of whether they possess a FLOCK camera. This demonstrates the intimate relationship

that FLOCK maintains with the State of Ohio, allowing government agencies to access their

camera and its software , even without a camera.

42.     FLOCK has also partnered with body camera company Axon and has API

implementation. This partnership facilitates the provision of mobile ALPR devices for police

vehicles and integration with evidence.com, a platform widely utilized by law enforcement

agencies. It is indisputable that the State plays a 'significant role in the operation, management,

or control' of the FLOCK system. The State, represented by individual cities, Sheriff's offices,

and the attorney general, is actively involved in the operation of the FLOCK system. This

involvement includes setting ALPR policies with the help of FLOCK, making decisions about

system usage, and directly managing the personnel who utilize the system. The State exercises

oversight and administration of the system, dictating its use, user base, and purpose through

FLOCK contractual arrangements and city regulatory authority. The cameras are no different

than a security contractor for these cities, as these cities have a yearly ongoing cost of $2500 per

camera

25

43.     It is to be noted that FLOCK also actively helps shape the ALPR policies of the cities with which it partners. FLOCK has government affairs reps, such as but limited to Hector Soliman-Valdez or Rick Lombardo , show up and present at local city council meetings and talk about ALPR policies that the city can adapt for its (Flock's) devices, which is highly unusual for a company that only leases "ALPR" cameras. It's not common for a private company to help a local city shape device policies before signing the contracts. (figure 20) (figure 21)(Exhibit O)



(figure 20)

## Youngstown may replace ShotSpotter with newer technology

The city safety committee along with the police chief and other officials met Thursday to discuss their options, most of them arguing that ShotSpotter is outdated and that newer options would help them solve more violent crimes.

Posted:
Updated:



After more than a decade in use, the city of Youngstown is considering replacing its ShotSpotter gunfire sensor technology with something else.

The city safety committee, police chief Carl Davis and other high-ranking YPD officials, the law director and council members met Thursday to go over potential alternatives.

"It has served its purpose, but I believe it to be outdated now," Chief Davis said of the current ShotSpotter system. The city recently renewed an agreement for maintenance and monitoring of the ShotSpotter equipment, which it owns, for another year at a cost of $77,214.

When Sixth Ward councilwoman Anita Davis asked Chief Davis what he suggested as an alternative, he said "the alternative is sitting here in the room - Flock Safety." The company is based in Atlanta.

Lieutenant Mohammad Awad agreed, saying Flock could prove critical in helping solve homicide cases.

"It's a good service, I'm very happy with ShotSpotter, but I know our money is not never ending, so I'd rather see maybe a different service available to help us solve some major crimes," Awad said Thursday. "That Lowellville double homicide (in November 2022), that person tried to flee the area, it came across a Flock camera - they were able to zero in on him immediately."

Laura Ann Holland, a representative from Flock, gave a presentation during the meeting, suggesting that if the goal is to solve more violent crimes, the company's vehicle recognition technology would pair very effectively with its newly launched gunshot detection software, called "The Raven."

(exhibit O)

(figure 21)

F.     **Unique Position in the Market**

44.     Unlike most other private entities, Flock Safety receives grant money from the State of Ohio, and its primary clientele consists of law enforcement and government agencies, including schools. This unique financial and operational relationship with the state distinguishes Flock

27

Safety from other private companies and also aligns it more closely with a state actor.

In Brentwood Academy v. Tennessee Secondary School Athletic Association, the Supreme

Court held that 'state action may be found if, though only if, there is such a 'close nexus between

the State and the challenged action' that seemingly private behavior 'may be fairly treated as that

of the State itself.' Flock Safety's License Plate Recognition (LPR) device is integrated with the

FBI's National Crime Information Center (NCIC) database. In pamphlets handed to Law

enforcement, FLOCK uses personification to liken their devices to a partner in law enforcement.

(figure 22) (figure 23)(Exhibit P)

45.     Furthermore,other than FLOCK asking the State to help vouch its product to other state

agencies, the company is involved with TALEN, an Ohio Attorney General project themselves ,

and has integrations with law enforcement programs and applications such as Evidence.com and

dispatch camera and its software. These integrations also further underscore Flock Safety's role

as a state actor. Flock Safety actively participates in city council meetings, proposing and

working alongside cities to craft Automatic License Plate Recognition (ALPR) policies for its

own devices. The company retains control over where its cameras are placed, and it pressures

law enforcement and government agencies to host community safety events to discuss Flock

devices with homeowners' associations (HOAs) and private communities.VICE, a news

organization, puts it, " Flock works closely with police to try and generate positive media

coverage, improve their PR strategy; in some cases, Flock has helped write press releases for

agencies (figure 26)(exhibit Q)."

(figure 22)

(exhibit P)(figure 23)

Flock Safety unites law enforcement and the communities they serve in the pursuit of a safer, more
equitable society, with the use of force-multiplying technology. Our devices, which are owned by
both public and private customers, see like a detective. They capture objective evidence, decode

45.    No typical contractor that builds a bridge for the state, or even any company that

harmlessly sells "only alpr devices," would ever go to the inappropriate lengths that FLOCK  has

done and take advantage of their close relationship with the state via abusing police resources to

throw parties for FLOCK product on the taxpayers dime , which even FLOCK describes in

Cleveland Ohio remote job descriptions for their remote customer success manager's as

"tactics..." (figure 24)(exhibit R), FLOCK has boilerplate PR statement's that FLOCK SAFETY

want law enforcement to use such as the Bellefontaine police department used(figure 25)(exhibit

S) and many other police departments used after those agencies installed FLOCK Cameras such

as:

> "The ___ Police Department has solved [CRIME] with the help of their Flock
> Safety camera system. Flock Safety ALPR cameras help law enforcement
> investigate crime by providing objective evidence. [CRIME DETAILS AND

29

1   STORY] ____ Police installed Flock cameras on [DATE] to solve and reduce
2   crime in [CITY]."

3   Even news organizations report that FLOCK helps create statements for the police to
    release, and even create government policies for city counsel to adopt. (figure 26)(exhibit
4   Q)

5

6

7

8   The Role
    Flock Safety is looking for a motivated and strategic-minded
9   individual to join our Customer team as our Customer Success
    Manager, working with our Law Enforcement clients.
10
    While this will be remote, the expectation is that the individual
11  will spend much of their time (virtually or in-person) with
    strategic law enforcement customers along with homeowners
12  associations in the region. The Customer team is focused on
    three pillars: customer satisfaction, retention, and growth. This is
13  not a sales role with things like quotas; rather, it's a market
    ownership role where you are focused on facilitating growth and
14  retention through a combination of hustle and relationship-
15  building. Satisfied customers renew their Flock Safety
    subscriptions because they feel supported and understand the
16  value of the product. Markets grow through a variety of tactics -
    some examples: connecting local press with great stories of
17  Flock cameras being used to solve crime; organizing a
18  community event between the local police department (who
    you've turned into Flock advocates) and neighborhood
19  association leaders from around the city interested in eliminating
20  non-violent crime; sharing access to private license plate reader
    cameras with law enforcement.
21

22

23  (This is for a Cleveland ohio remote job at FLOCK.)(figure 24)(exhibit R)

24

25

26

27

28

30



⬛ ci.bellefontaine.oh.us

HOME   GOVERNMENT   DEPARTMENTS   ANNOUNCEMENTS   VISITOR INFO   DOR/

# BELLEFONTAINE POLICE INSTALLING FLOCK SAFETY CAMERAS TO SOLVE AND PREVENT CRIME

4/7/2022   0 Comments

The Bellefontaine Police Department is taking an active role in preventing and solving crime by installing Flock Safety Automated License Plate Reading (ALPR) cameras.

