1
2
3

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FILED

JAN 2 5 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

4
5

**Michael Smith**
**1225 Skyline Dr Apt 105**
**Orrville, Ohio 44667**

Case No.: 5:23-CV-02198

6
7

                    **Plaintiff ,**
        **v.**

**VERIFIED SECOND AMENDED**
**COMPLAINT FOR INJUNCTIVE**
**RELIEF AND JURY DEMAND**

8
9
10

                    **Defendant.**
**FLOCK SAFETY**
**1170 HOWELL MILL RD. NW SUITE**
**210 ATLANTA , GA 30318**

**Judge: PEARSON**

11
12
13
14
15

  **VERIFIED SECOND AMENDED COMPLAINT FOR PERMANENT INJUNCTIVE**
  **RELIEF AND RECOVER DAMAGES FOR PRODUCT LIABILITY/ DEFAMATION/**
  **LIBEL/CONVERSION/UNJUST ENRICHMENT/ FRAUDULENT CONSEALMENT**
  **AND DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS**

16
17

I.      **NATURE OF THE CASE**

18
19
20
21
22
23

1.      The Plaintiff, proceeding pro se, initiates this action under 42 U.S.C. § 1983, seeking

redress for alleged violations of constitutional rights. Plaintiff seeks damages and a permanent

injunction to prevent Defendant, FLOCK Safety, from utilizing Plaintiff's personal information

within its Application Programming Interface (API) any longer and reimbursement for lost

profits over the last eight months for using his data without permission in its API.

24
25
26

2.      Flock's camera, a tangible product, sent a false and defamatory alert about the Plaintiff by

associating it with a non-existent criminal investigation; it was wrong and defamatory because

the Plaintiff was never subject to a Human Trafficking investigation.

27
28

1

3.      Defendants allows customers with API access to view personal information, such as license plate numbers and names, without warning that their data is available for anyone who pays for access.

4.      FLOCK Safety did not remain reasonably current with scientific knowledge, development, research, and discoveries concerning the camera because there is the technical ability to verify data through NCIC or other law enforcement databases before relaying the alert to police without affecting the product's usefulness.

5.      Defendant publicly represented its product as privacy-driven and bias-free to the Plaintiff and to the public even though it was selling access to its API without warnings of telling users and incidental users, such as Plaintiff, the public's/Plaintiff's information, which, because the Defendants were omitting those material facts from the public and the Plaintiff, the Defendants were able to achieve exponential growth and release a press statement back in November 2023 declaring that "Flock Safety Soars With 2,660% Revenue Growth"[1] because in part, of selling access to the Public/Plaintiff's data.

6.      The Defendant's tangible product lacked any warnings/disclaimers to the people who viewed the alert and warnings to bystanders or users or incidental users, Plaintiff falls under one of which, that the Camera may disseminate false information.

---

[1] Flock Safety. (2023, November 8). *Flock safety soars with 2,660% revenue growth, ranked number 58 fastest-growing company in North America on the 2023 Deloitte Technology Fast 500TM.* GlobeNewswire News Room. https://www.globenewswire.com/en/news-release/2023/11/08/2776613/0/en/Flock-Safety-Soars-With-2-660-Revenue-Growth-Ranked-Number-58-Fastest-Growing-Company-in-North-America-on-the-2023-Deloitte-Technology-Fast-500.html

2

7.     FLOCK SAFETY acts as a data broker by selling access to its API, which allows anyone to view license plate data and personal information from Plaintiff's car.

8.     Defendant allows unrestricted access to the vast amount of data collected by its cameras through its API, thereby misrepresenting its product's nature and use of collected data

**II. PARTIES**

9.     Plaintiff Michael Smith ("MICHAEL") was a resident of the State of Ohio, lived in Orrville, County of Wayne, and was a user of the FLOCK product during the relevant period in this action.

10.    Defendant FLOCK SAFETY ("FLOCK") is a Delaware corporation that leases ALPR cameras and maintains its principal place of business at 1170 Howell Mill Rd NW, Ste. 210 ATLANTA, GEORGIA UNITED STATES 30318 during all relevant periods in this action.

III.    **Jurisdiction and Venue**

11.    This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interests and costs, and FLOCK SAFETY are citizens of different states.

12.    Jurisdiction is also founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because it is brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the right under the Fourth Amendment, under 42 U.S.C. §§ 1983 and 1988. Plaintiff

brings this pursuant to the Fourth/Fifth and Fourteenth Amendment to the United States Constitution.

13.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

14.    **Intradistrict Assignment:** A substantial part of the acts and/or omissions in this Complaint occurred in the County of Stark County Ohio. Pursuant to CivR.3(C) this case is properly assigned to the Akron or Cleveland Division of the Court.

15.    Venue is proper in this judicial district under 28 U.S.C. §1391 (b)(2) because FLOCK acting under the color of the law throughout this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. At all pertinent times,

16.    FLOCK was also and is in the business of marketing, advertising, distributing, and leasing products, including the ALPR Machines, throughout Ohio and this judicial district, and nationwide.

## IV. FACTUAL ALLEGATIONS

### A. FLOCK Sold access to Plaintiff's data.

a.    Four words that will be discussed is "AdvancedSearch" "FlockCustomer" "API" and "Hotlist." here is the undisputed FLOCK definitions of AdvancedSearch, FlockCustomer, API and Hot List, which is on the FLOCK Website [2]

---

[2] "API Terms and Conditions." Flock Safety, https://www.flocksafety.com/api-terms-service. Accessed December 6, 2023.

b. ""AdvancedSearch" is a query based function of Flock's API which enables users to search and categorize data in a multitude of ways including, but not limited to, any combination of date, time, geolocation,camera name, and vehicle attributes."

c. "API" means Flock's application programming interface and any programming interface and any accompanying or related documentation, source code, SDKs, executable applications and other materials made available by Flock, including, without limitation, Hotlists, AdvancedSearch, and any copies and derivative works thereof.

d. "FlockCustomer" means a customer of Flock Services which has signed Flock's terms and conditions and is currently requesting integration with this API.

e. "Hotlist(s)" means a digital file containing alphanumeric license plate related information pertaining to vehicles of interest, which may include stolen vehicles, stolen vehicle license plates, vehicles owned or associated with wanted or missing person(s), vehicles suspected of being involved with criminal or terrorist activities, and other legitimate law enforcement purposes. Hotlist also includes, but is not limited to, national data (i.e.,NCIC) for similar categories, license plates associated with AMBER Alerts or Missing Persons/Vulnerable Adult Alerts, and includes manually entered license plate information associated with crimes that have occurred in any local jurisdiction."

17. The Plaintiff's data can be searched under the advancedsearch option of the API because the Plaintiff has driven by the Flock Camera, so any API customer can find the Plaintiff's name, license plate number and just by the alert later in the complaint as figure 14, shows that the Plaintiff information is within the Flock System

5

18. The Plaintiff asserts that FLOCK Safety operates an Automated License Plate Recognition (ALPR) system, which not only captures but also stores a vast quantity of license plate data and FLOCK offers subscription-based access to this data, again, a subscription to the Plaintiff's license plate data, The Defendant conducted fraudulent concealment of these material facts from the Public and the Plaintiff, because these misrepresentations of data privacy about data not being sold were being broadcasted by FLOCK through website right before the Plaintiff used the FLOCK camera on February 25th 2023 at 4:33am and still to this day, FLOCK also concealed the disclaimer on the alerts itself to Police stating that the Hot list is not probable cause on February 25th 2023 at 4:33am to Officer Haddain who pulled the Plaintiff over because of the concealed disclaimer warning that the alert is not probable cause, which is the same disclaimer on other parts of their website and for these concealments the Plaintiff lost profits, constitutional rights, emotional harm.

19. FLOCK offers this service because, under a principle called Law of Parsimony where the simplest explanation is usually the correct one, The subscribers, upon payment, will be able to use this extensive database to reconstruct an individual's location history over extended periods and even take this license plate data and integrate it with other API's such as Court public record companies (like Unicourt etc), and quickly look through courts in the regions where the cameras are located and if the motorist ever got a ticket under that license plate, the motorist behind the license plate is now identified, all from a picture of a license plate with the state and this is all automated to where it's done within seconds.

20. From the moment the data is captured by the camera and is parsed by the FLOCK customer into a database file to then be automatically compared to court records/public records through

another API to be parsed into a complete profile of the motorist, this happens all within seconds.

21. FLOCK is a Startup that has effectively been able to commercialize access to individuals license plate numbers and personal information because they sell access to the data they capture, because if there weren't any value in the data, FLOCK wouldn't sell access to it.

22. FLOCK maintains its ironfisted stranglehold over the ALPR market because of its ruthless anti-competitive jockeying and closed-door dealings which will be shown throughout this complaint.

23. License plate numbers itself are useless, but what isn't useless is FLOCK's license plate data/personal data, because of FLOCK's patented Vehicle Fingerprint Technology, per FLOCK's own website, FLOCK's data includes but not limited to, the License plate number, the State of the license plate, the color of the vehicle and the make of the vehicle, which is the same identifying information written on a traffic ticket and is included on most court dockets, such as Lakewood Ohio. (Figure 1)(Figure 2)

7



(Figure 1)

## Parties

| Name | Type | Address | Attorney(s) |
|---|---|---|---|
| ███████ | Defendant | ████████████ | |

## Offenses

**Arrest Date**
[NA]

**Arresting Officer**
KRISTEN CHENGERY

**Agency**
LAKEWOOD POLICE DEPT.

| Code | Description | Date | Finding | Finding Date | Degree |
|---|---|---|---|---|---|
| 333.030B2 | SPEED 25MPH | 02/11/20 | Waiver | 02/19/20 | MM |

## Tickets

████████████  - - - - - - - - - - - - - - - - - - - - - - - -

**Date:** 02/11/20
**Location:** MARS AVE NB NEAR DETROIT
**Accident:** No
**Speed:** 25/43
*(Posted / Recorded)*

Vehicle - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**Plate:** HCK8160
**Reg.:**
**VIN:**
**Insured:** Y
**Year:** 2017
**Type:**

**Make:** KIA
**Model:** FORTE
**Color:** GRAY

8

(Figure 2)

*24.*     The Plaintiff's highlights the ease with which technological advancements, such as Application Programming Interfaces (APIs), can be used to amalgamate data from FLOCK Safety's ALPR system with public court records . FLOCK has unjustly enriched themselves because FLOCK has the motorists data behind a $100,000/ $1,000,000 dollar pay wall meant for only the people who want access to over a billion license plate hits a month, FLOCK knows it's a great way for their clients themselves to market to new customers once the data is compared to court records and the contact information can be located for marketing/commercial purposes, all automatically done within seconds because if the data wasn't valuable, FLOCK wouldn't sell access to it in the first place. FLOCK understand the value of the data as FLOCK declares on their website in  Figure 1 that

*"Get more leads from local, state, and nationwide network of LPR cameras, with over 1B+ additional plate reads monthly."*

FLOCK has hidden the material facts from the Plaintiff that the data is being stored in database behind a paywall because if they told him the truth, he would never have used their products.

25. In short, FLOCK sold access via API subscription (exhibit A)( Figure3) containing the Plaintiff's personal information without permission which is profiting off MICHAEL's likeness without authorization because FLOCK never asked for permission nor granted any permission for his Data to be sold through a subscription. The Plaintiff's data is contained in the API because an alert with his personal information was attached to it as seen in  Figure 14.

9

1

**KC** **Kris Conwill**     October 11, 2023 at 11:20 AM

RE: DEA Access to Medina County Flock Data                    Details

2

To: Dillard, Justin S.,  Cc: Gergye, Thomas J.,   ty.moddelmog@flocksafety.com   & 4 more

3

Justin,

4

I was able to speak with Ty Moddelmog with Flock yesterday.  Ty is the Director of Flock's Growth
Team.  Our conversation was productive from the perspective of understanding each other's position.  I
explained to Ty it is the position of our office we would like the data collected from cameras within our
jurisdiction, along with the greater flock network, be shared with the DEA for use in the DEASIL
system.

5

6

7

Ty explained Flock is willing to share data with the DEA for a fee.  We discussed the process of sharing
data comes with a cost to manage the data transfer through an API or other data transferring
processes.  It seems this is where the challenge begins.  While Ty did not give specifics of offerings or
costs, he did indicated data could be purchased by the DEA for less than $100k on a regional basis
(i.e. Ohio and Michigan) or a few million on a national basis.  I shared my concerns with costs being at
a level that makes sharing of data cost prohibitive.

8

9

10

I also shared our long-term position as a customer may be affected by Flock not making LPR data
available to other law enforcement partners for a reasonable cost.

11

I told Ty I would include him on this group communication should others have questions and allow him
to offer a response.  Ty – Those copied include the following.

12

Thomas Gergye – DEA
Terry Grice – Medina County Sheriff
Geroge Maier – Stark County Sheriff
Bruce Zuchowski – Portage County Sheriff
Ed Kinney – City of Medina Police Chief

13

14

15

16

Thank you,

Kris

17

18

( Figure 3)

19

20

26. Above, the State mentions to FLOCK essentially "If you can't give the State the data for less

21

than, 1 million, it would be an absolute shame if we are not your customers any longer." The

22

State also participates in the crony and/or quid pro quo relationship with FLOCK.

23

24

27. FLOCK,  helps the State with the price of the Data among other requests, in turn as a

25

Customer, The State helps FLOCK by providing access to government buildings, spread

26

marketing materials to local communities, allow FLOCK to shape pr statements, local

27

28

10

1  policies, use FLOCK's sponsored Police Grant service, help write reference letters, help with

2  marketing projects within FLOCK.

**B.      FLOCK camera that is the center of this incident on February 25th 2023.**

28. The FLOCK Camera was stationed on Everhard @ Fulton in Canton Ohio, pictured below.( Figure 4)

29. No Warnings are visible informing anyone who drives by that it may alert police to non-existent investigations.



( Figure 4)

30. The camera was a Flock Falcon, a camera that was designed and developed by FLOCK.

31. FLOCK released many marketing materials regarding this device to law enforcement departments, such as technical specifications ( Figure 5)(exhibit B).

32. FLOCK Safety declared through its technical specifications Under CAMERA PERFORMANCE, FLOCK states " NCIC AND CUSTOM ALERT NOTIFICATIONS.....INCLUDES STATE SPECIFIC ALERTS BASED ON IMAGE"



**Camera Specifications**

Design

Dimensions: 8.75" x 3"
Weight: 3 lbs
IP65 Waterproof

Power

14Ah Battery
30W Solar Panel (14" x 21")
AC Power (5 ft. range)

Data

16GB local storage, ~2 weeks

Motion

Passive Infrared Motion Detection

Connectivity

Embedded Cellular LTE Connection
Cellular service provider depends on area

Production

Designed & manufactured in the U.S.

Night Vision

850nm Custom IR Array

**Camera Performance**

Motion

NCIC and Custom Alert Notifications
Average of 10-15 seconds
Includes time, location, plate, and vehicle image
Includes state specific alerts based on image

Power Source

100-240 VAC <1 amp
60 W Solar
11-14 Volt

Processing Power

1.4GHz
64-bit quad-core CPU

( Figure 5)

33. The hardware is responsible for the defamatory alert because FLOCK's own technical specifications and case studies have shown it to be the case

34. The FLOCK cameras have a processor, and an operating system built on Android OS.

35. Up close pictures of the camera itself is shown in ( Figure 6) and the motherboard ( Figure 7)

12

1
2
3
4
5
6
7
8
9
10
11



12 (figure 6)

13
14
15
16
17
18
19
20
21
22
23
24
25
26

27 ( figure 7)

28 36. Figure 4 is a picture the Camera motherboard, made by Lantronix

13

37. The camera is a mini computer which sends the alerts.

38. FLOCK has done case studies with Qualcomm Technologies and Lantronix to tout the capabilities of the FLOCK Camera (figure 8)(exhibit C)( figure 9)(exhibit D)



Flock Safety recognized the need for an affordable, effective ALPR system capable of giving the public the evidence they need to solve crime without compromising the privacy of citizens.

management support for remote software updates. Without having to worry about this foundation, Flock Safety was able to start innovating on their solution extremely quickly.

The affordability of Flock Safety ALPR system primarily comes from its lack of infrastructure. Thanks to its efficient smartphone hardware and modern software solutions it is powered entirely by solar and battery with a discrete design intended for neighborhoods. It can be installed in under thirty minutes in any area with solar and cellular coverage and receive software updates over the air to further reduce maintenance costs. This flexibility makes it a viable option for communities that cannot afford existing solutions.

Despite its affordable cost, Flock Safety's camera system is extremely powerful from a processing perspective: A single camera can capture 15,000 vehicles per day and send real-time alerts to law enforcement when it spots a license plate on the FBI's NCIC list of stolen vehicles. Using passive infrared motion detection, it can read the license plates of vehicles traveling at a speed of up to 75 MPH and up to 75 feet away from the camera during the day or night. The images it captures are analyzed with a proprietary machine learning algorithm using Vehicle Fingerprint technology to extract relevant data such as the license plate number and state of issue; the vehicle's make/type/color, and even additional objects caught in the image. The customer can search this database of footage using these details—even a partial license plate number—to filter through the images for easier identification.