Flock Safety ALPR cameras help law enforcement investigate crime by providing objective evidence that can be transformed into actionable leads. They capture license plates and vehicle characteristics, not people or faces.

Bellefontaine Police Department will use the Flock Safety system for both proactive and reactive crime fighting. The ALPR network delivers real-time alerts to law enforcement when a stolen or wanted vehicle has passed a camera. The license plate readers can also alert officers if a vehicle associated with a missing person in an AMBER or Silver Alert is detected. When investigating a crime, Flock Safety cameras detect and decode objective leads for law enforcement using Vehicle FingerprintTM technology, which identifies the make, vehicle type, color, license plate (full, partial, or missing), license plate state, and unique vehicle features like roof rack, trailer hitch, tinted windows, and more.

(figure 25)

31

VICE

Flock Pole - 12 ft                          Standard Pole Mount

Solar Panel - Double Top Mount               2 External Battery Pack

DETAILS ON A FLOCK DEPLOYMENT AVAILABLE ON A PUBLICLY ACCESSIBLE URL INCLUDED IN EMAILS OBTAINED
BY MOTHERBOARD. IMAGE: MOTHERBOARD

In one email, a Flock staffer offered members of the New Lenox Police
Department their abilities for "drafting social media posts, pitching local
reporters, writing press releases." The purpose, ultimately, is to "generate
some goodwill and get your jurisdiction activated, bring more private
cameras into the area, and highlight your successes!" the email from the
Flock staffer continues. "Please use us as your resource!"

ADVERTISEMENT

THIS IS
TEQUILA                                      DELEON

The result is a circle, with Flock working with police to generate positive
coverage, to encourage more communities to purchase cameras, and to
then provide access to that footage to the police, and around again.

(figure 26)(exhibit Q)

**46.**  This level of involvement in policy making and implementation plus the encouragement

from the Jackson Township (The State) to the Defendants by allowing FLOCK Safety

integration with Jackson township patrol/ detective e-mail/mobile numbers and notifications to

dispatch, thus supporting the action of sending police on FLOCK's beck and call,  is all

characteristic of a state actor and their close relationship with the state, as including to where

FLOCK can use police resources as a marketing tool to get access to HOA's, FLOCK does this

tactic because HOA leaders are willing to listen to a police officer vouch for a product at a

"community" event rather than a salesperson coming door to door pitching their product.

47.     The Supreme Court in West v. Atkins, 487 U.S. 42 (1988) stated that a private entity can be considered a state actor when it exercises power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."

48.     The influence of this close state relationship with FLOCK SAFETY of using agencies of the State of Ohio as marketing salespeople is evident in a particular article by ABC; at the bottom, it states(figure 27)(exhibit T)

Franklin Township trustee John Fleshman said he's seen these cameras in action and encouraged their use statewide.

"There is a huge benefit," Fleshman said.

*I've been out with police when they've gotten a text that a vehicle they were looking for is in our area and passed by one of our cameras. The bad guy doesn't hear the scanner. They have no idea that we are onto them. We can pick the time and place that we want to end it."*

Gilbert said the cameras are also being used at some apartment complexes across Central Ohio.

"There's an apartment complex close to here, Havenwood, where we have had multiple shootings and some homicides," he said. "Franklin Township worked with the property owner there to get this technology. This technology is also going to be looked at in the Wedgewood area where there's been a lot of problems."

(figure 27)(exhibit T)

50.     Back in November 2023, FLOCK held one of these "community" events in Columbus, as described in Figure 24.

51.     The job description of an Ohio FLOCK Safety Customer Success agent states that the company abuses police resources, the Sales Force program that collects data for the events that the Police hold on behalf of Flock, to the records by news articles stating that this tactic is being used on Police within Ohio by Flock Safety to FLOCK drafting and helping Police come up with pr statements and ALPR policies shows the close relationship with every level of the state to

where FLOCK is taking on rolls that typically would not be possible in any other business relationship and exerts a level of influence that is seen only from state officials.

52. In short, the Police are not party planners nor any marketing agents or even should ever be referred to as "Flock advocates"; they are law enforcement for the public, not anything else.

**G. Financial Commitment and Control**

53. Unlike other companies, Flock Safety leases, rather than sells, its devices, necessitating an ongoing financial commitment from its clients. Additionally, Flock Safety provides its camera and software to law enforcement agencies free of charge under a 5-year Memorandum of Understanding (MOU) but does not extend this offer to private communities or HOAs. This financial arrangement and control over its product further align Flock Safety with the role of a state actor. The Supreme Court in Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922 (1982) held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment.'

54. FLOCK can exert this level of influence compared to a typical security camera company or similar ALPR devices like Verkada with their integration with NCIC and local law enforcement databases and their Partnership with the International Chief of Police; a 30 thousand-member group made up of law enforcement. (figure 28)(figure 29)

**IACP Partner Program**

IACP Partners are companies and organizations that care about IACP's Mission and Vision and have a vested interest in helping them come to fruition, while also working with IACP to further strengthen their brand and purpose. IACP works with its partners to strengthen the industry, support and educate today's decision makers, and prepare the next generation for the future of law enforcement.

**Axon**

**FirstNet**

**Flock Safety**

**Motorola Solutions**

**Oracle**

**Learn How to Become a Partner**

The IACP hosts a number of conferences and events throughout the year. These events provide education, professional development, and networking opportunities for attendees. For partners and sponsors, it's an unmatched opportunity to reach your target audience, showcase thought leadership and generate new leads. To learn more about all available opportunities, please view the 2023 IACP Sponsorship Prospectus.

(figure 28)

1
2
3
4
5
6
7
8
9
10
11



**IACP/Flock Safety Leadership in Looking Beyond the License Plate Award**

The IACP/Flock Safety Leadership in Looking Beyond the License Plate Award recognizes the dedication and initiative of individual police officers whose daily efforts during traffic stops play a large part in preventing additional, more severe crimes.

12
13

**Applications are now closed**
Complete the 2024 IACP Awards Interest Form ☒ to receive information as it becomes available.

14

The IACP/Flock Safety Leadership in Looking Beyond the License Plate Award recognizes the dedication and initiative of individual police officers whose daily efforts during traffic stops play a large part in preventing additional, more severe crimes. This award is designed to substantiate and document the importance of license plates as law enforcement tools and recognize officers who use license plates to prevent and detect both civil traffic violations and further criminal conduct.

15
16
17

(figure 29)

18

55.    FLOCK also gives awards to law enforcement for **using their product** at IACP

19

conferences(figure 30)

20
21
22
23
24
25
26
27
28

36

**Congratulations to the Winners of 2023 Flock #Solved Awards!**

April 5, 2023 • 2 mins

Flock Safety is thrilled to announce the winners of the 2023 #Solved Awards, an honor that celebrates law enforcement who use technology to solve challenging cases while exemplifying bravery, hard work, and partnership with their community.