( figure 8)

39. The Case study states, "A single camera can capture 15,000 vehicles per day **and** send real-time alerts to law enforcement"…." with the use of the conjecture "and" (emphasis added)

40. The device that sent the picture also sends alerts with information attached to it. (see figure 5,as well under PERFORMANCE).

14

**Challenges included creating an ALPR solution with the following features:**

- o Affordable, infrastructure-less design with wireless cameras
- o Ability to integrate cellular data into cloud connectivity
- o Secure website accessible only by authorized users
- o Built-in privacy to protect neighbors' identities
- o Power management for ultra-long battery life




**Lantronix Open-Q 624A SOM Development Kit**

Lantronix's Open-Q 624A Development Kit is a cost-effective, feature-rich, exposed-board platform running the Android OS. It is ideal for evaluation of the Open-Q 624A SOM as well as jumpstarting development of AI-enabled home hub products requiring tasks such as video conferencing, remote video monitoring, movie and video streaming.

Applications

- Audio/video home hubs
- Smart home control center
- Video conferencing products
- Streaming video/audio devices
- Smart connected cameras

> **Lantronix's custom modules provide a great platform for fast-tracking product development of high-performance embedded devices.**
>
> – Matt Feury, Founder & CTO, Flock Safety

**Solution: Lantronix Open-Q 624A SOM and Development Kit**

Utilizing Lantronix's Open-Q 624A SOM, its Development Kit and a custom carrier board designed by Lantronix's engineers, the Flock Safety team was able to quickly and cost-effectively build a purpose-built core platform for its safety system.

**Features include:**

- Wireless camera technology
- Secure access by authorized users
- Remote device management, including software updates
- Low-power requirement for long-lasting battery
- Assurance of privacy for neighbors
- FCC/IC pre-certified Wi-Fi/BT module

**Results: Flock Safety Cameras Fight Crime With Technology**

Utilizing Lantronix's Open-Q 624A SOM and engineering expertise, the Flock Safety design team created its breakthrough ALPR solution that combines powerful processing with security. Each camera can capture 15,000 vehicles per day and send real-time alerts to law enforcement with information including the license plate number, state, color of the car and if it is on the FBI's NCIC list of stolen vehicles.

Flock Safety's camera systems are currently being used in more than 700 cities across 38 states to help solve crimes. Law enforcement agencies have reported reductions in crime as high as 60 percent or more.

**About Lantronix**

Lantronix is a global provider of Software as a Service (SaaS), engineering services and hardware for Edge Computing, the Internet of Things (IoT) and Remote Environment Management (REM). Lantronix enables its customers to provide reliable and secure solutions while accelerating time to market.

**Benefits Include:**

- Quickly build a market-ready prototype
- Provide an affordable solution that helps contain development costs
- Get to production and market faster
- Deliver a powerful yet affordable safety device

**Please Visit:** https://www.flocksafety.com/product/product-overview

**LANTRONIX**

(800) 422-7055 • sales@lantronix.com
lantronix.com

( figure 9)

41. The camera/ system transmitted false, defamatory information to the police about the Plaintiff on February 25th, 2023.

42. The Plaintiff drove by FLOCK devices over a hundred times without issue before February 25 2023, many cameras in Jackson Township on February 25th 2023, and out of all of them, this camera malfunctioned.

15

43. FLOCK SAFETY has stated about its device to the public "Flock Safety technology is purpose-built to remove human bias from crime-fighting. Our cameras and Vehicle Fingerprint TM technology are engineered to capture vehicle characteristics and license plates, which we cross-check against state and federal records to ensure data accuracy and minimize errors." This is a misrepresentation and FLOCK omitted crucial material facts regarding its hardware even though they knew because they were the hardware developers, nothing from the above statement, such as cross checking, happened with the Plaintiffs data, of which the Plaintiff relied on such representations when using the FLOCK product.

44. FLOCK pulls from NCIC 4 times a day according to Darwin Aldrich, a customer success manager from Flock. ( figure 10)(exhibit E)

On Oct 10, 2023, at 12:37 PM, Darwin Aldrich <darwin.aldrich@flocksafety.com> wrote:

Good afternoon.

It is updated every 6 hours. 1AM, 7AM, 1PM, and 7PM.
Please let me know if you have any questions.

Darwin

On Tue, Oct 10, 2023, 12:34 PM Sara Lynn <slynn@medinaoh.org> wrote:
Afternoon.

Was hoping you'd could answer an east question for us. We're told the NCIC list is updated every 6 hours. Is that accurate? And do you know is it a consistent time everyday? Such as Midnight, 6AM, Noon, 6PM, etc?

Thanks,

Sgt Sara Lynn
Medina Police Department
150 W Friendship St
Medina, OH 44256
Dispatch: 330-725-7777
Direct Line: 330-391-7020

( figure 10)

45. There is the ability within NCIC to check for " A "Temporary Felony Want"(figure 11)

46.  Temporary Felony defined as "*may be entered when a law enforcement agency has need to take prompt action to establish a "want" entry for the apprehension of a person who has*

16

*committed or the officer has reasonable grounds to believe has committed, a felony and who*

*may seek refuge by fleeing across jurisdictional boundaries and circumstances preclude the*

*immediate procurement of a felony warrant. A "Temporary Felony Want" shall be*

*specifically identified as such and subject to verification and support by a proper warrant*

*within 48 hours following the entry of a temporary want. The agency originating the*

*"Temporary Felony Want" shall be responsible for subsequent verification or re-entry of a*

*permanent want."*

47.  The Statements made by FLOCK below were not checked through state and federal records

before being disseminated because the Plaintiff got pulled over for a nonexistent

investigation,

48. The Plaintiff did not have any Temporary Want in NCIC because the Police would have

arrested the Plaintiff if such want existed.

49. FLOCK is not a broadcasting company nor a publishing company.

50. There is the technical ability through NCIC to make sure if that person has a temporary want,

FLOCK choose not to utilize readily available data for every "hot list" alert.

51.  FLOCK SAFETY currently has a product, the camera, disseminates false information not

verified through NCIC nor the FBI because these unlawful stops to FLOCK are considered

"successes" because they use these stops for their internal success projects, as seen later in

this complaint.

17

**SOURCES OF DATA:** Data contained in NCIC is provided by the FBI, federal, state, local and foreign criminal justice agencies, and authorized courts.

The most recent iteration of NCIC became operational on July 11, 1999 at the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia. A recent hardware upgrade to the NCIC system is responsible for this significant improvement in performance.

**Categories of individuals covered by the system:**

A. Wanted Persons: 1. Individuals for whom Federal warrants are outstanding.
2. Individuals who have committed or have been identified with an offense which is classified as a felony or serious misdemeanor under the existing penal statutes of the jurisdiction originating the entry and for whom a felony or misdemeanor warrant has been issued with respect to the offense which was the basis of the entry. Probation and parole violators meeting the foregoing criteria.
3. A "Temporary Felony Want" may be entered when a law enforcement agency has need to take prompt action to establish a "want" entry for the apprehension of a person who has committed or the officer has reasonable grounds to believe has committed, a felony and who may seek refuge by fleeing across jurisdictional boundaries and circumstances preclude the immediate procurement of a felony warrant. A "Temporary Felony Want" shall be specifically identified as such and subject to verification and support by a proper warrant within 48 hours following the entry of a temporary want. The agency originating the "Temporary Felony Want" shall be responsible for subsequent verification or re-entry of a permanent want.
4. Juveniles who have been adjudicated delinquent and who have escaped or absconded from custody, even though no arrest warrants were issued. Juveniles who have been charged with the commission of a delinquent act that would be a crime if committed by an adult, and who have fled from the state where the act was committed.
5. Individuals who have committed or have been identified with an offense committed in a foreign country, which would be a felony if committed in the United States, and for whom a warrant of arrest is outstanding and for which act an extradition treaty exists between the United States and that country.
6. Individuals who have committed or have been identified with an offense committed in Canada and for whom a Canada-Wide Warrant has been issued which meets the requirements of the Canada-U.S. Extradition Treaty, 18 U.S.C. 3184.
B. Individuals who have been charged with serious and/or significant offenses:
1. Individuals who have been fingerprinted and whose criminal history record information has been obtained.
2. Violent Felons: Persons with three or more convictions for a violent felony or serious drug offense as defined by 18 U.S.C. Sec. 924(e).
C. Missing Persons: 1. A person of any age who is missing and who is under proven physical/mental disability or is senile, thereby subjecting that person or others to personal and immediate danger.
2. A person of any age who is missing under circumstances indicating that the disappearance was not voluntary.
3. A person of any age who is missing under circumstances indicating that that person's physical safety may be in danger.
4. A person of any age who is missing after a catastrophe.
5. A person who is missing and declared unemancipated as defined by the laws of the person's state of residence and does not meet any of the entry criteria set forth in 1-4 above.
D. Individuals designated by the U.S. Secret Service as posing a potential danger to the President and/or other authorized protectees.
E. Members of Violent Criminal Gangs: Individuals about whom investigation has developed sufficient information to establish membership in a particular violent criminal gang by either:
1. Self admission at the time of arrest or incarceration, or
2. Any two of the following criteria:
a. Identified as a gang member by a reliable informant;
b. Identified as a gang member by an informant whose information has been corroborated;
c. Frequents a gang's area, associates with known members, and/or affects gang dress, tattoos, or hand signals;
d. Has been arrested multiple times with known gang members for offenses consistent with gang activity; or
e. Self admission (other than at the time of arrest or incarceration).
F. Members of Terrorist Organizations: Individuals about whom investigations have developed sufficient information to establish membership in a particular terrorist organization using the same criteria listed above in paragraph E, items 1 and 2 a-e, as they apply to members of terrorist organizations rather than members of violent criminal gangs.
G. Unidentified Persons: 1. Any unidentified deceased person. 2. Any person who is living and unable to ascertain the person's identity (e.g., infant, amnesia victim). 3. Any unidentified catastrophe victim. 4. Body parts when a body has been dismembered.

(exhibit F)(figure 11)

52. FLOCK Safety has posted on its website **that the camera** sent the alert, a physical, tangible device, and this is true because FLOCK is the hardware manufacturer of the product. ( figure 12)(exhibit G)

18

flock safety

COMMUNITY SAFETY

## How to be Proactive Against Crime

November 17, 2022 • 1 mins

Not all security cameras are created equal. Although many people believe that security cameras are made to solve crimes when they happen, Flock Safety cameras take a proactive approach and work to *prevent* crimes before they occur.

The difference lies in Flock Safety's **Hot List** alerts, which notify law enforcement when a known suspect's vehicle is in the area. These real-time notifications work by connecting Flock cameras with data from the National Crime Information Center and local law enforcement agencies.

When a vehicle with a warrant or a stolen vehicle passes a camera, officers receive a notification enabling them to respond accordingly, and prevent the suspect from committing any further crimes.

( figure 12)

**C. The Defamatory Alert**

53. The alert/ or information disseminated by a FLOCK camera was through FLOCK's email account and mobile phone number/app because the data belongs to FLOCK and is also hosted on FLOCK's rented servers.

54. FLOCK Is not a social media platform because they have distinguished themselves as a hardware manufacturer.

55. FLOCK camera, as in this incident in particular, is integral to State functions because it a State utilized device, the camera is operated by the Government via lease.( figure 13)(Exhibit H)

> **WHEREAS, Agency** desires to purchase, use and/or have installed access to the Flock Service on existing cameras, provided by Agency, or Flock provided Hardware (as defined below) in order to create, view, search and archive Footage and receive Notifications, including those from non-Agency users of the Flock System (where there is an investigative purpose) such as schools, neighborhood homeowners associations, businesses, and individual users;

( figure 13)

56. The Camera is a physical, tangible device because that means its covered under the Ohio product liability laws.

57. The Plaintiff has repeatedly used and was a user of the FLOCK cameras throughout Ohio and Jackson township because he used the camera, what he thought its only ability at the time, to only take a picture of the car multiple times as he was aware of the Camera's presence.

58.  On February 25th, 2023, the camera malfunctioned and disseminated false and defamatory information about the Plaintiff, even though he drove by other FLOCK cameras that morning without issue.

59. The Plaintiff was never on any hot list from Cleveland nor the FBI because he was never a suspect of any crime, not even in Jackson Township.

60. The Plaintiff drove by Jackson Township cameras multiple times before February 25th 2023 without issue, the camera simply malfunctioned and it malfunctioned because FLOCK did not have proper guardrails to make sure the alerts the camera is sending has been verified through law enforcement databases to make sure the investigations actually exist and the

format of the data matches what is typical even though they represented such to the Plaintiff as seen in paragraph 43.

61. FLOCK has no contract with the Plaintiff's signature, whether it's an agency or non-agency contract because the Plaintiff never entered a business relationship with FLOCK.

62. This product, which is a physical tangible device, the FLOCK ALPR on South BLVD , was the source of a defamatory statement because the alert came from the camera as it states the location of the Camera in the alert (figure 14)(Exhibit I)

From: Flock Hotlist Alerts <hotlist@flocksafety.com>
Date: February 25, 2023 at 04:33:35 EST
To: "McDannold, D " <mcdannold@jtpd.com>
Subject: HOTLIST ALERT: OH - JVM1640 #09 - South Blvd @ Fulton - SB

## OH - JVM1640

Event Time: 4:33:15 02/25/2023

Source: CLEVELAND PD / FBI HUMAN TRAFFICKING MISSING JUVENILE VICTIM

Case Number: CLEVELAND PD / FBI CASE

Reason: CLEVELAND PD / FBI HUMAN TRAFFICKING VICTIM - ██████████
/ SUSPECT: MICHAEL T. SMITH (DOB: 03/11/95) - IF SUBJECTS LOCATED CONTACT CLEVELAND PD, FBI, AND STARK COUNTY CPS (HAVE CUSTODY OF MISSING JUVENILE)

Camera: #09 - South Blvd @ Fulton - SB

Network: Jackson Township OH PD

(figure 14)

63. FLOCK SAFETY went ahead and emailed defamatory information to the Police because they never took the time nor had the safeguards to verify the information before emailing police.

21

64. The above constitutes a statement; it was written, it was sent out, and it came from a Flocksafety.com domain, which belongs to, Flock Safety, because the alert came from Flock Safety, the statement within the alert came from Flock Safety as well, there is no distinguishing period where the Statement is not FLOCK Safety's because they alerted the police through their integrations, such as email, text and dispatch.

65. FLOCK SAFETY does have the ability to check alerts through NCIC because they have done it before, FLOCK has access to NCIC. (figure 15) (Exhibit J)

| | |
|---|---|
| **From:** | hotlist=flocksafety.com@mail.flocksafety.com on behalf of Flock Hotlist Alerts <hotlist@flocksafety.com> |
| **Sent:** | Wednesday, August 2, 2023 11:44 AM |
| **To:** | ▮▮▮▮ |
| **Subject:** | HOTLIST ALERT: OH - DWA3289 #017 Copley Rd & Nome Ave WB |

# OH - DWA3289 Protection Order

**Event Time: 11:43:12 08/02/2023**

**Source: NCIC**

**Camera: #017 Copley Rd & Nome Ave WB**

**Network: Akron OH PD**

[x]

(figure 15) (Exhibit J)

66. FLOCK SAFETY by not checking every alert through NCIC and then emailing defamatory information to the Police, resulted in the Plaintiff's detainment because the Police relied on FLOCK's information because of FLOCK's integration with the Police Operations, as Police gets hundreds of emails, text messages and dispatch requests from FLOCK.

67. Figure 14 was not verified through NCIC, but Figure 15 was, per the inclusion of the NCIC label under source.

68. Jeffers v. Olexo (1989), 43 Ohio St.3d 140, 142, 539 N.E.2d 614. "To maintain a negligence action, the plaintiff must show the existence of a duty, a breach of that duty, and that the breach of that duty proximately caused the plaintiff's injury. "

69. Jackson Township Police Department own records show that they did not want the Plaintiff for any investigation, nor did the FBI, Cleveland Police, Stark County Children Services, no investigation ever existed because the agencies told the Plaintiff and CAPTA, a federal law, prohibits a child investigation being conducted without the subject, the Plaintiff, not being aware. (figure 16)(Exhibit K)

| Call Type | Status | Priority | Dispatcher | Created Date |
|---|---|---|---|---|
| Traffic Stop | In Progress | High | bbissler | 2/25/2023 4:38:01 AM |

| Call Narrative |
|---|

*** 2/25/2023 ***

| Time | Description | User | Unit # | Machine |
|---|---|---|---|---|
| 5:18:04 AM | PER CLE PD -THEY ARE NOT SURE WHY THE MALE IS FLAGGED/ THEY HAVE NO 15'S AND DO NOT NEED HIM FOR ANY INVESTIGATION// CLE DISPATCH ALSO CHECKED WITH FBI AND THEY DO NOT NEED HIM FOR ANY INVESTIGATION | Bissler,Brittany | | RED-CAD-PC02 |

(figure 16)(Exhibit K)

70. FLOCK sold access to Plaintiff's PI (personal information) through its API, and an API exists to be sold because as seen in figure 3, FLOCK sells access to the API for up to a million.