The Flock Safety #Solved Award is open to any member of a law enforcement agency that uses Flock Safety technology, including **Automated License Plate Recognition (ALPR)** cameras and the **Raven Gunshot Audio Detection** system, along with agencies using technology to work more closely with their fellow law enforcement and with their community.

Nominees were solicited from across the country and over 220 law enforcement personnel from 25 states were nominated by their colleagues. The winners are:

- **10+ Vehicles Recovered**: Detective Daniel Mendoza, Town of Colma Police (CA)
- **Missing Persons Case:** Deputy Laura Garcia, La Paz County Sheriff's Office (AZ)
- **Violent Crime:** Detective Joshua Garabedian, Montclair Police Department (CA)
- **Agency Collaboration:** Corporal Patrick Naughton, Palm Bay Police Department (FL)
- **Public Safety Partnership:** Master Police Officer Howard Mergler, Fairfax County Police Department (VA)
- **Community Engagement (Large Agency):** Detective Jamie Shoemaker, Geneseo Illinois Police Department (IL)
- **Community Engagement (Small Agency):** Chief of Police Christopher Cook, City of White Settlement (TX)
- **Wildcard:** Detective Sergeant Bryan Ashley, Sumner County Sheriff's Office (TN)

(figure 30)

56.     FLOCK, by its pervasive influence and inner connections within the governmental structure of Ohio, has effectively become a state actor for a Section 1983 claim. The extent of FLOCK's influence is such that it has become indispensable to various state agencies, including the Attorney General's office, due to the critical data it provides, FLOCK understands this by giving free access and/or leasing cameras to the State.

37

57.     This relationship is not merely transactional but extends to shaping public statements and policies of these agencies. FLOCK's involvement in law enforcement activities, such as hosting events to target HOAs as a marketing arm of FLOCK, further underscores its role as a state actor for this purpose. Its partnerships with NCIC, AXON, and IACP, which boasts a membership of 30,000 law enforcement personnel, and FLOCK, giving awards out to law enforcement as recognition for using FLOCK devices, further solidify its position within the law enforcement community. This unique relationship, unparalleled by any other company operating in the ALPR space, is akin to that of a detective within a squad.

58.     Given this context, it is reasonable for a patrol officer to respond to a high-intensity FLOCK alert, especially considering the company's partnerships with the Attorney General of Ohio, the Ohio Highway Patrol, and the other facts above. The incident on February 25, 2023, where FLOCK dispatched police to the Plaintiff's location based on its alerts and notifications, can be seen as an action taken under the color of law, given FLOCK's close relationship with the State of Ohio.

59.     The data within the alert provided to the Police Agency, such as in this case, does not originate from the Agency itself but rather from FLOCK. This data is stored on FLOCK's servers, making it FLOCK's information. The MOU that FLOCK signs with non-customers refers to all data as "FLOCKS." This situation is analogous to a scenario where a third-party contractor, engaged and remunerated by a local government, captures an image of a vehicle. Upon identifying a match from the contractor's independent, unverified list, the contractor communicates this information to the police via their communication channels. Under the auspices of a local government contract, the contractor has publicized through various means, such as pamphlets, that their services contribute to crime prevention. Consequently, the local

government takes the contractor's alerts seriously and acts upon them. In this instance, based solely on the contractor's alert, the local government stops the motorist. However, the alert turns out to be false and defamatory.

60.     The information in the FLOCK system transmitted to the State of Ohio, such as Jackson township police, was defamatory and was done while under the government. **FLOCK would not have notified and dispatched police otherwise**. Flock does not sell cameras; they lease, and FLOCK owns everything: the cameras, the solar panel, the operating system, and the data.

H.      **Negligence by FLOCK:**

**61.**     It is evident that FLOCK Safety, under the color of the law, made false and defamatory statements about the Plaintiff, which were unprivileged and published to a third party. FLOCK demonstrated negligence, at the very least, in publishing these statements. The statements were actionable irrespective of particular harm or if the publication caused special harm, as per Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc. 81 Ohio App.3d 591, 601 (1992).

I.      **Common Law and Defamation:**

62.     In Ohio, the Supreme Court held that 'a statement, in whatever form, that tends to injure a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business, is defamatory.' (Am. Chem. Soc. v. Leadscope, Inc. 133 Ohio St.3d 366, 2012-Ohio-4193). Because private individuals characteristically have less effective opportunities for rebuttal than public officials and public figures, they are more vulnerable to injury from defamation. Because they have not voluntarily exposed themselves to increased risk of injury from defamatory falsehoods, they are also more deserving of recovery. The state interest in compensating *324 injury to the reputation of private individuals is therefore

greater than for public officials and public figures. Pp. 3008—3010. Gertz v. Robert Welch, Inc., 418 U.S. 323, 323 – 24, 94 S. Ct. 2997, 2999, 41 L. Ed. 2d 789 (1974)

J.      **Facts support a Defective Product Design:**

63.      The defamatory information issued by the FLOCK camera shows a lack of data validation within its camera, as there has never been a "case number" in any court system with the words "CLEVELAND PD/ FBI CASE." This defect was a substantial factor in causing the Plaintiff's harm.

64.      When the cameras left FLOCK, as they were built and manufactured by FLOCK Safety, they lacked data validation in the Repository Layer and UI Layer. At the time of the injuries to the Plaintiff, there had not been a substantial change to the FLOCK camera as initially designed and manufactured;

65.      FLOCK permitted invalid data entry into the camera's hardware without verification through NCIC and law enforcement databases.

66.      FLOCK can verify, as the camera already alerts police officers if a license plate is associated with a missing person or warrant, as seen in the pamphlets provided to every FLOCK Falcon customer (Figure 31)(see Exhibit L).

67.      The camera's data to law enforcement should be validated in the Repository Layer and UI Layer through NCIC.

68.      This shows an intentional design decision as FLOCK could have easily chosen to verify all information released by its cameras from trusted law enforcement databases such as NCIC(figure 31)

40

69.     The false data disseminated by the ALPR camera and the subsequent detainment of the Plaintiff caused or is likely to cause serious harm to the Plaintiff's reputation. This lack of verification of all information spit out by FLOCK's cameras, resulting in arrests, allows FLOCK to brag about statistics in all their press releases and pamphlets; the defendant negligently designed the defective device for their gain.



SOFTWARE USER INTERFACE

Included at no additional cost with unlimited user licenses. Receive alerts to help detect crime and search footage to access evidence — with any internet-connected device (based on user credentials that are easily managed/approved by admin)

Detect Crime
- Connected to the NCIC Hot List & CJIS compliant
- State detection to ensure quality alerts
- Hotlist alerts (includes privately owned cameras in your jurisdiction)
- Create custom alerts for tags under investigation with your organization
- Filter notifications by reason codes (exclude sex offenders, include stolen plates, etc.)
- Email and SMS alerts to users
- Audible and visual alerts

(figure 31)(see exhibit N)

**K.     Legal Duty/ Design Defect/Nonconformance with Representation**

64.     FLOCK had a duty to design their camera against reasonably foreseeable hazards; FLOCK SAFETY didn't here.

65.     FLOCK refers to their FLOCK Safety as "Flock Safety is a public safety operating system." FLOCK acknowledges a unique duty of care distinct from other Automated License Plate Recognition (ALPR) camera companies. Given FLOCK's deliberate engagement with law

41

enforcement through integration with the National Crime Information Center (NCIC) and the Federal Bureau of Investigation (FBI),

66.    FLOCK bears a legal obligation under the color of the law to ensure the veracity of the alert and its data being released by its cameras before its dissemination to third parties. In contravention of this duty, FLOCK avoided incorporating validation in the Repository Layer and UI Layer through NCIC before the camera disseminated to a wide array of law enforcement agencies without verification.