71. FLOCK is an unorthodox data broker because they have gated access to data that can be bought for a large sum of money.

72. FLOCK doesn't sell data; FLOCK sells access by subscription to its trove of data which is why FLOCK is able to be disingenuous and state that "we don't sell users data," not that they don't "sell access to users' data". FLOCK never asked permission to sell access to the

23

Plaintiff's data, including his birthdate and other personal information, for that the Plaintiff is requesting damages of at least 26 million dollars in lost profits from a company worth billion as this business practice of selling access to drivers license plate/personal information violates the Ohio Driver's privacy protection and US Drivers Privacy Protection Act.

73. While the images taken by the camera may be deleted after 30 days, the data entered FLOCK is not deleted.

74. FLOCK owns the cameras, data, it only leases it to Police Departments.

75. FLOCK API through Axon allows a user search and view agency ALPR records. (figure 17)(Exhibit L)



3. Scroll to the ALPR section and select **Allowed** or **Prohibited** as needed.

- **Read/hit record search** – Lets a user search and view any agency ALPR records.
- **Hotlist management** – Lets a user search, modify, and create agency hotlists.
- **ALPR system administration**– Lets a user modify agency-level ALPR settings such as record retention and alert categories.

(Figure 17)(Exhibit L)

76. FLOCK SAFETY defamed the Plaintiff by stating that he was part of nonexistent human trafficking investigation because FLOCK never verified the data as true.

77. Any agency can share their hot list with any department (Figure 18)(Exhibit M).

Great News!

Craig Barna at Lyndhurst OH PD has shared their custom Hot List with you, giving you and your organization the ability to collaborate more effectively.

To begin receiving hits for this list, you must enable your organization as an audience.

1. Open Manage Lists
2. Scroll to the Shared Lists section at the bottom of the page
3. Click on the triple dots next to the list you want to enable and change the audience from "None" to "Organization"

Thanks for being part of the Flock.

(Figure 18)

78. Am. Chem. Soc. v. Leadscope, Inc., 133 Ohio St.3d 366, 2012-Ohio-4193. ("¶ 2. In determining whether a statement is defamatory as a matter of law, a court must review the totality of the circumstances and read the statement in the context of the entire publication to determine whether a reasonable reader would interpret it as defamatory. A client is vicariously liable for its attorney's defamatory statements only if the client authorized or ratified the statements.")

79. While any Government agency can input any information into FLOCK's system, the alert then any data attached comes from FLOCK and its servers, not from the Government agency, and it's all being done without being verified through NCIC before being disseminated back to law enforcement.

80. FLOCK isn't disseminating the alerts on behalf of an agency or non-agency, rather it's on FLOCK's own accord because FLOCK is not pressured by anyone to email or text message non verified information to Police, FLOCK chooses to do this without verifying the information and they are responsible for like any other person who would report false information to police, especially more so with their integrations with law enforcement and

FLOCK has direct access to text, email and dispatch software unlike what a normal citizen has access too.

81. No verification by FLOCK was done before stating it to third parties, such as Jackson Township because otherwise, he would not have been pulled over as the investigation never existed in the first place.

82. Jackson Township and its officers were third parties to the statement made by FLOCK Safety because the statement came from FLOCK Safety and the parties that received the statements were not employed by FLOCK nor were FLOCK themselves.

83. There was never an investigation into the Plaintiff for human trafficking; the Plaintiff was clear is NCIC because the Plaintiff checked with police agencies, the FBI and BCI and federal law prohibits such of an investigation without the Plaintiff being notified.

D. **How it was Defamatory.**

84. Defendant's failed to exercise reasonable or ordinary care by not checking nor even retracting the defamatory statements by FLOCK before the police arrived so Plaintiff wouldn't get detained because FLOCK didn't implement the ability to send a retraction message through hotlists@flocksafety.com, because of FLOCK's lack of care, this directly led to the violation of Plaintiff's constitutional rights. The false statement of fact disseminated by FLOCK constitutes a statement that caused severe harm to the Plaintiff's reputation because the statement came from FLOCK, stating that the Plaintiff is subject to a human trafficking investigation which was not true.

26

85. The only "sources" listed on the alert were Cleveland PD and the FBI. Jackson township was not listed as a source of the alert and because nor did the officers of its own department on scene knew anything about any investigation into the Plaintiff, the Statement made by FLOCK was a Statement, couldn't be interpreted as a question as it was to Police.

86. Those agencies knew nothing about this alert, nor did those agencies input the alert because the Call Log shows that Jackson Township called the agencies, and they didn't want the Plaintiff, ever.

87. Only FLOCK Safety knows who put the alert in because FLOCK has access to the data as FLOCK made the system.

88. Nowhere on the alert does it state who exactly put the warning in; any agency that was listed did not know anything about any investigation into the Plaintiff, and such an investigation can't take place by Stark County Children Services because such proceedings can't be conducted without the knowledge of the Plaintiff (See Ohio Revised Code [O.R.C.] 2151.421 G(l), 42 U.S. Code§ 51C6a (b)(2)(B)(xviii)). The allegro (b)(2)(B)(xviii), dictate that the Plaintiff must be informed of any investigation. The Plaintiff: in accordance with state and federal laws, has the unequivocal right to be notified of any investigation involving Children Services, especially in cases of such gravity as human trafficking. The lack of evidence further solidifies the argument that the alleged investigation is nothing more than a defamatory and false alert by FLOCK because this statutory requirement ensures transparency and safeguards the rights of individuals implicated in any investigation. Crucially, the call log from Stark County, shows the absence of any such investigation as no agency, even Jackson Township wanted the Plaintiff.

89. FLOCK never gave the Plaintiff the opportunity to correct or fix the false information about the Plaintiff before emailing the information to Law enforcement because FLOCK does not want the Plaintiff to see what he is being accused within FLOCK's own system.

90. The case number listed on the alert is not valid and implies to any outside reader that there is an active case against the Plaintiff, which is false and defamatory by the Defendant.

### E. Crony Relationship Between FLOCK Safety and the State of Ohio

91. FLOCK permits Ohio state agencies to access its proprietary camera, software, and data repositories for free through a memorandum of understandings because FLOCK wants as much data contributed to the system to make the product more valuable to its customers/future customers, which is mainly law enforcement.

92. FLOCK Safety has expanded rapidly, not because of free enterprise but rather through a pseudo crony capitalism because FLOCK needs Police to vouch for its products otherwise FLOCK wouldn't be able to sell to state schools and private communities as easy.

93.  FLOCK requests the help of Police officers and State officials to market the product to communities and schools because of such, FLOCK has seen rapid growth.

94. FLOCK, through multiple of their FLOCK employees such as Myron Marer by looking at their emails, solicits marketing help from the Police/ government for free because the State inadvertently helps for free, as each request is small enough (e.g. "hand out pamphlets to HOA or schools if you can") which doesn't cause a commotion (Figure 19)(Exhibit N)(Figure 20)(Exhibit O)  Attached to Exhibit O is the flyer that Michael Weaver wanted police to hand out, with his contact information at the bottom.

95. FLOCK does not pay for this help because that would raise their marketing expenses.

Morning LT,

Attaching the handouts we spoke about last week for commercial and community cameras. These are good points of reference for anyone who is interested but just remember that we have a representative for both fields here as well. They'd be happy to discuss the product and how other entities across the state are using it with anyone you think might be interested.

For commercial, it is Evan Filtz evan.filtz@flocksafety.com

Community safety (HOA's / neighborhoods), Austin Johnson austin.johnson@flocksafety.com

Have a good week,

Myron

Myron Maret
*Customer Success Manager - Ohio*
f ock safety
404.631.6599 | myron@flocksafety.com

(Figure 19)

Good afternoon Sir,

I am the new Ohio community safety representative at Flock. My role is to connect community entities (HOA's, multi-family housing, houses of worship) within your jurisdiction to Flock's solutions. This not only bolsters security for the community but increases your Flock network to help solve and eliminate crime. Attached is an informational flyer with my contact information that you can provide to community members.

I live in Columbus and would be happy to attend any community related events that you think could be beneficial. I look forward to working together.

Respectfully,
Michael Weaver
*Ohio Community Safety Representative*

614.832.0240 | michael.weaver@flocksafety.com

(Figure 20)

29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

96. FLOCK Safety also goes above and beyond its ALPR contract with the State through the

Sales Force feature called "Sales Force Account Engagement", because FLOCK actively ,

through multiple of their FLOCK employees by looking at their emails, utilizes the Sales

Force platform to communicate/email with these partnered police agencies to host

"community safety events" and/or "Metro law enforcement event" aimed exclusively at HOA

and other non-partnered law enforcement. (Exhibit P)(Figure 21)

97. FLOCK doesn't pay for the space because it would raise marketing costs.

**From:** Chris Clayton
**To:** Jason Messer; Rick Lombardo
**Subject:** Flock Safety User Group
**Date:** Thursday, October 12, 2023 1:09:46 PM

Hey Lt. Messer,

As Flock continues to grow and expand its services, we are committed to maintaining a close relationship with our customers, and we've seen that meeting Flock users face-to-face is instrumental in fostering partnerships. Therefore, we are launching a series of in-person events across the nation to meet with customers, hear your feedback, and keep you updated on our latest developments.

Given that Upper Arlington PD is a cornerstone customer in the region, I'm writing today to see if you would be willing to host one of these events either this quarter or in the future. What hosting means for your agency:

- Private Room:
  - A spacious room with a seating capacity for up to 50 people.
  - Comfortable seating arrangements, such as chairs and tables, for the attendees.
- Location:
  - Convenient and easily accessible location, preferably in a central area with parking facilities or good public transportation access.
- Audiovisual Equipment:
  - Projection Screen: A large, clear projection screen or wall for presentations.
  - Projector: A high-quality projector with appropriate connectivity options (HDMI, VGA, etc.).
  - Microphones: At least one handheld or lapel microphone with a sound system for clear audio during presentations.
  - Sound System: Adequate speakers and audio equipment for the room size.
- Furniture and Setup:
  - Flexible seating arrangements that can be adjusted to suit different meeting formats.
  - A podium or lectern for speakers.
  - Tables for presenters and for any catering or materials.
- Parking:
  - Adequate parking facilities for attendees, preferably on-site or nearby.

Our primary goal for an event like this is to bring customers and prospects together for best practices, feedback, and new updates.

If you're interested in hosting, please let me know and we'll pick a date. Currently I'd like to look at early November for an event. To thank you for your efforts in hosting, we are happy to offer some awesome Flock apparel for your team.

Thank you and stay safe,

Chris

Chris Clayton
**Customer Success Manager**

9198.103011      flocksafety.com

(figure 21)

31

98. The above email is from Chris Clayton, a customer success manager, talking to a state police department asking to use their space for free to invite other departments nearby to see the device up close, essentially a marketing event. (figure 22)(Exhibit Q). The Plaintiff couldn't find any similar request from any other private company, aside than FLOCK, that's specializes in law enforcement to use a government building as a convention center.

From:        Jason Messer
To:          Chris Clayton
Subject:     Re: Flock Meetin
Date:        Monday, November 27, 2023 5:26:46 PM
Attachments: image003.png
             image003.png
             image004.png
             image004.png
             image003.png

Ok .We would probably do well to move your Flock team cars across the street after any unloading is done.
See you tomorrow.
Jason
Sent from my iPhone

On Nov 27, 2023, at 16:41, Chris Clayton <christopher.clayton@flocksafety.com> wrote:

35 registered (but a lot from the same dept.) + 7 from Flock.

Chris Clayton
*Customer Success Manager*

919.810.3011 | christopher.clayton@flocksafety.com

*Book a meeting to learn more. Click here!*

On Mon, Nov 27, 2023 at 3:18 PM Jason Messer <jmesser@uaoh.net> wrote:

Do you have a count of attendees? We may need to direct overflow parking to the OSU Golf Course across the street if we have a lot. I am checking on permission for at the moment.

LIEUTENANT JASON MESSER #1275
Staff/Investigative Bureau  |  Police Division
The City of Upper Arlington
3600 Tremont Road, Upper Arlington, OH 43221
o: 614-583-5164  |  c: 614-595-0308

(figure 22)

99. Salesforce talks about their Partnership with FLOCK and would have information to help the Discovery process. FLOCK also uses SHOWPAD within its company , Google Workplace and Loomo. (figure 23) (Exhibit R). FLOCK Safety deleted/unpublished the article named

32

"Flock safety makes communities safe" after it was posted in this lawsuit on December 14th 2023, deleted on around December 29th 2023, an article that has been up since 2022. This erasing of evidence presented in this lawsuit shows the lengths that FLOCK is willing to go because they are trying to erase all traces of incriminating evidence of FLOCK abusing police resources for their own gains, going to the article now only results in a 404 error.[4] Which goes to the homepage named 'Meet Top Brands Who Are Transforming the Customer Experience with Salesforce" this link has been tested over multiple days, it's been deleted or unpublished.

> An early use case for Account Engagement? Event marketing. Here's an example:
>
> - Flock Safety is partnering with the Atlanta Police Department to put on a community safety event.
> - Flock Safety uses Account Engagement to run automated campaigns that invite prospects to the event. Thanks to the seamless sales and marketing alignment that Account Engagement enables, the Flock Safety team can not only easily drive

> registrations, but also create a full journey for those prospects from pre- to post-event, driving more deals.
> - Sales reps can see which leads attended the event.
> - When one of those leads attends the event, and shows interest in Flock Safety's offerings, the sales team can easily see that activity within Salesforce. They can then reach out to the lead, using an email template that the marketing created ahead of time.
> - With Account Engagement and Sales Cloud on the same platform, sales and marketing both get a full, 360-degree view of the customer, to inform future product evaluations.

(figure 23)

---

[4] "Meet Top Brands Who Are Transforming the Customer Experience with Salesforce." *Salesforce*, www.salesforce.com/resources/articles/flock-safety-makes-communities-safer/. Accessed 24 Jan. 2024.

33

100.    As of December 20th 2023 FLOCK had numerous contracts with high-ranking law enforcement and non-law enforcement agencies within the State of Ohio, These include, but are not limited to, the Ohio Attorney General's Office, Ohio Bureau of Criminal Investigation, Ohio Bureau of Motor Vehicles (Ohio DPS), Ohio Bureau of Workers' Compensation (LE), Ohio Department of Public Safety, Ohio Drug TF (HIDTA / Moreland Hills OH PD), Ohio State Highway Patrol, and Cuyahoga Emergency Communications Systems OH (CECOMS).

101.    Some of those agencies, Ohio Attorney General or Department of Public Safety, have no FLOCK cameras but have access to the FLOCK system through a MOU as of December 20th 2023

102.    Department of Public Safety and the Attorney General of Ohio provides grants to the local cities and towns which goes to FLOCK.

103.    FLOCK, through multiple of their FLOCK employees such as Darwin Aldrich by looking at their emails, helps state schools with filling out the Grants (Figure 24)(Exhibit S)

Todd Ellis with Flock Safety (Todd.Ellis@flocksafety.com) is working directly with Ohio Schools.

After the webinar for those interested, we will walk schools through an overview of the program AND help them directly with the grant application since we've done this before.

Thanks,


Darwin Aldrich
His
Customer Success Manager

(Figure 24)

104.     FLOCK is a State actor because FLOCK, through multiple of their FLOCK employees

and by looking at their emails, helps the State with grants, policy writing, PR statements,

social media posts, legal advice through educating about probable cause, thus changing the

Relationship on a whim because FLOCK wants the agencies resources for its own needs and

have its device come across as government endorsed, only FLOCK can change the

Relationship, not the Agency itself.

105.     FLOCK ,through multiple of their FLOCK employees such as sales reps like Logan

Harrah by looking at their emails, also helps agencies with Grants,. When an agency is on the

edge, FLOCK refers the State agency to Policegranthelp.com, which, FLOCK has a

sponsorship with policegranthelp.com. This is because FLOCK wants to increase revenue

through sponsorships and through subscriptions, so FLOCK refer states to fill out grants

through a sponsored website which then FLOCK gets the Grant money if the Grant is

successful and some sponsorship money by referrals. (Figure 25)(Figure 26)(Exhibit

T)(Exhibit U)

**From:** Logan Harrah <logan.harrah@flocksafety.com>
**Sent:** Thursday, April 20, 2023 12:04 PM
**To:** Snavely, Bryan <bsnavely@stow.oh.us>; Alison Randall <ARandall@lexipol.com>
**Cc:** Dirker, Erik <EDirker@stow.oh.us>
**Subject:** Re: FW: Flock Materials

Hi Gentlemen - yes!

Since you are interested in grant funding for Flock Safety LPR cameras, I have copied Alison Randall with
Lexipol to this email. Alison can help you find a grant to purchase our Flock LPR cameras. She cannot provide
any assistance until you fill out the attached form and notify us when completed. Once completed, she will help
you find a grant that will allow you to purchase LPR's.

Please fill ●ut the application below:

https://www.policegrantshelp.com/flock-safety-lpr-grant-assistance/

(Figure 25)

1

2

3

Join us on <u>Wednesday, November 30th, at 2 PM ET / 11 AM PT</u> for live training from Travis Martinez from Redlands PD and David Ballard, Solutions Consultant and former Lieutenant at Shelby County Sherrifs Office, as they cover how to:

4

5

• Make a case for ALPR to your city council
• Grow your budget with community fundraising and grants
• Promote crime reduction and success stories in the media

6

7

We will also announce November product releases and our new sponsorship of PoliceGrantsHelp's grant assistant program, which can support your agency with grant writing services.