67.    In short, the FLOCK camera lacks any safeguards from distributing defamatory information, which has not undergone any form of validation in the Repository Layer and UI Layer because of design decisions by FLOCK.

68.    FLOCK failed to incorporate sufficient safeguards within its camera distribution of inaccurate data to its customers. The conspicuous lack of data validation mechanisms within FLOCK's cameras in the Repository Layer and UI Layer highlights the breach of duty owed to the Plaintiff, ensuring that FLOCK does not disseminate information that is categorically false and defamatory to law enforcement

69.    Again, FLOCK refers to its FLOCK Safety as "A public safety operating system" (thus, it must use reasonable care in designing the product in light of those claims. The negligent actions are evident in its failure to implement even basic data validation in the Repository Layer and UI Layer before disseminating by the camera. Due to this breach of duty, the Plaintiff has suffered non-economic damages, emotional distress, and damage to his reputation.

70.    All camera units by FLOCK Safety as of February 25th left the manufacturer with the same flaw in the Repository Layer and UI Layer and FLOCK misrepresented the product to the public (exhibit U)(figure 32)

42

1
2
3
4
5
6

What is Flock Safety?

Flock Safety is a public safety operating system that helps communities and law enforcement work together to eliminate crime, protect privacy, and mitigate bias. We build devices that capture objective evidence and use machine learning to detect and deliver unbiased investigative leads to law enforcement. Flock Safety communities have reported crime reductions of up to 70 percent.

7    (exhibit U)(figure 32)

8

9

L.       **How the data was invalid**

10

11   71. It is well known that Case numbers traditionally lack linguistic structure, typically comprising

12   alphanumeric sequences devoid of sentence-like formations. These combinations of numbers and

13   letters can be inputted into a  court clerk's website or by a law enforcement agency. Given

14   FLOCK's integration with the National Crime Information Center (NCIC) and other law

15   enforcement databases, FLOCK demonstrates apparent familiarity with the characteristic

16   features of a legitimate case number. Flock Safety, possessing knowledge or reasonably expected

17   to possess knowledge commensurate with the prevailing standard of care within its professional

18   capacity, should have discerned the falsity of the data contained in the alert and what a proper

19   case number looks like.

20

21   72.       Applicable to both manufacturing and design defects, this standard now states that a

22   product may be proven to be defective if it is more dangerous than an ordinary consumer would

23   expect when used in an intended or reasonably foreseeable manner. Leichtamer v. American

24   Motors Corp. (1981), 67 Ohio St.2d 456, 21 O.O. 3d 285, 424 N.E.2d 568, paragraph two of the

25   syllabus; Knitz v. Minster Machine Co. (1982), 69 Ohio St.2d 460, 23 O.O. 3d 403, 432 N.E.2d 814,

26   syllabus; Cremeans v. International Harvester Co. (1983), 6 Ohio St.3d 232, 6 OBR 302, 452

27

28

N.E.2d 1281, syllabus. This standard "* * * recognizes the legitimacy of one of the fundamental

values in the law of torts: `the protection of the individuality of persons, by according to formal

respect for their fairly developed expectations of product safety * * *.' [Citation

omitted.]" Leichtamer, supra, at 467, 21 O.O. 3d at 292, 424 N.E.2d at 577

This design decision for input data validation runs contrary to "de facto "industry standards/

specifications, formulas, or performance, which FLOCK states on its website. (figure 33)(Exhibit

V), the evidence



shows.

(figure 33)(exhibit V)


73.      The same "**de facto standard**" OWASP [2] cheat sheets that FLOCK site speaks about,

mentions input validation as

_____

[2] "Input Validation Cheat Sheet

." OWASP® Foundation,
https://cheatsheetseries.owasp.org/cheatsheets/Input_Validation_Cheat_Sheet.html Accessed
November 9, 2023.

44

*Goals of Input Validation*

*Input validation is performed to ensure only properly formed data is entering the workflow in an information system, preventing malformed data from persisting in the database and triggering malfunction of various downstream components. Input validation should happen as early as possible in the data flow, preferably as soon as the data is received from the external party.*

*Data from all potentially untrusted sources should be subject to input validation, including not only Internet-facing web clients but also backend feeds over extranets, from suppliers, partners, vendors or regulators, each of which may be compromised on their own and start sending malformed data.*

73.     FLOCK's public assertions of adhering to best practices starkly contrast with its lack of OWASP input validation and data validation in its camera within its Repository Layer and UI Layer.

74.     This discrepancy constitutes negligence, particularly given that FLOCK could implement such input validation/data validation within the Repository Layer and U.I. Layer and not allow blown sentences in the case number field without compromising the camera's utility. "availability of a technically feasible alternative," namely, a metal inlet ring. See Aldridge, 2006-Ohio-4964 at ¶ 50, 2006 WL 2716696 (recognizing that to defeat summary judgment on a defective design claim, the Plaintiff must present evidence of a "technically feasible alternative design"). Ace Am. Ins. Co. v. Gerling & Assocs., Inc., 630 F. Supp. 3d 919, 929 (S.D. Ohio 2022)

75.     FLOCK's camera falls short of industry standards, such as those set by the Open Worldwide Application Security Project (OWASP) and the Security Cheat Sheet Series projects,

particularly for input/data validation. This defect existed when the product left the manufacturer's control, which currently affects FLOCK.

76. In the context of design defects, the 'product' refers to the FLOCK camera, and the 'defect' pertains to the design flaw that causes the camera to function unintentionally and unintentionally. In this case, the defect is the complete absence of validation for information released by the camera.

77. The product is defective as it poses more significant danger than an ordinary consumer would anticipate when used in an intended or reasonably foreseeable manner [Ohio Rev. Code Ann. § 2307.71 et seq.].

78. The lack of validation of the information released by the camera can lead to unpredictable interactions with law enforcement, as FLOCK does not verify the information before disclosing it to the police.

79. A practical and technically feasible alternative design for the camera that would have prevented harm to Plaintiff without diminishing the product's usefulness to businesses or law enforcement is the simple implementation of proper data validation.

80. The Plaintiff was never at fault at any point in time as he used the product as intended. This design defect directly resulted in the injury to Plaintiff.

81. In summary, the product was more dangerous than an ordinary consumer would anticipate, and FLOCK failed to design their product, the camera, against reasonably foreseeable hazards (invalid data in their alert and its data being released by its camera's). The defect in FLOCK Safety's ALPR camera, which releases false and defamatory information on behalf of FLOCK, meets this standard, especially for a company partnered with NCIC.

82.     It is evident that the product deviated from its intended design during production, as it is clear that FLOCK alerts and the data being released by its cameras were not designed to distribute unsubstantiated information on behalf of FLOCK.