8

Hope to see you there!

9

10

**REGISTER**

11

12

(Figure 26)

13

14 | 106.    FLOCK refers the State to a grant service, of which it's sponsoring because FLOCK gets

15 | benefits every time they refer customers, even though the State itself offers Grants to local

16 | law enforcement which applications is easily accessible through the Attorney Generals site.

17 | 107.    FLOCK is a State actor because through multiple of their FLOCK employees such as

18

19 | sales reps like Logan Harrah and their own genuine emails pressures the Government to help

20 | talk to schools about FLOCK devices which FLOCK changes the Contract relationship to

21 | now a partnership relationship because simply leasing a camera from a company doesn't

22 | mean one should be asked to spread pamphlets on FLOCK's behalf using the Government's

23 | credibility to do so, and the State supports the action of the private party. (figure 27) (Exhibit

24 | V)

25

26 | 108.    FLOCK then hot potato's the conversation to a sales rep through cc such as Ray Joyner to

27 | ante up the pressure of the Government to help because FLOCK rather have the Government

28

vouch for a product at first impressions with new customers rather than have their own

salespersons.

**From:** Logan Harrah <logan.harrah@flocksafety.com>
**Sent:** Tuesday, January 31, 2023 3:17 PM
**To:** Snavely, Bryan <bsnavely@stow.oh.us>
**Cc:** Ray Joyner <ray.joyner@flocksafety.com>
**Subject:** Grant Available to Stow-Munroe Falls City School District for Flock Cameras

Hi, Captain Snavely!

I wanted to let you know that Stow-Munroe Falls City School District can pursue a grant to purchase Flock cameras and I've copied my colleague on this email - this is time-sensitive! His name is Ray Joyner and he's very helpful! Would you be open to making a connection with Ray to your school's SRO to discuss this opportunity?

If you need us to request someone else to make the introduction, please advise!

Thank you sir,

(figure 27)

109.     FLOCK ends the email and implies to the Government that "If you can't do it, tell us who can," which statements are designed to pressure the official because FLOCK needs the Government help to spread awareness of its product to increase revenue and have more data coming into the system, making it more valuable to FLOCK to pitch as a helpful service to future customers.

110.     No point does FLOCK and the State treat the product contract lease relationship as such because FLOCK actively abuses the relationship for its own gains, which is not seen in a typical lease relationship and also the State strongarms FLOCK to lower its API prices otherwise many law enforcement organizations may not be customers much longer.

111.    FLOCK is a for-profit business.

112.    Flock Safety reported in November 2023 a growth of 2,660% over the last three years, which happened with the help of the Police and selling access to people's data.

113.    Subscriptions to the camera service and to access data, such as the Plaintiff, help propel this growth.

114.    FLOCK has an estimated valuation of billions of dollars.

115.    FLOCK Safety knows that the data is valuable because the emails of FLOCK employees knowingly sell access to it.

116.    FLOCK actively partakes in manipulative and pressuring behavior with the State because, as seen here, FLOCK constantly subtly urges the State to take specific actions, like having the Chief talk to school reps to market FLOCK devices.

117.    A Chief of Police has an inherent credibility compared to a sales rep from a private company because people would take a product more seriously if a government official vouched for it.

118.    FLOCK is having the State help spread awareness of their devices than their employees.

119.    FLOCK, through multiple of their FLOCK employees and their emails, comes in after the State does the heavy lifting with their credibility, and FLOCK closes the deal with ease over deals not pitched by the State with their inherent credibility. (figure 28) (Exhibit W)

120.    At time of these emails, the Stow-Munroe Falls School District website had no downtime, nor is there any mention of such in the emails.

121.    FLOCK had access to contacts within the School District via the school website without bringing in the Chief of Police.

38

| From: | Ray Joyner <ray.joyner@flocksafety.com> |
|---|---|
| Sent: | Wednesday, February 1, 2023 1:04 PM |
| To: | Snavely, Bryan |
| Cc: | Logan Harrah |
| Subject: | Re: Grant Available to Stow-Munroe Falls City School District for Flock Cameras |
| Attachments: | FAQ K-12 ENGLISH.pdf; Flock_Safety_Overview_-_School_Districts.pdf |

Hey Captain,

Please see below. I've included a link to an overview of the grant along with a link to the grant application. This grant is $20,000 per school district for technology that links schools with law enforcement, which is what Flock provides. I've also attached some more information on how Flock helps protect schools.

I'd be happy to speak with anyone at the school district if they have more questions or would like to schedule an overview and demo.

https://www.ohioattorneygeneral.gov/Media/News-Releases/January-2023/New-Safety-Innovation-Grants-Available-to-Ohio-Sch

https://grantsportal.ohio.gov/Public/FundingOpportunityDetails?detailid=178

Thank you,

Ray Joyner

On Wed, Feb 1, 2023 at 12:24 PM Snavely, Bryan <bsnavely@stow.oh.us> wrote:

Hello Ray,

I just spoke with Logan and he said that you would have more information on this. I was hoping you could forward me some information about what the grant is that could potentially fund these cameras? Maybe a link to the RFP. I would like to see if our district is aware of it or if they already intend to put an application in for it.

Thanks,

*Captain Bryan Snavely*

Stow Police Department

(figure 28)(Exhibit W)

39

122.     FLOCK changes the contract relationship between the State on its own whim when it goes outside what the Contract covers to satisfy its needs.

123.     FLOCK is a state actor because of the close relationship with the State to do what they please with government resources because Nowhere in the contract does it say that FLOCK will ask the agency requests to benefit FLOCK; FLOCK does it without pressure and willfully because nobody has questioned them about it yet because each request is settled and small but happens frequently to where it's not accidental but done to increase market share over their competitors.

124.     FLOCK Safety intended to ask the Police to market their devices without compensation because this behavior is seen done by multiple police agencies in Ohio and reported on the news, which is not a one-off situation.

125.     When FLOCK goes outside the contract, it then changes the relationship of the Contract to a partnership, an agency, or an employment, depending on what FLOCK wants from the Agency at the time.

126.     The Contract does not state that FLOCK can't change the Relationship; only the Agency can't.

127.     The Agency, State in this case, doesn't tell Flock to market any product or write references as that would change the relationship of a simple product contract into a partnership or act like an employment contract.

128.     The State of Ohio provides significant funding to FLOCK by grants, and also at the same time, as of December 20th, 2023, without cost through a MOU (Exhibit X), FLOCK provides most of Ohio State and its Attorney general access to its systems even without being

a customer, giving these non-customers the ability to add people to a hotlist and have access to the thousands of FLOCK cameras nationwide through their TALON network.

129.     Many local Governments of Ohio are under a contract with FLOCK; Flock doesn't treat it like a contract but instead treats it as a partnership where the Government is asked to help FLOCK with its requests, such as writing reference letters or helping market its devices.

130.     FLOCK is a state Actor because they held, as of December 20th, 2023, over 300 contracts with law enforcement and non-law enforcement government entities within Ohio. FLOCK also has agreements with state universities police departments, such as Denison University Campus OH PD.

131.     Approximately 30 of these contracts are with Sheriff's offices, while the remainder are with various other law enforcement agencies within the State. Some of these agencies, such as the Barberton and OH PD, do not possess physical camera equipment but retain the ability to add a custom hot list, akin to a FLOCK camera owner.

132.     Through multiple of their FLOCK employees and by looking at their emails such as Rick Lombardo, Director of Sales at FLOCK, helps the close relationship with the state and has helped give free access to local governments through MOUs because the platform becomes more valuable with more data that can be used as a talking point to future customers or retain customers. (Exhibit x)(Figure 29)

regulations or laws; Agency represents and warrants that, in receiving access to Flock Services, such Recordings and supplemental data shall be used solely for purposes authorized by law and described in this MOU.

4. **Ownership.** As between the Parties, subject to the rights granted in this MOU, Flock and its licensors retain all right, title and interest in and to the Flock Service, and its components and any Recordings or data provided by Flock through the Flock Service, and Agency acknowledges that it neither owns nor acquires any additional rights in and to the foregoing not expressly granted by this MOU. Agency further acknowledges that Flock retains the right to use the foregoing for any purpose in Flock's sole discretion. There are no implied rights.

(figure 29)

41

1
2
3

From: **Rick Lombardo** rick.lombardo@flocksafety.com,

4
Date: July 7, 2021 at 10:42:36

5
Cc:

6
Subject: **Re: Flock Safety**

7
Hi Chief Kinney,

8
I wanted to pass along a story that Action19 news ran a few days ago on some of the work we are doing out in Mentor.

9
https://www.cleveland19.com/2021/07/02/camera-system-tied-criminal-database-helps-mentor-police-fight-crime/

As stated in my previous emails I would love the opportunity to stop in and just present the technology to you. Worst case
10
scenario I can get your department free access to hundreds of cameras in the Cleveland area.

11
Thanks,

12
Rick Lombardo

13
(figure 29a)

14
15
16      133.    FLOCK's close relationship with the State is apparent because, as of December 20th,

17      2023, shared its system with hundreds of other Ohio agencies regardless of whether they

18      possess a FLOCK camera.

19      134.    FLOCK has also partnered with body camera company Axon and has API

20      implementation because FLOCK wants to be or in the alternative, integrate with every

21      commonly used Court/law enforcement products /devices and software .Medina Ohio Police,

22      for example, just bought access to FLOCK OS, a software that Dispatch and Police can use

23      that is separate from the cameras itself, and its own cost, it's a glorified dispatch software.

24      135.    This partnership facilitates the provision of mobile ALPR devices for police vehicles and

25      integration with evidence.com, a platform widely utilized by law enforcement agencies.

26
27
28

42

136. The State plays a 'significant role in the operation, management, or control' of the FLOCK system because the State controls who access the system, etc.

137. FLOCK is a state actor because the State, represented by individual cities, Sheriff's offices, and the attorney general, is actively involved in the operation of the FLOCK system because of the vast number of MOUs

138. Flock is a state actor because the State involvement includes setting ALPR policies with the help of FLOCK, making decisions about system usage, and directly managing the personnel who utilize the system.

139. Flock is a State actor because The State exercises oversight and administration of the system, dictating its use, user base, and purpose.

140. Flock is a state actor also because The cameras are no different than a security contractor for these cities, as these cities have an ongoing yearly cost of $2500 per camera.

141. Flock is a state actor because FLOCK also helps shape the ALPR policies of the cities with which it partners because FLOCK doesn't want its devices to be restricted by privacy laws as the data is valuable for its API subscription.

142. Flock is a State actor because FLOCK has reps, such as Hector Soliman-Valdez or Rick Lombardo, who present at local city council meetings and propose ALPR policies that the city can adapt for its (Flock's) devices. (figure 30)

143. The Councils are elected government officials in charge of drafting policies for the city.

144. FLOCK Safety is not an elected official because they are a private business, not a human being.

145. FLOCK SAFETY are not citizens of these cities that they help draft policies, because FLOCK is based out of Atlanta Georgia and they are a cooperation, not a human being.

146. Flock is a State actor because It's rare for a private company to help a local city shape device policy because private companies are not elected officials.



(figure 30)

147. FLOCK uses personification to liken their devices to a partner in law enforcement.

(figure 30a)



(figure 30a)

44

148. Flock is a State actor because FLOCK is involved with TALEN, an Ohio Attorney General project, and has integrations with law enforcement programs and applications such as Evidence.com and dispatch systems.

149. Flock is a State actor because these integrations intertwine itself heavily with police operations

150. Flock is a State actor because Flock Safety actively participates in city council meetings, proposing and working alongside cities to craft Automatic License Plate Recognition (ALPR) policies for its own devices.

151. Flock is a State actor because The company retains control over where its cameras are placed because the data they get needs to be plentiful and consistent; thus, they must be placed in areas that FLOCK studies as high traffic.

152. Flock is a State actor because FLOCK talks to law enforcement and government agencies to host community safety events and Law Enforcement Metro Events to discuss Flock devices with homeowners' associations (HOAs) and private communities or even non-partnered law enforcement agencies

153. Flock is a State actor because FLOCK employees such as Amanda Spees uses these events as marketing to brag about on social media, showing that the State hosted a FLOCK event. (figure 31)(Exhibit y)



(figure 31)

154.    Flock is a State actor because VICE, a news organization, puts it, " Flock works closely with police to try and generate media coverage, improve their PR strategy; in some cases, Flock has helped write press releases for agencies"

155.    Flock is a State actor because Holly Beilin, head of public relations at FLOCK, has admitted through emails to Police Departments that FLOCK PR Team has helped "hundreds of cities" craft their press releases.

156.    Flock is a State actor because None of the Government Agency contracts state that FLOCK is required to help draft PR statements or city policies.

157.    Flock is a State actor because None of the contracts that FLOCK has any government or non-government agency sign state that FLOCK is responsible for helping craft PR statements or city policies.

158.    Flock is a State actor because Other private companies that deal with law enforcement, such as Axon and Mozilla,seems to have never hosted events at police departments and invited other police departments/ private communities to attend.

159.    Flock is a State actor because These Law Enforcement Metro events/Community Safety Events are not for a government purpose, such as a city council meeting; it's purely for FLOCK's benefit because FLOCK needs to increase market share at all costs while saving costs, such as venue rentals.

160.    FLOCK saves venue money by using government buildings instead of convention centers to host non-government private events.

161.    Flock is a State actor because Using government buildings for private events is an unauthorized benefit from the contract with the state.

162.    Flock is a State actor because Soliciting references and influencing state officials to promote Flock Safety's products is to gain a marketing advantage over its competitors.

163.    Flock is a State actor because These tactics by FLOCK are not "Marketing", because other companies that have Government contracts within Law enforcement don't participate heavily in doing Government jobs, such as writing policies for citizens and pr statements for Police, FLOCK has done that here because FLOCK wants to act like part of the Government and control everything without being the government.

164.     FLOCK describes in Cleveland Ohio remote job descriptions for their remote customer success manager's as "tactics..." when it comes to these events. (Figure 32)(Exhibit Z)

165.     FLOCK has boilerplate PR statement's that FLOCK SAFETY want law enforcement to use such as the Bellefontaine police department (figure 33) (Exhibit AA) used and many other police departments used after those agencies installed FLOCK Cameras such as:

> "The ___ Police Department has solved [CRIME] with the help of their Flock Safety camera system. Flock Safety ALPR cameras help law enforcement investigate crime by providing objective evidence. [CRIME DETAILS AND STORY] ____ Police installed Flock cameras on [DATE] to solve and reduce crime in [CITY]."

Even news organizations report that FLOCK helps create statements for the police to release, and even create government policies for city council to adopt (figure 34)(Exhibit BB). Mentor Police got assistance when it came to PR statements by FLOCK.

The Role

Flock Safety is looking for a motivated and strategic-minded individual to join our Customer team as our Customer Success Manager, working with our Law Enforcement clients.

While this will be remote, the expectation is that the individual will spend much of their time (virtually or in-person) with strategic law enforcement customers along with homeowners associations in the region. The Customer team is focused on three pillars: customer satisfaction, retention, and growth. This is not a sales role with things like quotas; rather, it's a market ownership role where you are focused on facilitating growth and retention through a combination of hustle and relationship-building. Satisfied customers renew their Flock Safety subscriptions because they feel supported and understand the value of the product. Markets grow through a variety of tactics - some examples: connecting local press with great stories of Flock cameras being used to solve crime; organizing a community event between the local police department (who you've turned into Flock advocates) and neighborhood association leaders from around the city interested in eliminating non-violent crime; sharing access to private license plate reader cameras with law enforcement.

(figure 32)

49



⛉ ci.bellefontaine.oh.us

HOME   GOVERNMENT   DEPARTMENTS   ANNOUNCEMENTS   VISITOR INFO   DOR/

# BELLEFONTAINE POLICE INSTALLING FLOCK SAFETY CAMERAS TO SOLVE AND PREVENT CRIME

4/7/2022   0 Comments

The Bellefontaine Police Department is taking an active role in preventing and solving crime by installing Flock Safety Automated License Plate Reading (ALPR) cameras.

*Flock Safety ALPR cameras help law enforcement investigate crime by providing objective evidence that can be transformed into actionable leads. They capture license plates and vehicle characteristics, not people or faces.*

Bellefontaine Police Department will use the Flock Safety system for both proactive and reactive crime fighting. The ALPR network delivers real-time alerts to law enforcement when a stolen or wanted vehicle has passed a camera. The license plate readers can also alert officers if a vehicle associated with a missing person in an AMBER or Silver Alert is detected. When investigating a crime, Flock Safety cameras detect and decode objective leads for law enforcement using Vehicle FingerprintTM technology, which identifies the make, vehicle type, color, license plate (full, partial, or missing), license plate state, and unique vehicle features like roof rack, trailer hitch, tinted windows, and more.