83.     However, due to the lack of safeguards, this has occurred, and FLOCK camera alerts the police using this erroneous, unverified alert, and its data being released by its cameras under the color of the law.

84.     The data validation issue with the ALPR camera could have been discovered by reasonable inspection or tests before the product was sold through a proper Q.A. test.

85.     No agency or non-agency is distributing this erroneous information; FLOCK alerts the police under the color of the law with the incorrect data via their one-way number/email and app.

86.     Therefore, FLOCK is responsible for the content of the alert and its data being released by its cameras as FLOCK SAFETY own that data, and FLOCK disseminates it of their own volition to any FLOCK customer, without any external pressure.

87.     [E]vidence of unsafe, unexpected product performance is sufficient to infer the existence of a product defect' under the first prong of the consumer-expectation standard." Id. (quoting State Farm Fire Cas. v. Chrysler Corp., 37 Ohio St.3d 1, 523 N.E.2d 489, 494-95 (Ohio 1988)). "[T]he determination of whether a product is more dangerous than an ordinary person would expect is generally a question of fact which does not require expert testimony." Id. (quoting Fisher v. Ford Motor Co., 13 F.Supp.2d 631, 638 n. 10 (N.D.Ohio 1998)). Tompkin v. Philip Morris USA, Inc., 362 F.3d 882 (6th Cir. 2004)

88.     Defendant publicly represented to Plaintiff multiple times that the product was of a certain quality and would perform in a certain way. (figure 34)(Exhibit W) (figure 35)(exhibit X)

47

With Flock Safety, the answers are straightforward and have been consistent since our founding in 2017.

- We collect the objective evidence police need to solve crime, which includes license plates and vehicle information. We do not utilize facial recognition technology, mitigating any implicit or explicit bias in the Flock Safety operating system.
- The data is fully owned by our customers. Only authorized users can access the system and every search requires a search reason, which is collected in a publicly available audit. No unauthorized users, including Flock Safety employees, have access to the footage. We never share or sell the data, and all the data is encrypted using AES-256 encryption with a secure cloud server.
- By default, all data is automatically deleted every 30 days on a rolling basis. Meaning, if you want to find footage from 31 days ago, you can't because it's been permanently deleted. The only exception to our data retention policy is if a democratically elected governing body or official has clearly defined a license plate reader data retention policy or law and made it publicly available. We always comply with local laws and regulations.

(figure 34)(exhibit W)

How does Flock Safety protect citizen privacy?                    ∧

Flock Safety has strict measures in place to protect resident privacy.

Flock Safety believes that we can successfully reduce crime while protecting and preserving privacy. Here are a few of the ways we have ethically-engineered our suite of products to ensure privacy protection:

- We store all data for only 30 days (or in adherence with local laws). Customers own all of their data — Flock will never share or sell data with third parties. The customer is the only one to determine who has access to the footage.

(figure 35)(exhibit X)

89.     This representation to the Plaintiff was false, as the product did not conform to the

represented quality or performance standards. Because behind the scenes, FLOCK has a license

for all the information it obtains, and also, according to Territory Managers who are hired to sell

Flock, it sells API access to anyone who pays FLOCK to access the treasure trove of data.

90.     It is indisputable that Plaintiff relied on Defendant's public representations to Plaintiff

when he decided to utilize their product by allowing it to take a picture of his car.

48

91.       As Plaintiff consciously drove past a FLOCK camera,  FLOCK captured an image of Plaintiff's vehicle under the color of the law, thereby indicating Plaintiff's knowing use of FLOCK's product feature. The Plaintiff could have chosen an alternate route but had their vehicle photographed by FLOCK's camera without charge. As a result of the product's deviation from its public representation, Plaintiff has suffered damages, including economic and non-economic harm and loss of millions in monetary commissions from FLOCK using his data and likeness for commercial purposes without permission by selling access to the API to access his information.

M.       **Failure to Warn the Public**

92.       FLOCK Safety, as the manufacturer, was cognizant of the fact that FLOCK alert and the data being released by its cameras are inaccurate and may result in one's detainment. Consequently, FLOCK Safety had a duty to provide a comprehensive warning outlining the inherent risks or hazards faced by each motorist in the vicinity of a FLOCK Camera, including the potential for being surrounded by multiple police officers without cause. In other words, Defendant negligently failed to warn users, such as Plaintiff, by failing to provide information that Defendant possessed and which Defendant should have known was necessary to make use of the camera safe for users such as Plaintiff, and those in whose vicinity the camera was to be used; and Such a warning by the Defendant would have allowed the user to use the camera safely.

93.       Such a warning, necessitated by FLOCK Safety's knowledge that enforcement actions typically follow receipt of their alerts with their close relationship with the State, which FLOCK sent under the terms of their government contract, is crucial given law enforcement's reliance on information provided by FLOCK Safety. To establish a claim for failure to warn or warn adequately, it must be proven that the manufacturer knew or should have known, in the exercise

49

of ordinary care, the risk or hazard about which it failed to warn Crislip v. TCH Liquidating Co., 52 Ohio St. 3d 251, 257, 556 N.E.2d 1177, 1182 (1990).

93.     FLOCK should have taken the precautions that a reasonable person would take in presenting the product to the public.

94.     FLOCK Safety is obligated to warn users, such as the Plaintiff, of its product regarding the inherent risk of detainment associated with the company's lack of adequate safeguards for verifying data disseminated to law enforcement and other third parties. This critical oversight renders the product unsafe, as FLOCK neglected to disclose to the Plaintiff and the public the latent danger of FLOCK's false data leading to a motorist's, such as the Plaintiff's unwarranted detention.

95.     FLOCK Safety's failure to affix an adequate warning on each camera to warn the Plaintiff and the public represents a fundamental breach of its duty to users, specifically to the Plaintiff in this case. The absence of explicit alerts cautioning users such as Plaintiff about the potential risks linked to FLOCK's ability to disseminate inaccurate data violates the duty of care and fails to meet industry standards.

96.     This breach of duty is further aggravated by FLOCK Safety's awareness of its product's inherent defectiveness, which can generate defamatory information. The company, cognizant of this potential harm, failed to implement necessary precautions or issue cautionary notifications for motorists passing by the cameras. In essence, FLOCK Safety knew or should have known about the defect and yet failed to take reasonable steps to warn users such as the Plaintiff or correct the issue.

97.     The duty to warn users such as the Plaintiff about potential risks associated with a product is a well-established legal principle, especially when the product can impact individuals'

50

rights and liberties. FLOCK Safety's omission to provide explicit warnings on their cameras and their knowledge of the product's defectiveness underscores a blatant disregard for the duty owed to users such as the Plaintiff.

98.     FLOCK Safety's awareness of the potential risks and their failure to incorporate adequate warnings or corrective measures constitutes a breach of duty. The omission to caution users such as the Plaintiff about the potential harm arising from inaccurate data dissemination renders the product unsafe and reflects a lack of due diligence on the part of FLOCK Safety. This failure to warn users such as the Plaintiff, especially in the context of the known risks associated with their product, forms a solid foundation for holding FLOCK accountable for the Plaintiff's harm.