(figure 33)

50

Flock Pole - 12 ft
Standard Pole Mount

Solar Panel - Double Top Mount
2 External Battery Pack

DETAILS ON A FLOCK DEPLOYMENT AVAILABLE ON A PUBLICLY ACCESSIBLE URL INCLUDED IN EMAILS OBTAINED BY MOTHERBOARD. IMAGE: MOTHERBOARD

In one email, a Flock staffer offered members of the New Lenox Police Department their abilities for "drafting social media posts, pitching local reporters, writing press releases." The purpose, ultimately, is to "generate some goodwill and get your jurisdiction activated, bring more private cameras into the area, and highlight your successes!" the email from the Flock staffer continues. "Please use us as your resource!"

ADVERTISEMENT

THIS IS TEQUILA          DELEON

The result is a circle, with Flock working with police to generate positive coverage, to encourage more communities to purchase cameras, and to then provide access to that footage to the police, and around again.

(figure 34)

166.  Flock is a State actor because FLOCK's has an agency level of involvement because FLOCK partakes in policy making and implementation plus the encouragement from the Jackson Township (The State) to the Defendants by allowing FLOCK Safety integration with Jackson township patrol/ detective e-mail/mobile numbers and notifications to dispatch.

167.  Flock is a State actor because **FLOCK Safety has been increasing market share at the expense of taxpayer resources.**

168.  Flock is a State actor because Jackson Township and the State of Ohio are supporting the private party's action of sending police on FLOCK's beck and call.

169.  Flock is a State actor because FLOCK uses police resources as a marketing tool to get access to HOA's, Emily Norman, a Community Safety Territory Representative of Flock,

51

pressures local Police governments of Ohio to help market FLOCK devices by using words in the email such as "Partnership", thus changing the contract to a Partnership on a whim. (figure 35) (Exhibit CC). Or even write implicitly to the State that "Help me help you" by stating "Lets grow YOUR Flock Network", which is growing the FLOCK network, not the Departments as the Departments network belongs to FLOCK and increases revenue for FLOCK.

170.    FLOCK Sales reps get commission, uncapped.

> It was so great to just connect with you. I am excited to share with your department more about my role as the Community Safety representative at Flock Safety. I am responsible for getting private cameras in the ground at HOAs, neighborhoods, apartments, churches, etc. When working with someone in my role, departments are gaining access to more private cameras faster, at no additional cost to them.
>
> As we discussed the key to being successful in this is a partnership between me and your department. Please let me know who would be best to connect with to help grow your Flock network.
>
> Also, I mentioned that Ohio just announced a new security grant that will **provide funds for eligible security improvements to houses of worship and non-profit organizations. They must apply for the grant by November 3rd.**
>
> Read more about it here: State of Ohio Security Grant (OSG)
>
> I would love to help connect with the Houses of worship in your area that you think could benefit from this grant. Please send over names of the organization and any contact information you may have.

(figure 35)

171.    Flock is a State actor because there is no standard or law that require FLOCK to take on government officials' duties, FLOCK does everything on its own volition because of the support of the State.

172.    Flock is a State actor because There is no marketing standard that states that private companies should use Government buildings instead of private buildings to host private events, FLOCK does this on its own volition because of the support of the State.

173.     Flock is a State actor because through multiple of their FLOCK employees and by

looking at their emails such as Myron, FLOCK asks the Government to write references or

help with FLOCK projects for them for leverage against any competitors, as the Government

has vouched for the Product, and all the while the Government supports the private parties'

actions. (figure 36)(Exhibit DD)

Good Afternoon,

Hope all is well with you! I wanted to reach out and see if you would be comfortable writing a
reference letter for Flock Safety based on your success with the system.

I will be meeting with personnel at the state level in a week and am hoping to unlock new
avenues for future grant funding specific to LPR. As a part of the discussion, I would like to
be able to provide references that speak to the great success that has been seen with Flock
across the state so far.

If you can assist me with this brief letter on your agency letterhead, I would greatly appreciate
it!

Thank you and be safe,

Myron

**Myron Maret**
Sr. Customer Success Manager



404.631.6599 | myron@flocksafety.com

(Figure 36)

174.     Flock is a State actor because the above is a request for a Reference Letter by FLOCK

which is written by the State on its letterhead, to then give to another agency of the State to

help get additional grants for cities to help get FLOCK devices. Asking for reference letter

from the government is not part of any government product lease agreement.

53

**Subject:**  Flock Safety | Success Storyboard
**Date:**  Tuesday, June 20, 2023 3:25:57 PM
**Attachments:**  Westlake_OH_PD.pdf

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Good Afternoon,

Hope all is well with you. I am currently assisting with a project to create success storyboards from agencies that used ARPA funds for Flock.

To assist the State in realizing the investigative successes from this funding, we are putting together storyboards of the most impactful cases made by your agency to send to Director Wilson and Asst. Director Huey at the Department of Public Safety. See the attached sample from Westlake PD.

I would be happy to create the storyboard for your agency - can you send me descriptions of your 4-5 success stories that you feel demonstrate the value of this program? (redacted photos would also help paint the picture of how the technology is used!)

Thank you for your assistance!

Myron Maret
**Senior Customer Success Manager**

(figure 37)(Exhibit EE)

175.  Flock is a State actor because FLOCK, in one of many of their FLOCK employees emails, is requesting the State to help vouch to another agency of the State, its own FLOCK product. (figure 37)

176.  Myron has sent these emails to most State customers of FLOCK in Ohio.

177.  Flock is a State actor because FLOCK constantly asks the State to assist in their projects, even though it's irrelevant to the Contract of leasing a camera, so because the State signed a contract; FLOCK now asks them to help with marketing and spreading awareness of their products even though FLOCK has its own marketing and sales team. (figure 38)(Exhibit FF)

54

I need your help with a project here at Flock we are working on. We are working on a data project to understand how often departments are using Flock to assist in clearing cases. Here are ways other departments are tracking that success.

- Require a check box in their RMS if Flock was used.
- Require it be written in the narrative so that it can be queried at a later time
- Utilize a spreadsheet that they keep of Flock successes.
- Power users of Flock are tracking it directly in Flock through their insights dashboard.

*Would you mind sharing the data you are collecting with me and our team?*

How can you help?

To better understand how Flock is impacting your work in the field, we are asking our partnering agencies to provide:

1. The number of cases cleared by arrest where Flock contributed: This can be sorted by UCR crime type or total arrests. We only need the Flock-associated arrest numbers.
2. The time period for these arrest numbers: We need at least 3 months worth of data.
3. Source Material: We'd like a report or export of the reference material where you have been tracking these metrics. This will give us a better understanding of the methods and tools you are using to measure success.

Below are some more details on why we are wanting these details as well as a couple of document links you can use to track this data if needed. I appreciate your time and consideration in providing this data to me.

(Figure 38)

178.   Flock is a State actor because FLOCK , in multiple of their FLOCK employees emails, requests the State to hold private events at government buildings with Lunch paid, write reference letters, have elected officials adopt city policies it writes for its devices, write PR/social media statements for Police, considers the Relationship between the State and FLOCK as a "Partnership" because FLOCK can change the relationship on a whim.

179.   Under the section of **Relationship** within the Government Contract, it states**."** No agency, partnership, joint venture, or employment is created as a result of this Agreement and Agency does not have any authority of any kind to bind Flock in any respect whatsoever."

180.   Nowhere under Relationships does it state that FLOCK **doesn't have** the authority to bind the Agency as an "agency, partnership, joint venture, or employment."

181.    FLOCK recognizes that the relationship between the State and FLOCK is more than a

Product Contract.

182.    Flock is a State actor because FLOCK gets unauthorized benefits from the Government

Agency Contract.

183.    Flock is a State actor because Anything other than providing ALPR devices and

maintained to such devices and typical support is not part of the contract with the State.

184.    Flock is a State actor because The State helps with FLOCK's requests and supports their

actions because in turn, FLOCK offers valuable data to law enforcement.

185.    Flock is a State actor because FLOCK refers the scope of the Relationship directly to the

State agency within its emails as a "Partnership" and also going future by asking the agency

to write reference letters, which is only seen in a employment relationship.

186.    The Agency, per contract, can't bind FLOCK to any special relationship, but FLOCK can

and have through these requests and actions with the State as mentioned in different parts of

this Complaint.

187.    Flock is a State actor because In short, FLOCK has a crony relationship with the State,

which isn't seen in a typical contract relationship because no private company that only in

the business of leasing cameras would care about a reference letter or having events at

government buildings, write policies.

188.    Flock is a State actor because FLOCK Safety is not simply executing the contract,

everything done by FLOCK is outside the texts of the contract because nobody has

questioned this practice.

189.    The Supreme Court in West v. Atkins, 487 U.S. 42 (1988) stated that a private entity can

be considered a state actor when it exercises power 'possessed by virtue of state law and

made possible only because the wrongdoer is clothed with the authority of state law."

190.    The influence of this crony state relationship with FLOCK SAFETY of using agencies of

the State of Ohio as marketing salespeople is even evident in a particular article by ABC;

because at the bottom, it states (figure 39)(exhibit GG)

Franklin Township trustee John Fleshman said he's seen these cameras in action and
encouraged their use statewide.

"There is a huge benefit," Fleshman said.

> " I've been out with police when they've gotten a text that a vehicle
> they were looking for is in our area and passed by one of our cameras.
> The bad guy doesn't hear the scanner. They have no idea that we are
> onto them. We can pick the time and place that we want to end it."

Gilbert said the cameras are also being used at some apartment complexes across Central Ohio.

"There's an apartment complex close to here, Havenwood, where we have had multiple
shootings and some homicides," he said. "Franklin Township worked with the property owner
there to get this technology. This technology is also going to be looked at in the Wedgewood
area where there's been a lot of problems."

(figure 39)

191.    Flock is a State actor because Back on September 27th, 2023, FLOCK held a Metro Area

Law Enforcement event, with Lunch paid for at the Toledo Police Department because the

State allowed it.

192.    Flock is a State actor because  On November 28th, 2023, FLOCK also held one of these "

Metro Area Law Enforcement " events in Upper Arlington because the State allowed it

193.    FLOCK pays for the lunches for the events held at these Police Departments.

57

194.     Flock is a State actor because FLOCK is taking on rolls that typically would not be possible in any other business relationship and exerts a level of influence that is seen only from state officials.

195.     Police are not party planners nor any marketing agents.

196.     Unlike other companies, Flock Safety leases, rather than sells, its devices, necessitating an ongoing financial commitment from its clients such as the State in this instance.

197.     Flock is a State actor because additionally, Flock Safety provided  as of December 20th 2023 its camera and software to law enforcement agencies free of charge under a 5-year Memorandum of Understanding (MOU).

198.     The Supreme Court in Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922 (1982) held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment.'

199.     Flock is a State actor because FLOCK can exert this level of influence compared to a typical security camera company or similar ALPR devices like Verkada from of their integration with NCIC and local law enforcement databases.

200.      Flock is a State actor because FLOCK also has a Partnership with the International Chief of Police; a 30-thousand-member group made up of law enforcement.

201.      Flock is a State actor because FLOCK, has a pervasive influence and inner connections within the governmental structure of Ohio and is able to bind the agency to whatever Relationship it feels like conducting with the State, Partnership, employment etc because FLOCK needs the government influence to market its product.

202.    Flock is a State actor because The extent of FLOCK's influence is such that its camera has become indispensable to various state agencies, including the Attorney General's office, due to the critical data it provides. FLOCK understands this by giving free access and/or leasing cameras to the State.

203.    Flock is a State actor because This relationship between FLOCK and the State is not merely transactional but extends to shaping public statements and policies of these agencies, which is seen in agency, employment and partnership relationships.

204.    Flock is a State actor because FLOCK's involvement in law enforcement activities, such as hosting events at police stations to target HOAs with the support of the Police.

205.    FLOCK also uses Eventbrite to allow people to reserve tickets to these events at the Police Stations.

206.    These tactics are not done by marketing team at FLOCK, but rather are done by multiple sales reps which the upper leadership, such as the CEO knows about.

207.    Even though FLOCK states it's an ALPR company, its more nuanced than FLOCK states to the Public because FLOCK is also integrated itself with every aspect of Police operations such as Dispatch, text messaging and even collaborations with the FBI to integrate NCIC.

208.    Unlike other private companies in law enforcement, FLOCK has partnerships with NCIC, FBI, AXON, and IACP, which boasts a membership of 30,000 law enforcement personnel, and FLOCK, giving awards out to law enforcement as recognition for using FLOCK devices, further solidify its position within the law enforcement community.

209.    This unique relationship, unparalleled by any other company operating in the ALPR space, is akin to that of a detective within a squad.

210.    Flock is a State actor because FLOCK SAFETY with their relationship with the State, understands that patrol officers will respond to a FLOCK alert with a high intensity as the patrol officer gets emailed, text messaged and notified through the dispatch software and especially considering the company's partnerships with the Attorney General of Ohio, the Ohio Highway Patrol, and the other facts above thus owe the Plaintiff a higher degree of care to make sure all the information released by the Camera is accurate.

211.    The incident on February 25, 2023, where FLOCK dispatched police to the Plaintiff's location based on its alerts and notifications, taking advantage of it's close relationship with the State of Ohio.

212.    The data within the alert, the alert provided to the Police Agency, originates from FLOCK as the alert comes from a email with a flocksafety.com domain.

213.    This data is stored on FLOCK's servers, making it FLOCK's information.

214.    Flock is a State actor because The MOU that FLOCK signs with non-customers refers to all data as "FLOCKS." Because it is FLOCK's.

215.    This situation is analogous to a scenario where a third-party contractor, engaged and remunerated by a local government, captures an image of a vehicle. Upon identifying a match from the contractor's independent, unverified list, the contractor communicates this information to the police via their communication channels. Under the auspices of a local government contract, the contractor has publicized through various means, such as pamphlets, that their services contribute to crime prevention. Consequently, the local government takes the contractor's alerts seriously and acts upon them. In this instance, based solely on the contractor's alert, the local government stops the motorist. However, the alert turns out to be false and defamatory.

60

216.    The Camera in question was leased by the Government

217.    The information in the FLOCK system transmitted to the State of Ohio, such as Jackson township police, was defamatory because it was not true.

218.    Without the integrations, FLOCK would not have notified and dispatched police otherwise because FLOCK wouldn't have that access.

219.    FLOCK owns the data it gathers, the cameras, the solar panel, the operating system, because of that, the Defendants exercised dominion or control wrongfully over the property, the data of the Plaintiff without permission. The Plaintiff owns his data, never gave permission to Flock to sell access to his data without compensation.

220.    FLOCK Safety made false and defamatory statements about the Plaintiff, which were unprivileged and published to a third party, Jackson Township.

221.    FLOCK was negligent, at the very least, in publishing these statements, because since any information they send is being relayed to Police.

222.    The statements were actionable irrespective of particular harm or if the publication caused special harm, as per Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc. 81 Ohio App.3d 591, 601 (1992).

223.    In Ohio, the Supreme Court held that 'a statement, in whatever form, that tends to injure a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business, is defamatory.' (Am. Chem. Soc. v. Leadscope, Inc.,133 Ohio St.3d 366, 2012-Ohio-4193). Because private individuals characteristically have less effective opportunities for rebuttal than public officials and public figures, they are more vulnerable to injury from defamation. Because they have not voluntarily exposed themselves to increased risk of injury from defamatory falsehoods, they are also more

deserving of recovery. The state interest in compensating *324 injury to the reputation of private individuals is therefore greater than for public officials and public figures. Pp. 3008—3010. Gertz v. Robert Welch, Inc., 418 U.S. 323, 323 – 24, 94 S. Ct. 2997, 2999, 41 L. Ed. 2d 789 (1974)

224.    The defamatory information issued by the FLOCK camera shows a lack of safeguards preventing such data dissemination.

225.    There has never been a "case number" in any court system with the words "CLEVELAND PD/ FBI CASE." This defect was a substantial factor in causing the Plaintiff's harm.

226.    When the cameras left FLOCK, as they were built and manufactured by FLOCK Safety, they lacked proper guardrails built within the camera to prevent defamatory data from being sent by the Camera.

227.    At the time of the injuries to the Plaintiff, there had not been a substantial change to the FLOCK camera as initially designed and manufactured;

228.    FLOCK permitted invalid data entry into the camera's hardware without verification through NCIC and law enforcement databases.
FLOCK has the ability to verify data through NCIC, as the camera already alerts police officers if a license plate is associated with a missing person or warrant, as seen in the pamphlets provided to every FLOCK Falcon customer (Figure 40)(see Exhibit HH) and an alert itself from NCIC . (figure 14) (Exhibit J)

229.    FLOCK doesn't verify all information released by its cameras from trusted law enforcement databases such as NCIC

230.    The false data disseminated by the ALPR camera and the subsequent detainment of the

Plaintiff caused serious harm to the Plaintiff's reputation.

231.    This lack of verification of all information spit out by FLOCK's cameras, resulting in

arrests, the defendant negligently designed the defective device for their gain.



SOFTWARE USER INTERFACE

Included at no additional cost with unlimited user licenses. Receive alerts to help detect crime and search
footage to access evidence — with any internet-connected device (based on user credentials that are easily
managed/approved by admin).