**N. How the incident unfolded/ severe emotional distress**

99.     At approximately 04:33 AM on February 25th, 2023, a FLOCK camera positioned on South Blvd N.W in Canton, Ohio (see Figure 36), sent a false alert about the Plaintiff  The accompanying image illustrates the camera's specific location. Subsequently, FLOCK Safety, acting under the authority of the law, promptly notified the local law enforcement. However, during reporting, FLOCK Safety disseminated misleading and damaging data to the dispatch, including details about the Plaintiff's private life and the license mentioned above plate. This action not only constituted an infringement upon Plaintiff's due process rights but also transpired without allowing Plaintiff to contest the accuracy of the disseminated information before the ensuing deprivation.

100.    Illustrated below, no warnings are visible anywhere, nor is there any notice of any detainment or that anyone can access his information through an API. Private life matters such as the Plaintiff's full name, D.O.B and linking the Plaintiff's name and likeness to imaginary but non-charged investigations, none of the fictional investigations, even if they were true, were ever

anyone concern other than the Plaintiff and should never have been shared with anybody until the Plaintiff was charged. It was in NCIC, nor should it be available through an API.



(figure 36)

102.    Plaintiff asserts, based on Stark County records, that he was not identified as a person of interest or a potential suspect in any active investigation, and his record was clear of any warrants or violations in both LEADS and NCIC. The Plaintiff alleges that he was unlawfully detained due to FLOCK Safety's negligent and unlawful alert to the police, which was based on false information. The Plaintiff contends that FLOCK Safety's reckless decision to disseminate their wrong and defamatory data about the Plaintiff, associating him with non-existent crimes, constitutes a liability for the distress caused by their reckless conduct.

103.    Plaintiff alleges that Defendant either intended their conduct to cause severe emotional distress or acted with recklessness when it was likely that emotional distress would result from

their failure to verify the information before disclosing it to the police. Plaintiff cites Restatement

(Second) of Torts § 652E (1977), Restatement (Second) of Torts § 652B (1977), and

Restatement (Second) of Torts § 35 (1965) in support of this claim. The Plaintiff also cites

Yeager v. Local Union 20, 6 Ohio St. 3. 369, 1983-Ohio-35 as authority for the proposition that

one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional

distress to another is subject to liability for such emotional distress.

104.    The Plaintiff alleges that he was placed in fear of physical harm by being unjustly

surrounded by armed officers without cause due to FLOCK's actions. The Plaintiff cites Heiner v.

Moretuzzo, 73 Ohio St. 3d 80, 86 (1995) and King v. Bogner, 88 Ohio App.3d 564, 569, 624

N.E.2d 364 (Ohio Ct. App.1993) in support of this claim. The Plaintiff also cites Doe v.

SexSearch.com, 502 F. Supp. 2d 719, 730 (N.D. Ohio 2007), aff'd, 551 F.3d 412 (6th Cir. 2008)

as authority for the proposition that a plaintiff may only bring a claim for negligent infliction of

emotional distress where "the plaintiff is cognizant of real physical danger to himself or another."

105.    The Plaintiff alleges that FLOCK Safety's status as a 'state actor' is established through

the close relationship with the State; this relationship between FLOCK Safety and the State

serves as a decisive factor in establishing the company's actions as being conducted under the

color of state law, transforming them into a 'state actor.' This legal status is further underscored

by the State's encouragement of the private parties' actions through the integration of FLOCK

Safety with the city's dispatch and its software, text messaging, and app notifications to law

enforcement. The Plaintiff asserts that the systematic reporting of false and defamatory

information to the police, resulting in unlawful traffic stops, constitutes a clear violation of

individuals' constitutional or federal rights. Such actions impinge upon fundamental rights,

including the right to due process and the right against unreasonable searches and seizures.

1  106.    The plaintiff contends there is no discernible point during these incidents where FLOCK

2  Safety operated as a private entity distinct from its role as a contracted state actor. Plaintiff

3  argues that FLOCK's integration with law enforcement operations, mainly through the NCIC and

4  dispatch and its software, entwines its business activities with police functions. The data

5  reflecting an 184.962% increase in 'high priority' traffic stops with dispositions of 'Completed'

6

7  since FLOCK's installation in April 2021 underscores the correlation between FLOCK's alerts

8  and police actions. This is only possible with a close relationship fostered with the State, as

9  mentioned in paragraphs at the beginning.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



26  (figure 37)

27

28

107.     The defendant's conduct on February 25th, 2023, is a grave concern. FLOCK Safety, in an act of defamation, caused the police to apprehend a private citizen without any proven misconduct. The defendant's invasive search of the citizen's life, lasting over 40 minutes despite the citizen's innocence, calls for punitive damages amounting to $6,000,000. This serves as a deterrent, signaling that such behavior is unacceptable in our society.

108.     The actions of FLOCK Safety are deeply troubling. As established in Baab v. A.M.R. Servs. Corp., 811 F. Supp. 1246, 1269 (ND Ohio 1993), the crux of liability lies in whether the defendant's conduct in the given situation reaches a level of outrageousness that warrants recovery. To establish a prima facie case of Intentional Infliction of Emotional Distress (IIED), the Plaintiff must demonstrate emotional distress that is both severe and debilitating, as per Paugh v. Hanks, 6 Ohio St. 3d 72 (1983).

109.     Defendant, as per Hayward, 759 F.3d 601, 619 (6th Cir. 2014), either intended to cause emotional distress or should have known that their actions would result in severe emotional distress to the Plaintiff.

110. Flock Safety's camera is fundamentally flawed due to its lack of proper input and data validation—standards that FLOCK openly acknowledges on its website. This deviation from industry standards indicates a departure from the intended design during production. Cameras were never designed to distribute false and unsubstantiated information. However, that is exactly what happened due to the lack of safeguards.

111. FLOCK Safety, acting as a 'state actor' under the color of the law, irresponsibly used Plaintiff's likeness, name, and birthdate to disseminate defamatory information to third parties, including local law enforcement. This action directly led to the Plaintiff's unlawful detention—a

55

consequence of FLOCK's actions operating under the color of the law, distributing unfounded and defamatory information.

112. The defamatory notification to the police, facilitated by FLOCK, caused severe emotional distress to the Plaintiff—such distress, arising from FLOCK's negligent actions, warrants due compensation under the law. FLOCK, as a provider of public safety technology, owes a duty to the public—a task further emphasized by its integration with the National Crime Information Center (NCIC).

113. FLOCK Safety is responsible for ensuring the accuracy of the information reported by its cameras to law enforcement, a standard expected of any citizen reporting a crime to 911. FLOCK's failure to meet this standard constitutes negligence. With the implementation of NCIC, FLOCK has a heightened responsibility to guarantee the accuracy of information provided to law enforcement.

114. This duty is underscored by the fact that any other citizen would be held to similar standards when reporting a crime to 911. FLOCK, however, neglected this responsibility, resulting in the camera's distribution of false and defamatory information. This is not just a failure in product design; it is an act of negligence for which FLOCK is answerable. The defendant publicized the particular facts through its distribution and access in its API as they could have retracted it before any damages occurred

115. Had the camera been designed with proper input and data validation—industry standards that FLOCK is well aware of—the distribution of false and defamatory information leading to Plaintiff's unlawful detention would have been averted. In stark contrast, an Automatic License Plate Reader (ALPR) camera with proper input/data validation, devoid of glaring defects like the

FLOCK camera, would not have facilitated the dissemination of inaccurate information, sparing individuals from such harm.