**Detect Crime**

- Connected to the NCIC Hot List & CJIS compliant
- State detection to ensure quality alerts
- Hotlist alerts (includes privately owned cameras in your jurisdiction)
- Create custom alerts for tags under investigation with your organization
- Filter notifications by reason codes (exclude sex offenders, include stolen plates, etc.)
- Email and SMS alerts to users
- Audible and visual alerts

(figure 40)(see exhibit HH)

**K.     Legal Duty/ Design Defect/Nonconformance with Representation**

232.    FLOCK had a duty to design their camera against reasonably foreseeable hazards;

FLOCK SAFETY didn't here because it would ruin the intentions of allowing Police in

starting pseudo investigations without going through the courts.

233.    FLOCK declares that "Flock Safety is a public safety operating system." FLOCK

acknowledges a unique duty of care distinct from other Automated License Plate Recognition

(ALPR) camera companies because FLOCK's deliberate engagement with law enforcement

63

through integration with the National Crime Information Center (NCIC) and the Federal Bureau of Investigation (FBI) and marketing the product that's geared towards "Public safety" and not marketing it as "It's just a camera that takes pictures" which is what FLOCK has attempted to paint it as when being held to account for their faulty products, which is disingenuous when compared to technical specifications of the devices.

234.    FLOCK never ensured the veracity of the alert and its data being released by its cameras before its dissemination to third party because it would ruin the intentions of allowing law enforcement of starting pseudo investigations without going through the courts.

235.    FLOCK camera lacked any safeguards from distributing defamatory information, which has not undergone any form of validation in the Repository Layer and UI Layer because of design decisions by FLOCK.

236.    The conspicuous lack of data validation mechanisms within FLOCK's cameras in the Repository Layer and UI Layer by running all data through NCIC highlights the breach of the duty they had owed to the Plaintiff, ensuring that FLOCK does not disseminate information that is categorically false and defamatory to law enforcement.

237.    FLOCK failed to implement even basic data validation in the Repository Layer and UI Layer by running all data through NCIC before disseminating by the camera because it would ruin the intentions of allowing law enforcement of starting pseudo investigations/ tracking people without going through the courts, if the data in the hot list is scrutinized to only allow individuals with existing cases that are already in NCIC, again, law enforcement would no longer be able track people and detain innocent people without a warrant or probable cause like what happened to the Plaintiff. It's not a bug, it's a feature.

238.    Due to this breach of duty, the Plaintiff has suffered non-economic damages, emotional

distress, and damage to his reputation.

239.    All camera units by FLOCK Safety as of February 25th left the manufacturer with the

same flaw in the Repository Layer and UI Layer

240.    FLOCK misrepresented the product to the public, including to the Plaintiff (exhibit

II)(figure 39)

*Flock Safety is a public safety operating system that helps communities and law*
*enforcement in 2000+ cities work together to eliminate crime, protect privacy, and mitigate*
*bias. We build devices that capture objective evidence and use machine learning to create*
*and deliver unbiased investigative leads to law enforcement. Our proprietary devices and*
*cloud-based software reduce crime by +70%. Flock Safety serves 2000 cities in 42+ states*
*and is helping solve hundreds of crimes every day.*

(exhibit II)(figure 39)

L.    **How the data was invalid**

241.    Case numbers lack linguistic structure, typically comprising alphanumeric sequences

devoid of sentence-like formations like pictured in the alert in figure 13.

242.    FLOCK has familiarity with the characteristic features of a legitimate case number

because FLOCK are heavily involved with courts and law enforcement operations. Flock

Safety, possessing knowledge or reasonably expected to possess knowledge commensurate

with the prevailing standard of care within its professional capacity, failed to have discerned

the falsity of the data contained in the alert by even scrutinizing the case number because if

FLOCK scrutinized the data in the alerts it would ruin the ability of allowing law

enforcement of starting pseudo investigations without going through the courts.

243.    Applicable to both manufacturing and design defects, this standard now states that a product may be proven to be defective if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Leichtamer v. American Motors Corp. (1981), 67 Ohio St.2d 456, 21 O.O. 3d 285, 424 N.E.2d 568, paragraph two of the syllabus; Knitz v. Minster Machine Co. (1982), 69 Ohio St.2d 460, 23 O.O. 3d 403, 432 N.E.2d 814, syllabus; Cremeans v. International Harvester Co. (1983), 6 Ohio St.3d 232, 6 OBR 302, 452 N.E.2d 1281, syllabus. This standard "* * * recognizes the legitimacy of one of the fundamental values in the law of torts: `the protection of the individuality of persons, by according to formal respect for their fairly developed expectations of product safety * * *.' [Citation omitted.]" Leichtamer, supra, at 467, 21 O.O. 3d at 292, 424 N.E.2d at 577

244.    This design decision for lack of data validation within the camera runs contrary to "de facto "industry standards/ specifications, formulas, or performance, which FLOCK states on its website. (figure 40)(Exhibit JJ), the evidence shows.





(figure 40)(exhibit JJ)

245.     The same "**de facto standard**" OWASP [5] cheat sheets that FLOCK site speaks about,

mentions input validation as

*Goals of Input Validation*

*Input validation is performed to ensure only properly formed data is entering the workflow in an*

*information system, preventing malformed data from persisting in the database and triggering*

*malfunction of various downstream components. Input validation should happen as early as*

*possible in the data flow, preferably as soon as the data is received from the external party.*

*Data from all potentially untrusted sources should be subject to input validation, including not*

*only Internet-facing web clients but also backend feeds over extranets, from suppliers, partners,*

*vendors or regulators, each of which may be compromised on their own and start sending*

*malformed data.*

246.     FLOCK's public assertions to the Plaintiff of adhering to best practices starkly contrast

with its lack of OWASP input validation and proper data validation in its camera within its

Repository Layer and UI Layer by running all the information through NCIC.

247.     Not allowing false and full blown sentences in the case number field to be distributed by

the camera is an alternative design without compromising the camera's utility. "availability of

a technically feasible alternative," namely, a metal inlet ring. See Aldridge, 2006-Ohio-4964

at ¶ 50, 2006 WL 2716696 (recognizing that to defeat summary judgment on a defective

---

[5] "Input Validation Cheat Sheet

." OWASP® Foundation,
https://cheatsheetseries.owasp.org/cheatsheets/Input_Validation_Cheat_Sheet.html Accessed
November 9, 2023.

design claim, the Plaintiff must present evidence of a "technically feasible alternative design"). Ace Am. Ins. Co. v. Gerling & Assocs., Inc., 630 F. Supp. 3d 919, 929 (S.D. Ohio 2022)

248.   FLOCK's camera falls short of industry standards, such as those set by the Open Worldwide Application Security Project (OWASP) and the Security Cheat Sheet Series projects, particularly for input/data validation. This defect existed when the product left the manufacturer's control, which currently affects FLOCK.

249.   The tangible 'product' refers to the FLOCK camera, and the 'defect' pertains to the design flaw that causes the camera to function unintentionally. In this case, the defect is the complete absence of validation for information within the camera, released by the camera, the camera is tangible because it's a physical object.

250.   The product is defective as it poses more significant danger than an ordinary consumer would anticipate when used in an intended or reasonably foreseeable manner [Ohio Rev. Code Ann. § 2307.71 et seq.].

251.   Ohio is not a state that requires a contract between the seller and the buyer before he is able to sue under product liability.

252.   FLOCK as a manufacture failed to provide a product that is not defective or unreasonably dangerous because if they did take proper precautions, those precautions would ruin the ability of allowing law enforcement of starting pseudo investigations without going through the courts.

253.   The lack of validation of the information released by the camera has led to unpredictable interactions with law enforcement with the Plaintiff.

254.   FLOCK does not verify the information through NCIC before disclosing it to the police.

255.   A practical and technically feasible alternative design for the camera that would have prevented harm to Plaintiff without diminishing the product's usefulness to businesses or law enforcement is the simple implementation of proper data validation by the camera because it would have shown that there was never any investigation into the Plaintiff as the case number isn't even valid.

256.   The Plaintiff was never at fault at any point in time as he used the product as intended. This design defect directly resulted in the injury to Plaintiff.

257.   The product was more dangerous than an ordinary consumer would anticipate, and FLOCK failed to design their product, the camera, against reasonably foreseeable hazards (invalid data in their alert and its data being released by its camera's). The defect in FLOCK Safety's ALPR camera, which releases false and defamatory information on behalf of FLOCK, meets this standard, especially for a company partnered with NCIC.

258.   The product deviated from its intended design during production, because FLOCK alerts and the data being released by its cameras were not designed to distribute unsubstantiated information on behalf of FLOCK.

259.   However, due to the lack of safeguards and inherent design flaws, this has occurred because FLOCK camera alerted the police using this erroneous, unverified alert, and its data, which resulted in the detainment of the Plaintiff.

260.   The data validation issue with the ALPR camera could have been discovered by reasonable inspection or tests before the product was sold through a proper Q.A. test but because it was a willful decision and it would increase development costs, FLOCK choose not to test for invalid information or develop proper safeguards to prevent such incidents.

69

261.   The information from the Alert is from FLOCK, not from an agency or non-agency, FLOCK is distributing this information.

262.    FLOCK alerted the police with the data via their one-way number/email and app.

263.   FLOCK disseminates this information, minus any validation, on their own volition to any FLOCK customer, without any external pressure.

264.   FLOCK hid these material facts from the Plaintiff about the potential of the camera sending out wrong and defamatory alerts and that access to his data is being sold through a subscription because FLOCK needs motorists to use their products to contribute data to the system to make the overall product worth the asking price to future customers.

265.   FLOCK has unlawfully enriched itself by selling access to citizens information, such as the Plaintiff by not telling the users such as the Plaintiff about the subscription access to negotiate a cut from the subscriptions because then FLOCK would have increased expenses which would be detrimental to FLOCK's growth as a Startup.

266.   FLOCK knew that if it told users that it was selling access to the data, motorists such as the Plaintiff would not use the product.

267.   FLOCK had no agreement or business contract with the Plaintiff that gave permission to use the Plaintiff's information without compensation because FLOCK would have been turned down.

268.   [E]vidence of unsafe, unexpected product performance is sufficient to infer the existence of a product defect' under the first prong of the consumer-expectation standard." Id. (quoting State Farm Fire Cas. v. Chrysler Corp., 37 Ohio St.3d 1, 523 N.E.2d 489, 494-95 (Ohio 1988)). "[T]he determination of whether a product is more dangerous than an ordinary person would expect is generally a question of fact which does not require expert

70

1    testimony." Id. (quoting Fisher v. Ford Motor Co., 13 F.Supp.2d 631, 638 n. 10 (N.D.Ohio

2    1998)). Tompkin v. Philip Morris USA, Inc., 362 F.3d 882 (6th Cir. 2004)

3    269.    Defendant publicly represented to Plaintiff multiple times that the product was of a

4    certain quality and would perform in a certain way. (figure 41)(Exhibit KK) (figure

5

6    42))(exhibit LL)

7

8

9
        With Flock Safety, the answers are straightforward and have been consistent since our founding in 2017.

10      · We collect the objective evidence police need to solve crime, which includes license plates and vehicle
          information. We do not utilize facial recognition technology, mitigating any implicit or explicit bias in

11        the Flock Safety operating system.

12      · The data is fully owned by our customers. Only authorized users can access the system and every
          search requires a search reason, which is collected in a publicly available audit. No unauthorized users,

13        including Flock Safety employees, have access to the footage. We never share or sell the data, and all
          the data is encrypted using AES-256 encryption with a secure cloud server.

14      · By default, all data is automatically deleted every 30 days on a rolling basis. Meaning, if you want to
          find footage from 31 days ago, you can't because it's been permanently deleted. The only exception to

15        our data retention policy is if a democratically elected governing body or official has clearly defined a
          license plate reader data retention policy or law and made it publicly available. We always comply with

16        local laws and regulations.

17

18   (figure 41)(exhibit KK)

19

20

21   **How does Flock Safety protect citizen privacy?**          ︿

22   Flock Safety has strict measures in place to protect resident privacy.

     Flock Safety believes that we can successfully reduce crime while protecting
23   and preserving privacy. Here are a few of the ways we have ethically-
     engineered our suite of products to ensure privacy protection:

24
     •  We store all data for only 30 days (or in adherence with local laws).
25      Customers own all of their data — Flock will never share or sell data with
        third parties. The customer is the only one to determine who has access
26      to the footage.

27                                                            (figure 42)(exhibit LL)

28

                                        71

270. This representation to the Plaintiff was false, as the product did not conform to the represented quality or performance standards.

271. FLOCK has a license for all the information it obtains to redistribute because FLOCK owns all of it.

272. According to Managers who are hired by Flock, FLOCK sells API access to anyone who pays FLOCK to access the treasure trove of data.

273. The Plaintiff relied on Defendant's public representations because he decided to utilize their product by allowing it to take a picture of his car which he didn't realize is being sold through a subscription.

274. As Plaintiff consciously drove past a FLOCK camera, FLOCK captured an image of Plaintiff's vehicle, thereby indicating Plaintiff's knowing use of FLOCK's product feature.

275. The Plaintiff could have chosen an alternate route but had his vehicle photographed by FLOCK's camera without charge, because a result of the product's deviation from its public representation, Plaintiff has suffered damages, including economic and non-economic harm and loss of millions in monetary commissions from FLOCK using his data and likeness for commercial purposes without permission by selling access to the API to access his information.

M.    **Failure to Warn the Public**

276. FLOCK Safety, as the manufacturer, was cognizant of the fact that FLOCK alert and the data being released by its cameras are inaccurate and may result in one's detainment.

277.     FLOCK Safety failed to provide a comprehensive warning outlining the inherent risks or

hazards faced by each motorist in the vicinity of a FLOCK Camera, including the potential

for being surrounded by multiple police officers without cause.

278.     Defendant failed to warn users and/or incidental users.

279.     FLOCK failed to provide information that Defendant possessed and which Defendant

should have known was necessary to make use of the camera safe for users, bystanders

and/or incidental users and Such a warning by the Defendant would have allowed the user to

use the camera safely.

280.     FLOCK also failed to include any disclaimer or warning to users to the receiving end of

the alerts, law enforcements in this case to warn them that the Alerts are not itself Probable

cause.

281.     FLOCK includes a legal disclaimer on the FLOCK website that states "Disclaimer:

Custom hot lists alone should never be used as probable cause." This disclaimer is not visible

when an officer gets an alert on his phone or email .(Figure 43)(Exhibit MM)



(figure 43)

282.    The above disclaimer is not on the alerts itself, and from the lack of disclaimer on the Alert to officers who received the alert, this resulted in injury to the Plaintiff.

283.    FLOCK failed to provide warnings on the Alert stating that it can't be used as probable cause, the same Disclaimer on its website, FLOCK also failed to warn users, bystanders and/or incidental users that the Camera may distribute false and unverified information if the user drives by it.

284.    These lack of warnings and disclaimers helped caused the injury to the Plaintiff because the Police who received the alert never got notice that the alert should never be used for Probable Cause like stated on the website or that the alert may be inaccurate or to the Plaintiff because he never got warning that the camera may distribute wrong information.

285.    The Plaintiff had no expectation that the Camera would have malfunctioned and send an alert that connected him to a nonexistent investigation, which no agency ever conducted against the Plaintiff according to every public record request available, Jackson Township, Cleveland Police, FBI, BCI, as there was no warning on the camera stating there is the possibility of wrong information about the Plaintiff.

286.    FLOCK Safety provides legal guidance to its customers about how its devices should be used.

287.    Nowhere on government agency contract, terms and conditions, privacy policy nor the legal policy indicates that any information on the site doesn't constitute legal advice for users like the Agencies who have access to these disclaimers because FLOCK wants to tell the Police without limitations, proper guidance, like a government agency would.

288.    When users see the disclaimer, given the context, it is legal advice to whoever reads it because there is no warnings stating that it is not legal advice.

74

289.    FLOCK even offers legal services for the camera data, such as court testimony for its customers by contacting legal@flocksafety.com, so because FLOCK offers legal services to its customers for its devices, its customers take the disclaimer as legal advice since FLOCK already offers such services and plus all the other actions FLOCK partakes with the Government, like policy writing etc and to be noted, FLOCK doesn't ever state that it's not legal advice and also, its not normal for a private company to be talking about probable cause to the Police because as a camera company, they doesn't have to worry about Probable cause, only law enforcement worries about that, so if a private company is talking about Law enforcement subjects, law enforcement, and the reader like the Plaintiff will take it as legal advice especially if there is no disclaimers stating otherwise plus with the other actions of FLOCK with the State.

290.    FLOCK Safety was aware of potential misuse of the product when it provides free legal advice to the State of what constitutes probable cause.

291.    The Disclaimer isn't a warning of injury but rather informs the user , which is law enforcement in this matter, of subject matter that doesn't pertain to FLOCK SAFETY

292.    The existence of the Disclaimer shows that FLOCK SAFETY is aware of police acting on the alerts it sends.

293.    Such a disclaimer was concealed on the alerts itself because FLOCK want's the law enforcement to act on the alerts without second guessing to use as marketing..

294.    FLOCK Safety's knowledge of probable cause to have a disclaimer about it show the expected standard of care which should have been used when designing the camera but wasn't when the Alert was never verified and was inaccurate.