116. FLOCK, with the lack of data validation, acted with reckless disregard as to the falsity of the publicized matter and the false light in which it placed the Plaintiff.

## V.    CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

117.    Plaintiff incorporates by reference paragraph 1-125 of this Complaint as if fully set forth herein.

118.    As a direct and proximate result of Defendant negligence and failure to exercise (reasonable) or (ordinary) care by not retracting the defamatory statements before the police arrived. Plaintiff was caused and/or in the future will be caused to suffer  severe emotional distress, financial or economic loss, including, but not limited to,  lost income, reputational  and other damages.

### COUNT II

### STRICT LIABILITY – DESIGN DEFECT (ORC §2307.75, et seq.)

119.    Plaintiff incorporates by reference paragraphs 1-128 of this Complaint as if fully set forth herein.

129. The FLOCK camera and its software/ FLOCK ALPR CAMERAS product implanted in the Plaintiff was not reasonably safe for its intended use and was defective as a matter of law with respect to its design.

130. As a direct and proximate result of the FLOCK camera and its software/ FLOCK ALPR CAMERAS aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to, lost income, reputational and other damages.

131. Defendant are strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

132. Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including costs and and all such other relief as the Court may deem proper.

**COUNT III**

**STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT (ORC §2307.74, et**

**seq.)**

133.    Plaintiff incorporate by reference paragraphs 1- 133 of this Complaint as if fully set forth herein.

134.    The FLOCK camera and its software/ FLOCK ALPR CAMERAS product used by the Plaintiff was not reasonably safe for its intended use and was defective as a matter of law with respect to its manufacture.

58

135.    As a direct and proximate result of the FLOCK camera and its software/ FLOCK ALPR CAMERAS aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to, lost income,reputational and other damages.

136. Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including and all such other relief as the Court may deem proper.

# COUNT IV

## STRICT LIABILITY – FAILURE TO WARN (ORC §2307.76, et seq.)

137.    Plaintiff incorporates by reference paragraphs 1- 136 of this Complaint as if fully set forth herein.

138. The FLOCK camera  product  was not reasonably safe for its intended use and was defective as a matter of law due to its lack of appropriate necessary warnings.

139. As a direct and proximate result of the FLOCK camera aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to, lost income,reputational and other damages.

140. Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including and all such other relief as the Court may deem proper.

# COUNT V

## Strict Product Liability: Defect Due to Nonconformance with

## Representation (ORC §2307.77, et seq.)

59

141. Plaintiff incorporates by reference paragraph 1- 140 of this Complaint as if fully set forth herein.

142. Defendant expected and intended the FLOCK camera  product to reach users such as Plaintiff in the condition in which the product was sold.

143. Defendant represented to Plaintiff that the FLOCK camera and its software/ FLOCK ALPR CAMERAS was safe and reasonably and justifiably relied upon Defendant representations that the product was safe for use reading license plates and the data outputted was not defamatory/ slanderous and would conform to Defendant representations regarding the character and quality of the FLOCK camera for use.

144. As a direct and proximate result of Plaintiff's Defendant's representations about the FLOCK camera  Plaintiff suffered injuries and damages as summarized herein.

145. WHEREFORE, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including costs , and all such other relief as the Court may deem proper.

**COUNT VI**

**LIBEL PER SE**

146.    PLAINTIFF incorporates by reference and realleges Paragraph 1 through 145, as if set forth in full herein.

147.    Defendant have defamed MICHAEL by publishing the ALERT and the false and misleading statements about MICHAEL contained therein, including the statements alleged in Paragraphs 25 – 34. These statements about MICHAEL are false, misleading, and libelous, both explicitly and by implication.

60

148.     Defendant published the statements with knowledge of their falsity or reckless disregard of their falsity. Among other things, Defendant obtaining a license and publishing fabrication of a non existent crime regarding MICHAEL demonstrates their knowledge that these statements were untrue. In addition, these statements were published with the intent of harming MICHAEL reputation and career, and thus published with malice, both in law and in fact.

149.     Defendant statements constitute libel per se, for which MICHAEL is entitled to recover presumed damages for injury. Defendant statements also constitute libel per quod. As a result of all of these false statements, MICHAEL has suffered, and will continue to suffer, injury in fact, including loss of good will and injury to his reputation.

150.     The publication of the ALERT damaged MICHAEL's reputation, will continue to harm his reputation, and will continue to impact MICHAEL's appeal as an UBER/ gig work driver.

151.     Finally, as described above, FLOCK's unfounded statements and fabricated allegations demonstrate that Defendant acted deliberately, purposefully, and without regard for the truth. Defendant acted with malice and the intent to harm MICHAEL's reputation and with knowledge that their accusations were false. Moreover, Defendant disregard for publication of false statement and/or reckless disregard for the truth renders punitive damages appropriate in this action.


**COUNT VII**

**FALSE LIGHT INVASION OF PRIVACY**

152.     MICHAEL incorporates by reference and realleges Paragraph 1 through 151, as if set forth in full herein.

152.    Defendant intended to and did publish the ALERT regarding MICHAEL that included non existent crimes MICHAEL was wanted for

153.    MICHAEL, like any reasonable person, was highly offended by being labeled a suspect in any human trafficking investigation. Any association with and/or attribution of responsibility of any human trafficking of a child is deeply offensive to any reasonable person.

154.    Defendant conducted no independent investigation as to the truth of the assertion that MICHAEL was a suspect of any human trafficking investigation

155.    Defendant knowledge of the falsity of their statements is highlighted by the fact that Defendant never had safeguards to verify such information. Defendant included in the ALERT both fake and real information by MICHAEL to convince third parties that the false information attributed to MICHAEL were real.

156.    Defendant acted without regard to the false light in which the ALERT would place MICHAEL. Defendant also acted without regard to the likelihood such false statements would lead to unlawful detainment to MICHAEL.


**COUNT IX.**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

157.    MICHAEL incorporates by reference and realleges Paragraph 1 through 157, as if set forth in full herein.

158.    Defendant intended to cause MICHAEL severe and serious emotional distress through, among other things, their publication of false statements of fact and their efforts to elicit unlawful detainment against MICHAEL.

159.    Alternatively, Defendant knew or should have known that their actions would result

62

in MICHAEL's severe and serious emotional distress by, among other things, impacting his reputation amongst his audience and potential employers and eliciting detainment against MICHAEL in response to their false and defamatory statements.

160. Defendant conduct, including the publication of false statements and the fabrication of made up crimes that purport to show MICHAEL as a human trafficker MICHAEL, is extreme and outrageous, and is beyond all possible bounds of decency. Such conduct is so atrocious that it is utterly intolerable in a civilized society.

161. Defendant conduct is the proximate cause of MICHAEL's emotional distress. MICHAEL did not suffer from emotional distress before learning of Defendant false and defamatory statements

162. No reasonable person could be expected to endure the distress that MICHAEL has suffered since learning of Defendant false statements about him and the resulting detainment.

## Count X.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

163. MICHAEL incorporates by reference and realleges Paragraph 1 through 164, as if set forth in full herein.

164. Defendant negligently caused MICHAEL severe emotional distress by publishing false statements of fact regarding MICHAEL's purported involvement in human trafficking. Defendant knew or should have known such false statements would cause severe emotional distress to MICHAEL.