295. FLOCK knew, by posting the disclaimer that enforcement actions typically follow receipt of their alerts because FLOCK sends the alerts under the terms of the government contract.

296. FLOCK never had safeguards to make sure the information isn't false which is crucial because given law enforcement's reliance on information provided by FLOCK Safety.

297. To establish a claim for failure to warn or warn adequately, it must be proven that the manufacturer knew or should have known, in the exercise of ordinary care, the risk or hazard about which it failed to warn Crislip v. TCH Liquidating Co., 52 Ohio St. 3d 251, 257, 556 N.E.2d 1177, 1182 (1990).

298. FLOCK never took the precautions that a reasonable person would take in presenting the product to the public, nor had proper warnings or additional disclaimers on the alert to state that the alert does not constitute probable cause.

299. FLOCK Safety failed to warn users, such as the Plaintiff, of its product regarding the inherent risk of detainment because of the company's lack of adequate safeguards for verifying data disseminated to law enforcement and other third parties.

300. FLOCK neglected to disclose to the Plaintiff and the public the latent danger of FLOCK's false data leading to a motorist's detainment from the acts of its own camera, because of such omission, it resulted in the Plaintiff's unwarranted detention.

301. FLOCK Safety's failure to affix an adequate warning on each camera to warn the Plaintiff and the public breached its duty to the Plaintiff in this case, also because of the failure of any Disclaimer within the Alert to tell Law enforcement to not pull over based on the alert.

76

302.     The absence of explicit alerts cautioning users such as Plaintiff and readers of the Alert

(Police) about the potential risks linked to FLOCK's ability to disseminate inaccurate data

violates the duty of care and fails to meet industry standards.

303.     FLOCK Safety's awareness of its product's inherent defectiveness and/or its product

misuse by one disclaimer on its Website near the hot list section but failed to incorporate any

safeguards to prevent defamatory data from being released by the Camera.

304.     The company, cognizant of this potential harm, failed to implement necessary

precautions or issue cautionary notifications for motorists passing by the cameras.

305.     FLOCK Safety with their experience knew about the defect and yet failed to take

reasonable steps to warn users such as the Plaintiff or correct the issue.

306.     FLOCK Safety's never provided explicit warnings on their cameras with their knowledge

of the product's defectiveness through disclaimers on the website to certain users.

307.     FLOCK Safety's awareness of the potential risks and their failure to incorporate adequate

warnings or corrective measures constitutes a breach of their duty because they knew with

their experience that the Camera may distribute false information without proper safeguards.

308.     The omission to caution users such as the Plaintiff about the potential harm arising from

inaccurate data dissemination makes the product unsafe because it will result in unknown

interactions with law enforcement.

309.     There was a lack of due diligence on the part of FLOCK Safety.

310.     This failure to warn users such as the Plaintiff, especially in the context of the known

risks associated with their product, and because of this failure it forms a solid foundation for

holding FLOCK accountable for the Plaintiff's harm.

311.    FLOCK fraudulently concealed the product defectiveness, the disclaimers from the police which harmed the Plaintiff, the fact that FLOCK sells API access to the Plaintiff's data on February 25th 2023 at 4:33am at Fulton Rd in Canton.

### N.    How the incident unfolded/ severe emotional distress

312.    At approximately 04:33 AM on February 25th, 2023, a FLOCK camera positioned on South Blvd N.W in Canton, Ohio (see Figure 44), sent a false alert about the Plaintiff through FLOCK servers.  The accompanying image illustrates the camera's specific location.

313.    FLOCK Safety, promptly notified the local law enforcement with the false information.

314.    FLOCK Safety disseminated misleading and damaging data to the dispatch, including details about the Plaintiff's private life.

315.    FLOCK never gave an opportunity allowing Plaintiff to contest the accuracy of the disseminated information before the ensuing deprivation.

316.    Illustrated below, no warnings are visible anywhere, nor is there any notice of any detainment or that anyone can access his information through an API.

317.    Private life matters such as the Plaintiff's full name, D.O.B and linking the Plaintiff's name and likeness to imaginary but non-charged investigations, none of the fictional investigations, because even if they were true, were never anyone concern other than the

78

Plaintiff and should never have been shared with anybody until the Plaintiff was charged.



(figure 44)

318.    The Plaintiff was never identified as a person of interest or a potential suspect in any active investigation, because his record was clear of any warrants or violations in both LEADS and NCIC, which FLOCK has integrations with.

319.    The Plaintiff was unlawfully detained due to FLOCK Safety's alert to the police because the alert was sent under the Government Agency terms between FLOCK and the Department.

320.    FLOCK Safety's made a decision to disseminate their wrong and defamatory data about the Plaintiff to result in his detainment, because FLOCK enjoys having success stories which it can use as marketing.

321.     Defendant intended their conduct to cause severe emotional distress or acted with recklessness because they knew emotional distress would result from their failure to verify the information before disclosing it to the police and/or that unlawful detainments result in emotional distress.

322.     Plaintiff cites Restatement (Second) of Torts § 652E (1977), Restatement (Second) of Torts § 652B (1977), and Restatement (Second) of Torts § 35 (1965) in support of this claim. The Plaintiff also cites Yeager v. Local Union 20, 6 Ohio St. 3. 369, 1983-Ohio-35 as authority for the proposition that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.

323.     The Plaintiff was placed in fear of physical harm by being unjustly surrounded by armed officers without cause due to FLOCK's actions. The Plaintiff cites Heiner v. Moretuzzo, 73 Ohio St. 3d 80, 86 (1995) and King v. Bogner, 88 Ohio App.3d 564, 569, 624 N.E.2d 364 (Ohio Ct. App.1993) in support of this claim. The Plaintiff also cites Doe v. SexSearch.com, 502 F. Supp. 2d 719, 730 (N.D. Ohio 2007), aff'd, 551 F.3d 412 (6th Cir. 2008) as authority for the proposition that a plaintiff may only bring a claim for negligent infliction of emotional distress where "the plaintiff is cognizant of real physical danger to himself or another."

324.     The State's encouraged the private parties' actions because through the integration of FLOCK Safety with the city's dispatch , text messaging, and app notifications to law enforcement and the State allowing FLOCK to use government buildings for private parties, non-government purposes, the State allowing FLOCK to help shape PR statements for Police and the State allowing FLOCK to help shape city policies as well.

325. The systematic reporting of false and defamatory information to the police, resulting in unlawful traffic stop harmed the Plaintiff.

326. There is no discernible point during these incidents where FLOCK Safety operated as a private entity distinct from its role as a contracted state actor because FLOCK was operating under the state contract alongside with their close relationship with the state by partaking in state actions that are only seen by government officials, such as helping draft policies etc.

327. FLOCK's integration with law enforcement operations, mainly through the NCIC and dispatch because FLOCK entwines its business activities with police functions. The data reflecting an 184.962% increase in 'high priority' traffic stops with dispositions of 'Completed' since FLOCK's installation in April 2021 underscores the correlation between FLOCK's alerts and police actions. (figure 45)

328. This high rise in traffic stops is only possible because of the close relationship fostered with the State, as mentioned in paragraphs throughout the complaint.

81



(figure 45)

329.    FLOCK Safety directed the police by the alert to apprehend a private citizen without any proven misconduct.

330.    The defendant's invasive publication of a citizen's life, despite the citizen's innocence, calls for punitive damages amounting to $30,000,000. This serves as a deterrent, signaling that such behavior is unacceptable in our society.

331.    As established in Baab v. A.M.R. Servs. Corp., 811 F. Supp. 1246, 1269 (ND Ohio 1993), the crux of liability lies in whether the defendant's conduct in the given situation reaches a level of outrageousness that warrants recovery. To establish a prima facie case of Intentional Infliction of Emotional Distress (IIED), the Plaintiff must demonstrate emotional distress that is both severe and debilitating, as per Paugh v. Hanks, 6 Ohio St. 3d 72 (1983).

332.    Defendant, as per Hayward, 759 F.3d 601, 619 (6th Cir. 2014), either intended to cause

emotional distress or should have known that their actions would result in severe emotional

distress to the Plaintiff.

333.    Flock Safety's camera is fundamentally flawed due to its lack of proper input and data

validation—standards that FLOCK openly acknowledges on its website.

334.    This deviation from industry standards indicates a departure from the intended design

during production.

### O.    Conclusion/ Concealment and Unjust Enrichment

335.    The Cameras was never designed to distribute false and unsubstantiated information.

336.    FLOCK Safety used Plaintiff's likeness, name, and birthdate to disseminate defamatory

information to third parties, including local law enforcement. This action directly led to the

Plaintiff's unlawful detention.

337.    The notification to the police, facilitated by FLOCK, caused severe emotional distress to

the Plaintiff—such distress, arising from FLOCK's actions.

338.    These actions warrants due compensation under the law. FLOCK, as a provider of public

safety technology, has a duty to the public—a task further emphasized by its integration with

the National Crime Information Center (NCIC).

339.    FLOCK Safety, like any other person, is responsible for ensuring the accuracy of the

information reported to law enforcement, a standard expected of any citizen reporting a crime

to 911.

340.    FLOCK's failed to meet this low standard because they failed to implement any

safeguards of preventing the release of false information.

341.    With the implementation of NCIC, FLOCK has a heightened responsibility to guarantee the accuracy of information provided to law enforcement.

342.    Any other citizen would be held to similar standards when reporting a crime to 911 because it's a crime to falsely call the Police for no reason with nothing to substantiate the call.

343.    FLOCK neglected their responsibility, resulting in the camera's distribution of false and defamatory information because a camera cannot get arrested, thus more, not less, due care should be taken when designing a product mostly used by law enforcement or to dispatch law enforcement.

344.    This is a failure in product design. Because there were readily available design alternatives which would not have affected the products usefulness.

345.    The defendant publicized the particular facts through its distribution and access in its API as FLOCK SAFETY could have retracted it before any damages occurred because the technology exists.

346.    Had the camera been designed with proper data validation—industry standards that FLOCK is aware of—the distribution of false and defamatory information leading to Plaintiff's unlawful detention would have been averted.

347.    Automatic License Plate Reader (ALPR) camera with proper input/data validation, would not have facilitated the dissemination of inaccurate information, sparing individuals from such harm. The FLOCK, with the lack of data validation in its camera, shown a reckless disregard as to the falsity of the publicized matter and the false light in which it placed the Plaintiff.

348.    The Plaintiff has never entered a contract with FLOCK nor gave permission to FLOCK to sell access to his information.

349.    The Plaintiff did not have knowledge of the specific risk involved or voluntarily accept it. Because Plaintiff was not aware of the product's defects, or the danger posed, and thus could not have assumed the risk before driving by a camera.

350.    The Plaintiff never voluntarily relinquished a known right, claim, or privilege because he never had a business relationship with FLOCK.

351.    There was no express or implied conduct by the Plaintiff that would constitute a waiver.

352.    There was no action or inaction by the Plaintiff that would mislead the defendant.

353.    There was no unreasonable delay in bringing the claim that prejudiced the defendant. Because the Plaintiff filed the claim within the applicable statute of limitations.

354.    The Plaintiff did not enter into any agreement to release the defendant from liability. Because If a release was signed, it was not executed with full knowledge of its implications, or that it was signed under duress, fraud, or undue influence.

355.    The Plaintiff has done due diligence in trying to uncover the facts over 10 months that the Defendant concealed from the Public and the Plaintiff through dozens of public record requests.

356.    The Defendants took the Plaintiff's property (information and data) and was deprived of the monetary value of the property because the Defendants sold access to it without permission from the Plaintiff.

357.    The Plaintiff never abandoned his property to warrant the Defendant taking his information and selling access to it without restitution.

358.    FLOCK frequently conceals material facts from the Plaintiff and their customers on how FLOCK uses license plate reader data it gathers, by selling access to it by its API and concealed from the Plaintiff on February 25th 2023 at 4:33am that the Camera will redistribute false information on behalf of FLOCK. FLOCK also concealed a critical disclaimer stating that the alert is not probable cause within every alert it disseminates as FLOCK has a legal disclaimer on its website, but its absent on the alert which concealing material facts from the Police resulted in injury to the Plaintiff as well.

359.    The Plaintiff provided a picture of his license plate, plus other identifying details of his vehicle for noncommercial purposes and not to be stored in any database because that is how FLOCK markets its product, that the data is not sold, *but not that* access to the data isn't sold which it is.

360.    FLOCK accepted the Plaintiffs data because they stored it in their database indefinitely to be used nationwide and behind a million dollar paywall for government agencies.

361.    The Defendants failed to compensate him over the years that they used his data for commercial purposes and stored defamatory information about him. This is beyond the scope any purpose of what the Plaintiff intended for his data to be used because he relied on FLOCK marketing to make an informed decision before using their product but FLOCK concealed material facts from the Plaintiff through its deceptive marketing by not detailing that FLOCK sells access to the database containing the Plaintiff's information through its API.

362.    It is unfair to the Plaintiff to not be compensated by a portion of the hundreds of millions in profits earned by FLOCK because of the unauthorized use of the Plaintiff's information within its systems, plus the other claims levied within the complaint.

363.   With FLOCK's heavy involvemenet with Law Enforcement and the close relationship with the State, FLOCK had a duty to disclose material facts about their products to users such as the Plaintiff, such as that the Plaintiff's data is stored in a database which FLOCK sells access to third parties because if they actually disclosed such details and not concealed it on February 25th 2023 at 4:33am to the Plaintiff, the Plaintiff wouldn't have driven by the FLOCK product and consented to FLOCK using the Plaintiff's data for, what was believed at the time, non-commercial purposes, the concealment deceived the Plaintiff and the lack of important information such as access to his data being sold convinced the Plaintiff to pursue a transaction with the Defendant, simple data exchange, no monies was exchanged because it was believed that the Data was going to be used for noncommercial purposes, but the true facts were concealed from the Plaintiff months later after diligent fact finding.

364.   FLOCK knew that they were selling access to its API, which in turn was selling access to the Plaintiff data and information, because the emails show (figure 3) that FLOCK is selling access for a million dollars to Government agencies, so when FLOCK made statements that they don't sell data, its misleading and leaving out material facts of which people like the Plaintiff relied on before using the product and because absent of those material facts, the Plaintiff suffered financial and reputational injuries because of the reliance he had on FLOCK representations which he thought were accurate. The Supreme Court of Ohio has held that "a vendor has a duty to disclose material facts which are latent, not readily observable or discoverable through a purchaser's reasonable inspection." *Layman v. Binns*, 35 Ohio St. 3d 176, 178, 519 N.E.2d 642, 644 (1988).

365.   FLOCK and its employees kept critical material facts away from the Public condoned by as high up as the heads of Customer Success and Product Marketing to the Sales members.

## V.      CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

366.     Plaintiff incorporates by reference paragraph 1-365 of this Complaint as if fully set forth herein.

367.     As a direct and proximate result of Defendant negligence and failure to exercise (reasonable) or (ordinary) care by not retracting the defamatory statements before the police arrived. Plaintiff was caused and/or in the future will be caused to suffer  severe emotional distress, financial or economic loss, including, but not limited to,  lost income, reputational and other damages.

### COUNT II

### STRICT LIABILITY – DESIGN DEFECT (ORC §2307.75, et seq.)

368.     Plaintiff incorporates by reference paragraphs 1-368 of this Complaint as if fully set forth herein.

369.     The FLOCK camera product was not reasonably safe for its intended use and was defective as a matter of law with respect to its design.

370.     As a direct and proximate result of the FLOCK camera aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer  severe emotional distress, financial or economic loss, including, but not limited to,  lost income, reputational  and other damages.

88

371.    Defendant are strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

372.    Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including costs and all such other relief as the Court may deem proper.

**COUNT III**

**STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT (ORC §2307.74, et seq.)**

373.    Plaintiff incorporate by reference paragraphs 1 - 373 of this Complaint as if fully set forth herein.

374.    The FLOCK camera product used by the Plaintiff was not reasonably safe for its intended use and was defective as a matter of law with respect to its manufacture.

375.    As a direct and proximate result of the FLOCK camera aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to, lost income, reputational and other damages.

376.    Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including and all such other relief as the Court may deem proper.

89

## COUNT IV

### STRICT LIABILITY – FAILURE TO WARN (ORC §2307.76, et seq.)

377.    Plaintiff incorporates by reference paragraphs 1- 377 of this Complaint as if fully set forth herein.

378.    The FLOCK camera product  was not reasonably safe for its intended use and was defective as a matter of law due to its lack of appropriate necessary warnings.

379.    As a direct and proximate result of the FLOCK camera aforementioned defects, Plaintiff was caused and/or in the future will be caused to suffer severe emotional distress, financial or economic loss, including, but not limited to,  lost income, reputational  and other damages.

380.    The Plaintiff never expected that his information will be sold per the Ohio Driver's privacy protection and US Drivers Privacy Protection Act nor was he warned.

381.    Wherefore, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including and all such other relief as the Court may deem proper.

## COUNT V

### Strict Product Liability: Defect Due to Nonconformance with Representation (ORC §2307.77, et seq.)

382.    Plaintiff incorporates by reference paragraph 1- 382 of this Complaint as if fully set forth herein.

383.    Defendant expected and intended the FLOCK camera product to reach users and/or incidental users such as Plaintiff in the condition in which the product was sold.