165. Defendant knew or should have known that the ALERT's false statements would

63

result in detainment against MICHAEL.

166.    Defendant false statements of fact regarding MICHAEL resulted in an unlawful

detainment

167.    Defendant conduct is the proximate cause of MICHAEL's severe emotional

distress. MICHAEL did not suffer from emotional distress before learning of Defendant false

and defamatory statements.

# COUNT XI

## COMMON-LAW MISAPPROPRIATION OF

## MICHAEL'S NAME AND LIKENESS

168.    MICHAEL incorporates by reference and realleges Paragraph 1 through 168, as if

set forth in full herein.

169.    Defendant have misappropriated MICHAEL's name and likeness in the ALERT

for commercial and non-commercial purposes.

170.    Defendant have misappropriated MICHAEL's name in the ALERT, thereby

associating MICHAEL with the false statements of fact contained in the ALERT.

171.    Defendant have misappropriated numerous photos reflecting MICHAEL's

likeness in the ALERT, thereby associating MICHAEL with the false statements of fact

contained  in the ALERT.

172.    MICHAEL did not consent to Defendant use of his name or likeness.

173.    Defendant used MICHAEL's name and likeness in connection with a product in the API.

**COUNT XII**

**Defamation Per Se**

174.     MICHAEL incorporates by reference and realleges Paragraph 1 through 1174, as if set forth in full herein.

175.     Defendant FLOCK knew the above-reference statement was false or acted with reckless indifference to the truth when it published the statement.

176.     The defamatory statements of Defendant FLOCK Safety and chargeable to the remaining defendant constitutes defamation per se because it accused the Plaintiff of conduct incompatible with the Plaintiff's business, trade, position, or office.

177.     As a result of the defamatory statements, the Plaintiff has suffered damages within the jurisdictional limits of the Court.

**COUNT XIII**

**Defamation Per Quod**

178.     The allegations in Paragraph one through Paragraph 178 are realleged and incorporated herein.

179.     The defamatory statement of Defendant FLOCK  constitutes defamation per quod based on extrinsic facts proving the existence of actual/special damages to the Plaintiff's reputation and business.

**COUNT XIV**

**42 U.S.C. § 1983 –Unconstitutional and Unreasonable seizure in violation of the Fourth Amendment (As to defendant FLOCK SAFETY )**

65

180.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

    42 U.S.C. § 1983 provides that:

181.    Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

182.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

183.    In view of all the circumstances surrounding the foregoing incident on February 25th 2023, a reasonable person would have believed Michael Smith was not free to leave from his encounter with law enforcement after FLOCK reported false information to the police under their contract.

184.    Defendant FLOCK, deprived MICHAEL of clearly established rights secured to him under the United States Constitution— specifically the Fourth Amendment rights to be free from unreasonable search and seizures against one's person by working alongside the state and reporting false information which resulted in Michael's detainment

185.     Defendant FLOCK  failed to take any action to prevent harm to MICHAEL's rights which resulted in a constitutionally-actionable injury. Defendant FLOCK are liable for such constitutionally-actionable injuries.

186.     FLOCK had a reasonable opportunity to alert the police of the erroneous information in order to prevent or mitigate injury to MICHAEL, they chose not to.

187.     Any reasonable private company  would have known that the reporting false information to the police ,which they have a contract will result in the motorists detainment.

189.     Defendant' conduct also resulted in psychological injury to MICHAEL. Since his seizure, MICHAEL has experienced emotional and psychological injuries, including mental anguish, anxiety, emotional distress, loss of enjoyment of life, and other non-pecuniary losses. Due to these injuries from the seizure, MICHAEL still suffers of heighten anxiety.

190.     MICHAEL is further entitled to costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

191.     In depriving MICHAEL of his rights under the United States Constitution, Defendant FLOCK  acted under color of  the law which can be established by their contract with the state.

192.     This deprivation under color of law is actionable and may be redressed by 42 U.S.C. § 1983.

193.     The Defendant  accused Plaintiff of heinous criminal activity knowing those accusations to be without probable cause, and they made statements to police officers with the intent of exerting influence to institute and continue the investigatory proceedings.

194.     Statements of the Defendant regarding Plaintiff's alleged culpability were made with knowledge that said statements were false . In so doing, the Defendant reported false allegations to get the Plaintiff stopped.

195. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others and the truth.

196. Due to the injuries suffered by MICHAEL, he is entitled to compensatory, economic, non economic and consequential damages, in amounts to be determined at trial against each Defendant. As a further result of Defendant' unlawful conduct, MICHAEL is entitled to recover punitive damages against the individual defendant.

## COUNT XV

**42 U.S.C. § 1983 –Fifth and Fourteenth Amendments(As to defendant FLOCK SAFETY )**

197. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

42 U.S.C. § 1983 provides that:

198. Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

199. The Defendant's actions violated the Plaintiff's right to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution. The Defendant, acting under color of state law, deprived the Plaintiff of his liberty based on false information, without a fair process to challenge the accuracy of that information before the deprivation occurred [Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)].

**VI. Prayer for Relief**

MICHAEL demand that judgment be entered in his favor on all counts and pray the court to award the following relief:

a. Declare that defendant' acts, omissions, and conduct constitute violations of the Fourth Amendment/ Fifth and Fourthteenth to the United States Constitution, as well as of 42 U.S.C. § 1983.

b. A Preliminary and Permanently injunction from FLOCK allowing the Plaintiff's name/plate/location appearing in commercially available API by FLOCK.

c. An award of actual and/or compensatory damages, including but not limited to damages for mental anguish,lost wages, profits, emotional distress, humiliation, embarrassment, and inconvenience that MICHAEL has suffered and is reasonably certain to suffer; against the defendant to to be exactly determined at trial but no less than $20,000,000 that will fully and fairly compensate MICHAEL to make him whole and reimburse for lost profits by FLOCK commercializing his data without permission.

d. An award of punitive damages and exemplary damages no less than $6,000,000 dollars in total this will serve to adequately punish and deter the acts and omission alleged in this complaint. Such acts that were clearly intentional, malicious, egregious, callous and a reckless disregard of MICHAEL's constitutional rights and reputation

e. Punitive damages are recoverable in sec. 1983 suit where defendant conduct is motivated by an evil motive or intent, or where it involves reckless or callous indifference to MICHAEL's

federally protected rights." Smith v. Wade, 461 U.S. 30, 50 –51(1983); Clark v. Taylor, 710 F.2d 4, 14(1st Cir. 1983)

f.   Presumed Damages against the Defendant of no less than $20,000,000 dollars

g.   Nominal damages against the Defendant of no less than $2,000,000 dollars

h.   An award of costs and court costs of this action pursuant to 42 U.S.C. § 1988 allowed  under FRCP 54(d)(1)

i.   Award pre- and post-judgment interest at the highest lawful rate;

j.   All such other relief to which MICHAEL is entitled and/or this Court deems equitable.

70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY DEMAND**

Plaintiff requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated this December 14, 2023

Respectfully submitted

Pro Se

Michael Smith

1225 Skyline Dr Apt 105

Orrville Ohio 44667