384.    Defendant represented to the public and the Plaintiff that the FLOCK camera  was safe and reasonably and justifiably relied upon Defendant representations that the product was safe for use reading license plates and the data outputted was not defamatory/ slanderous and would conform to Defendant representations regarding the character and quality of the FLOCK camera for use.

385.    As a direct and proximate result of Defendant's representations about the FLOCK camera Plaintiff suffered injuries and damages as summarized herein

386.    WHEREFORE, Plaintiff demands judgment against the Defendant for compensatory, treble and punitive damages, including costs , and all such other relief as the Court may deem proper.

**COUNT VI**

**LIBEL PER SE**

387.    PLAINTIFF incorporates by reference and realleges Paragraph 1 through 387, as if set forth in full herein.

388.    Defendant have defamed MICHAEL by publishing the ALERT and the false and misleading statements about MICHAEL contained therein, including the statements alleged in Paragraphs 53 – 80. These statements about MICHAEL are false, misleading, and libelous, both explicitly and by implication.

389.    Defendant published the statements with knowledge of their falsity or reckless disregard of their falsity. Among other things, Defendant obtaining a license and publishing fabrication of a non existent crime regarding MICHAEL demonstrates their knowledge that these

statements were untrue. In addition, these statements were published with the intent of harming MICHAEL reputation and career, and thus published with malice, both in law and in fact.

390.    Defendant statements constitute libel per se, for which MICHAEL is entitled to recover presumed damages for injury. Defendant statements also constitute libel per quod. As a result of all of these false statements, MICHAEL has suffered, and will continue to suffer, injury in fact, including loss of good will and injury to his reputation.

391.    The publication of the ALERT damaged MICHAEL's reputation, will continue to harm his reputation, and will continue to impact MICHAEL's appeal as an UBER/ gig work driver.

392.    Finally, as described above, FLOCK's unfounded statements and fabricated allegations demonstrate that Defendant acted deliberately, purposefully, and without regard for the truth. Defendant acted with malice and the intent to harm MICHAEL's reputation and with knowledge that their accusations were false. Moreover,  Defendant disregard for publication of false statement and/or reckless disregard for the truth renders punitive damages appropriate in this action.


## COUNT VII

## FALSE LIGHT INVASION OF PRIVACY

393.    MICHAEL incorporates by reference and realleges Paragraph 1 through 393, as if set forth in full herein.

394.    Defendant intended to and did publish the ALERT regarding MICHAEL that included non existent crimes MICHAEL was wanted for

395.    MICHAEL, like any reasonable person, was highly offended by being labeled a

92

suspect in any human trafficking investigation. Any association with and/or attribution of

responsibility of any human trafficking of a child is deeply offensive to any reasonable person.

396.    Defendant conducted no independent investigation as to the truth of the assertion

that MICHAEL was a suspect of any human trafficking investigation

397.    Defendant knowledge of the falsity of their statements is highlighted by the fact

that Defendant never had safeguards to verify such information. Defendant

included in the ALERT both fake and real information by MICHAEL to convince third parties

that the false information attributed to MICHAEL were real.

398.    FLOCK had no authorization to sell access to the Plaintiff's data nor had permission.

399.    Defendant acted without regard to the false light in which the ALERT would place

MICHAEL. Defendant also acted without regard to the likelihood such false statements would

lead to unlawful detainment to MICHAEL.


**COUNT VIII.**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

400.    MICHAEL incorporates by reference and realleges Paragraph 1 through 400, as if

set forth in full herein.

401.    Defendant intended to cause MICHAEL severe and serious emotional distress.

through, among other things, their publication of false statements of fact and their efforts to elicit

unlawful detainment against MICHAEL.

402.    Alternatively, Defendant knew or should have known that their actions would result

in MICHAEL's severe and serious emotional distress by, among other things, impacting his

reputation amongst his audience and potential employers and eliciting detainment against MICHAEL in response to their false and defamatory statements.

403.   Defendant conduct, including the publication of false statements and the fabrication of made up crimes that purport to show MICHAEL as a human trafficker MICHAEL, is extreme and outrageous, and is beyond all possible bounds of decency. Such conduct is so atrocious that it is utterly intolerable in a civilized society.

404.   Defendant conduct is the proximate cause of MICHAEL's emotional distress. MICHAEL did not suffer from emotional distress before learning of Defendant false and defamatory statements

405.   No reasonable person could be expected to endure the distress that MICHAEL has suffered since learning of Defendant false statements about him and the resulting detainment.

## Count IX.

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

406.   MICHAEL incorporates by reference and realleges Paragraph 1 through 406, as if set forth in full herein.

407.   Defendant negligently caused MICHAEL severe emotional distress by publishing false statements of fact regarding MICHAEL's purported involvement in human trafficking. Defendant knew or should have known such false statements would cause severe emotional distress to MICHAEL.

408.   Defendant knew or should have known that the ALERT's false statements would result in detainment against MICHAEL.

94

409.    Defendant false statements of fact regarding MICHAEL resulted in an unlawful

    detainment

410.    Defendant conduct is the proximate cause of MICHAEL's severe emotional

distress. MICHAEL did not suffer from emotional distress before learning of Defendant false

and defamatory statements.

## COUNT X

## COMMON-LAW MISAPPROPRIATION OF

## MICHAEL'S NAME AND LIKENESS

411.    MICHAEL incorporates by reference and realleges Paragraph 1 through 411, as if

set forth in full herein.

412.    Defendant have misappropriated MICHAEL's name and likeness in the ALERT

for commercial and non-commercial purposes.

413.    Defendant have misappropriated MICHAEL's name in the ALERT, thereby

associating MICHAEL with the false statements of fact contained in the ALERT.

414.    Defendant have misappropriated numerous photos reflecting MICHAEL's

likeness in the ALERT, thereby associating MICHAEL with the false statements of fact

contained  in the ALERT.

415.    MICHAEL did not consent to Defendant use of his name or likeness, especially with

    Ohio Driver's privacy protection and US Drivers Privacy Protection Act.

416.    Defendant used MICHAEL's name and likeness in connection with a product in the API.

95

## COUNT XI

### Defamation Per Se

417.    MICHAEL incorporates by reference and realleges Paragraph 1 through 417, as if set forth in full herein.

418.    Defendant FLOCK knew the above-reference statement was false or acted with reckless indifference to the truth when it published the statement.

419.    The defamatory statements of Defendant FLOCK Safety and chargeable to the remaining
        defendant constitutes defamation per se because it accused the Plaintiff of conduct
        incompatible with
the Plaintiff's business, trade, position, or office.

420.    As a result of the defamatory statements, the Plaintiff has suffered damages within the jurisdictional limits of the Court.

## COUNT XII

### Defamation Per Quod

421.    The allegations in Paragraph one through Paragraph 421 are realleged and incorporated herein.

422.    The defamatory statement of Defendant FLOCK constitutes defamation per quod based
        on extrinsic facts proving the existence of actual/special damages to the Plaintiff's reputation
        and business.

**COUNT XV**

**42 U.S.C. § 1983 –Unconstitutional and Unreasonable seizure in violation of the Fourth**

**Amendment (As to defendant FLOCK SAFETY )**

423.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if

fully set forth herein.

42 U.S.C. § 1983 provides that:

424.    Every person, who under color of any statute, ordinance, regulation, custom or usage of

any state or territory or the District of Columbia subjects or causes to be subjected any citizen

of the United States or other person within the jurisdiction thereof to the deprivation of any

rights, privileges or immunities secured by the constitution and law shall be liable to the

party injured in an action at law, suit in equity, or other appropriate proceeding for redress . .

425.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the

people to be secure in their persons, house, papers, and effects, against unreasonable searches

and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized."

426.    FLOCK SAFETY acted under the color of the law because with the close relationship it

has with the State.

427.    In view of all the circumstances surrounding the foregoing incident on February 25th

2023,  a reasonable person would have believed Michael Smith was not free to leave from his

encounter with law enforcement after FLOCK reported false information to the police under

their contract.

428.     Defendant FLOCK , deprived MICHAEL of clearly established rights secured to him under the United States Constitution— specifically the Fourth Amendment rights to be free from unreasonable search and seizures against one's person by working alongside the state and reporting false information which resulted in Michael's detainment

429.     Defendant FLOCK  failed to take any action to prevent harm to MICHAEL's rights which resulted in a constitutionally-actionable injury. Defendant FLOCK are liable for such constitutionally-actionable injuries.

430.     FLOCK had a reasonable opportunity to alert the police of the erroneous information in order to prevent or mitigate injury to MICHAEL, FLOCK SAFETY chose not to.

431.     Any reasonable private company  would have known that the reporting false information to the police ,which they have a contract will result in the motorists detainment.

432.     Defendant' conduct also resulted in psychological injury to MICHAEL. Since his seizure, MICHAEL has experienced emotional and psychological injuries, including mental anguish, anxiety, emotional distress, loss of enjoyment of life, and other non-pecuniary losses. Due to these injuries from the seizure, MICHAEL still suffers of heighten anxiety.

433.     MICHAEL is further entitled to costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

434.     In depriving MICHAEL of his rights under the United States Constitution, Defendant FLOCK  acted under color of  the law which can be established by their contract with the state.

435.     This deprivation under color of law is actionable and may be redressed by 42 U.S.C. § 1983.

98

436. The Defendant accused Plaintiff of heinous criminal activity knowing those accusations to be without probable cause, and FLOCK SAFETY made statements to police officers with the intent of exerting influence to institute and continue the investigatory proceedings.

437. Statements of the Defendant regarding Plaintiff's alleged culpability were made with knowledge that said statements were false . In so doing, the Defendant reported false allegations to get the Plaintiff stopped.

438. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others and the truth.

439. Due to the injuries suffered by MICHAEL, he is entitled to compensatory, economic,non economic and consequential damages, in amounts to be determined at trial against each Defendant. As a further result of Defendant' unlawful conduct, MICHAEL is entitled to recover punitive damages against the individual defendant.

## COUNT XVI

**42 U.S.C. § 1983 –Fifth and Fourteenth Amendments(As to defendant FLOCK SAFETY )**

440. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

42 U.S.C. § 1983 provides that:

441. Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . .

442.    The Defendant's actions violated the Plaintiff's right to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution. The Defendant, acting under color of state law, deprived the Plaintiff of his liberty based on false information, without a fair process to challenge the accuracy of that information before the deprivation occurred [Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985)].

## COUNT XVII

### Unjust Enrichment

443.    Plaintiff incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

444.    Plaintiff conferred benefits on Defendant in the form of pictures and data gathered by the Defendant's defective Product.

445.    Defendant voluntarily accepted and retained this benefit but then sold access to the Data without knowledge by the Plaintiff.

446.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for access to the Plaintiff's data, it would be unjust and inequitable for Defendant to retain the benefit without paying the Plaintiff for access to his information.

447.    Defendant received benefits in the form of revenues from purchases of the Subscriptions to the detriment of Plaintiff, products that were not actually what they were not represented on FLOCK's own website and were not safe and that access to the Plaintiff data was being sold contrary to what FLOCK was representation to the Public,

448.    Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the data/camera subscriptions through its customers. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to the Plaintiff, because he would have not used the Products had he known the true facts.

449.    Because Defendant's retention of the non-gratuitous benefits conferred on them by customers to access the Plaintiff's data, Defendant must pay restitution to the Plaintiff for its unjust enrichment, as ordered by the Court.

## COUNT XVIII

### Fraudulent Concealment

450.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

451.    Defendant had a duty to disclose material facts to Plaintiff given he was the intended users of the Products. Defendant also had a duty to disclose material facts to Plaintiff namely that it was in fact manufacturing, distributing, and selling, products that will defame and get one detained because of FLOCK's integration with police and that the Product is being used to gather data about the Plaintiff to then be sold via API as because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

452.    Defendant possessed knowledge of these material facts as they knew they were selling access to the Plaintiff's data and information through an API/ subscription and that the camera may result in one's detainment by the disclaimer on FLOCK's website which is legal guidance.

453.    During this time, Plaintiff was using the Product without knowing his data was being sold without his consent and that he may be detained unlawfully because of FLOCK camera.

454.    Defendant failed to discharge its duty to disclose these materials facts.

455.    In so failing to disclose these material facts to Plaintiff, Defendant intended to hide from Plaintiff that it was selling the Plaintiff data through an API subscription and that the camera will distribute false information which will result in one's detainment. The Plaintiff relied on Defendant's failure to disclose insofar as he would not have used the defective Products manufactured and sold by Defendant had he known that the Camera will send out defamatory information and that the Defendants are actually selling access to his data without permission.

456.    As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff, suffered damages in the amount of estimated lost profits from not earning a cut of each subscription and trauma caused because of the defamation and detainment.

457.    As a result of Defendant's willful and malicious conduct, punitive damages are warranted.


**COUNT XIX**

**CONVERSION**


458.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

459.    Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications. Personal information is their property. In

Ohio, a tort claim for common law conversion is one that alleges the defendant xercised

dominion or control wrongfully over the property of another, in denial of or under a claim

inconsistent with their rights." DeNune v. Consol. Capital of N. Am., Inc., 288 F. Supp. 2d

844, 853–54 (N.D. Ohio 2003) (citing Ohio Telephone Equipment & Sales, Inc. v. Hadler

Realty Co., 24 Ohio App. 3d 91, 93, 493 N.E. 2d 289 (10th Dist. 1985))

460.    Defendants unlawfully collected, used, and exercised dominion and control over the

Plaintiff's personal and private information without authorization.

461.    Defendants wrongfully exercised control over Plaintiffs' information and have not

returned it.

462.    Plaintiff have been damaged because of Defendants' unlawful conversion of his property.

\

**VI. Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order and judgment

granting the following relief to remedy the substantial, persistent harm conducted by the FLOCK

GROUP organization since February 25th 2023.

a. Declare that defendant' acts, omissions, and conduct constitute violations of the Fourth

Amendment/ Fifth and Fourthteenth to the United States Constitution, as well as of 42 U.S.C. §

1983.

b. A Preliminary and Permanently injunction from FLOCK allowing the Plaintiff's name/plate/

location appearing in commercially available API by FLOCK.

c. An award of actual and/or compensatory damages, including but not limited to damages for mental anguish, lost wages, profits, emotional distress, humiliation, embarrassment, and inconvenience that MICHAEL has suffered and is reasonably certain to suffer; against the defendant to be exactly determined at trial but no less than $18,250,000 that will fully and fairly compensate MICHAEL to make him whole and reimburse for lost profits by FLOCK commercializing his data without permission. Based on an the cost of a typical agency entire yearly subscription of $50,000, but per day

d.  An award of punitive damages and exemplary damages  no less than $30,000,000 dollars in total this will serve to adequately punish and deter the acts and omission alleged in this complaint. Such acts that were clearly intentional, malicious, egregious, callous and a reckless disregard of MICHAEL's constitutional rights and reputation and lost business profits. In any normal circumstance, the Plaintiff would have allowed the Defendant to sell his data with permission and a cut of profits but since they went ahead and did it anyways without asking, it requires a strong message.

e.  Punitive damages are recoverable in sec. 1983 suit where defendant conduct is motivated by an evil motive or intent, or where it involves reckless or callous indifference to MICHAEL's federally protected rights." Smith v. Wade, 461 U.S. 30, 50 −51(1983); Clark v. Taylor, 710 F.2d 4, 14(1st Cir. 1983)

f.  Presumed Damages against the Defendant of no less than $18,250,000 dollars  . Based on an the cost of a typical agency entire yearly subscription of $50,000, but per day.

g.  Nominal damages against the Defendant of no less than $18,250,000 dollars  . Based on an the cost of a typical agency entire yearly subscription of $50,000, but per day.

104

h.  An award of costs and court costs of this action pursuant to 42 U.S.C. § 1988 allowed under FRCP 54(d)(1)

i. Require the Defendant to have a big visible banner on the top of its website informing users that it sells access to their license plate number and give those users a way to delete their information from FLOCK services and prevent the camera from collecting their information any longer because they have opted out of the service.

j. Require the Defendant to email a copy of the most recent complaint in this lawsuit to all customers informing them that they sell access to license plate data and personal information.

k.  Award pre- and post-judgment interest at the highest lawful rate;

l.  All such other relief to which MICHAEL is entitled and/or this Court deems equitable.

### JURY DEMAND

*Plaintiff requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.*

*Dated this January 25, 2024*

*Respectfully submitted*

*Pro Se*

*Michael Smith*

*1225 Skyline Dr Apt 105*

Orrville *Ohio 44667*

**VERIFICATION**

Michael Smith, hereby affirms and certifies that:

1. I am the Plaintiff in this proceeding. I am duly authorized to make this verification and am acquainted with the facts in this matter.

2. I have read the annexed verified complaint, know the contents thereof, and state that the same are true to my knowledge, except for those matters alleged to be upon information and belief, and as to those matters, I believe them to be true.

Dated: 01/25/2024

*Pro Se*

*Michael Smith*

*1225 Skyline Dr Apt 105*

Orrville *Ohio 44667*